UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
NOLITA CARIDAD LORQUET,                    :        08 CIV 2787 (DLC)

              Plaintiff,                    :

LOEHMANN'S DEPARTMENT STORE           :

              Defendant.               :
--------------------------------------------------------X

## MEMORANDUM OF LAW OF
## LOEHMANN'S INC. IN SUPPORT OF MOTION TO DISMISS

### PRELIMINARY STATEMENT

Defendant Loehmann's Inc., improperly named as Loehmann's Department Store
("Loehmann's" or the "Company"), respectfully submits this memorandum in support of its
motion: a) to dismiss the complaint of *pro se* plaintiff Nolita Caridad Lorquet ("Nolita" or
"Plaintiff") pursuant to: (i) Rule 12(b)(1) of the Federal Rules of Civil Procedure ("FRCP") for
lack of subject matter jurisdiction, and (ii) Rule 12(b)(6) of the FRCP for failure to state a claim
upon which relief can be granted and for untimeliness.

The complaint, which purports to assert a claim under Title VII of the Civil Rights Act
for gender discrimination, should be dismissed due to the untimely filing of Plaintiff's charge of
discrimination with the Equal Employment Opportunity Commission ("EEOC"). As will be
demonstrated, timely filing of charge of discrimination with the EEOC is a threshold requirement
that must be satisfied by Plaintiff prior to filing a lawsuit under Title VII. Plaintiff did not file
her charge of discrimination with the EEOC within 180 days of the alleged discriminatory
conduct.

The complaint in this action alleges that the alleged discriminatory acts occurred during the one month, "August-September 2003" during which Plaintiff was employed by Loehmann's. Plaintiff, however, did not file a notice of charge of discrimination with the EEOC until November 30, 2007, over four (4) years after her employment with, and alleged discriminatory acts of, Loehmann's ended, which charge was filed well beyond the 180 day requirement for filing an EEOC charge. Notably, the EEOC dismissed the charge as untimely. As Plaintiff has failed to satisfy the timing requirement for filing an EEOC charge, this Court should likewise dismiss the complaint, as it is time barred, the Court lacks jurisdiction over the Title VII claim, and the claim cannot properly be stated.

## THE ALLEGATIONS IN THE COMPLAINT[1]

The complaint alleges, in conclusory manner, that Loehmann's, a department store, employed Plaintiff in New York, New York, in August-September 2003 and that the discriminatory acts occurred in "August-September 2003" (Compl. p. 3, § II.B).[2] The sum and substance of the complaint is as follows: "I was moved around from place to place in the store until I was asked to be a salesperson on the first floor. A few hours later, that position was offered to a man and I was told to go 'handle gloves.' There was no such thing in the store as glove handling and I was forced out." (Compl. p. 3, § II.E).

---

[1]    The Court is respectfully referred to the accompanying affirmation of Sharon H. Stern, Esq. with the following attachments: The complaint to which is attached the EEOC notice of dismissal of Plaintiff's charge of discrimination (Exh. 1), and the EEOC notice of charge of discrimination (Exh. 2).

[2]    Plaintiff alleges in the complaint that her employment with Loehmann's commenced in "August 2003" (Compl., p. 3 § II.3), and that the discriminatory acts occurred between "August-September 2003" (Compl. p. 3, § II.B). Plaintiff states in her request for *in forma pauperis* treatment that her last employment was in "August-September 2003." (*In forma Pauperis* application, p 1, § 2), which is contemporaneous with the alleged dates of discrimination by Loehmann's. Thus, pursuant to the complaint and papers filed with the complaint, both Plaintiff's employment with Loehmann's and the alleged discrimination occurred in August-September 2003.

In the complaint, Plaintiff audaciously requests the following relief: "**I wish to receive hundreds of thousands of dollars hoping that nobody will tell me to go handle gloves in the future.**" (emphasis added). (Compl. p. 4, § IV).

The complaint alleges that in November 2007, over four (4) years (and over 1460 days) after Plaintiff's employment and the alleged discrimination ended, Plaintiff filed a charge of gender discrimination with the EEOC ("EEOC Charge"). (Compl. p. 3, § III.A; November 30, 2007 EEOC Charge, Stern Aff. Exh. 2).

Plaintiff alleges that in February 2008, the EEOC issued Plaintiff a "Dismissal and Notice of Rights" letter stating that it was closing the file on the matter because plaintiff's "charge was not timely filed with the EEOC; in other words [she] waited too long after the date(s) of the alleged discrimination to file [her] charge." (the "EEOC Dismissal").

The EEOC Dismissal also advised Plaintiff that she had the right to file a lawsuit within 90 days of her receipt of the EEOC Dismissal. In March 2008, Plaintiff filed the instant suit. (Compl. p. 4, § III B).

As will be demonstrated, under these circumstances, the complaint must be dismissed because the EEOC Charge Plaintiff filed was untimely. Under Title VII, a charge of discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice.[3] Here, the EEOC Charge was filed over 1460 days after the occurrence of the alleged unlawful employment practice. Thus, the procedural prerequisites for bringing a claim under VII have not been satisfied, requiring that the complaint be dismissed.

---

[3]    Although Plaintiff's complaint fails on procedural and jurisdictional grounds, Loehmann's denies any allegation that it, or anyone working on its behalf, has engaged in any discriminatory conduct.

## ARGUMENT

## THE COMPLAINT SHOULD BE DISMISSED BECAUSE
## PLAINTIFF DID NOT TIMELY FILE A CHARGE WITH THE EEOC

Title VII prohibits a complainant from filing a civil action unless she has first timely brought a charge alleging unlawful discrimination with the EEOC. 42 U.S.C. § 2000e-5(b), (f); Butts v. City of New York, 990 F.2d 1397, 1401 (2d Cir. 1993).[4]

Title VII requires that an aggrieved party file an administrative charge with the EEOC within 180 days of the alleged unlawful employment action. 42 U.S.C. § 2000e-5(e) (1); Occidental Life Ins. Co. v. EEOC, 432 U.S. 355, 359 (1977); Boggle-Assegai v. State of Connecticut, 470 F. 3d 498 (2d Cir. 2006); McPherson v. New York City Department of Education, 457 F. 3d 211 (2d Cir. 2006) ("Under Title VII…, a plaintiff can sue in federal court only after filing timely charges with the EEOC"). That period may be extended to 300 days if the complainant can satisfy the following two requirements: (i) the alleged unlawful employment practice arose in a state or locality that has a fair employment practices agency with authority to grant or seek relief; and (ii) the person bringing the charge has initially instituted proceedings with such state or local agency. See 42 U.S.C. § 2000e-5(e)(1); EEOC v. Commercial Office Products Company, 486 U.S. 107, 110 (1988) ("If a complainant initially institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days); Ford v. Bernard Fineson Development Center, 81 F.3d 304, 307 (2d Cir. 1996) ("Title VII contains an additional requirement, not found in the ADEA, that must be met before the 180-day period is extended to

---

[4]    All decisions cited in this memo are included in an accompanying appendix that is being provided to the *pro se* Plaintiff and to the Court.

300 days: the person bringing the charge must 'initially institute proceedings with the state agency").

The timeliness requirement of Title VII is analogous to a statute of limitations. Bhaduri v. Summit Sec. Servs., 2008 U.S. App. LEXIS 8576 (2d Cir. N.Y. Apr. 21, 2008). It is meant to "put the adversary on notice to defend within a specified period" and to promote "the right to be free of stale claims." United States v. Kubrick, 444 U.S. 111, 117, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979).

If the EEOC charge is not timely filed, the complainant cannot bring suit under Title VII. Boggle-Assegai v. State of Connecticut, supra; McPherson v. New York City Department of Education, supra; Hogans v. Dell Magazines, 2008 U.S. Dist LEXIS 20898, 07 Civ. 7721 (DLC) (S.D.N.Y. 2008) (Cote, J.); Betancourt v. City of New York HRA, 2007 U.S. Dist LEXIS 74934, 07 Civ. 2165 (DLC) (S.D.N.Y. 2007) (Cote, J.); Gibson v. New York City Police Department, 1998 Dist Lexis 9246, 97 Civ. 4021 (DLC) (S.D.N.Y.1998) (Cote, J.).

Here, the alleged violation occurred in New York City and State, each of which has a fair employment practices agency empowered to seek relief with respect to the violations alleged. However, Plaintiff did not initially institute proceedings with either the state agency or the local agency. Therefore, by operation of the express dictates of Title VII, Plaintiff was required to file her charge with the EEOC within 180 days of the date on which the alleged unlawful employment practice occurred.

Plaintiff clearly did not satisfy this requirement as she filed her charge of discrimination in November 2007, over 1460 days (or 4 years) after the alleged "August -September 2003" acts

5

## CONCLUSION

For the reasons set forth above, it is respectfully submitted that Loehmann's motion should be, in all respects, granted together with such other and further relief as the Court deems just and proper.[6]

Dated: New York, New York
      May 8, 2008

                    TROUTMAN SANDERS LLP

                    By: _____
                        Sharon H. Stern (SS-3788)
                        405 Lexington Avenue
                        New York, New York 10174
                        (212) 704-6000
                        *Attorneys for Defendant*
                        *Loehmann's, Inc.*

To:    Nolita Caridad Lorquet, *pro se*
       1281 Eastern Parkway, #5C
       Brooklyn, New York 11213

---

[6]  Plaintiff is appearing *pro se*. However, *pro se* status does not excuse procedural mistakes or untimeliness. See, e.g., Anderson v. Osh Kosh B'Gosh, 2006 U.S. App. LEXIS 9155 at *10, n.4 (11th Cir. Apr. 12, 2006) cert. denied, 2006 U.S. LEXIS 6288 (Oct. 2, 2006) ("a [party's] *pro se* status in civil litigation generally will not excuse mistakes he makes regarding procedural rules."). (citing McNeil v. United States, 508 U.S. 106, 113, 113 S.Ct. 1980, 1984, 124 L. Ed. 2d 21 (1993) (explaining that we "never [had] suggested that procedural rules in ordinary civil litigation shall be interpreted so as to excuse mistakes by those who proceed without counsel"); see also Parks v. City of Carrollton, 2005 U.S. App. LEXIS 19917 at *12 (11th Cir. Sept. 14, 2005) ("*pro se* litigants, while entitled to liberal construction of their pleadings, are required to conform to procedural rules."); Hogans v. Dell Magazines, supra (dismissing complaint of *pro se* litigant based upon untimeliness of filing of the EEOC charge); Betancourt v. City of New York HRA, (dismissing complaint of *pro se* litigant based upon untimeliness of filing of the EEOC charge).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

NOLITA CARIDAD LORQUET,                    :        08 CIV 2787 (DLC)

     Plaintiff,                 :        **AFFIDAVIT OF SERVICE**

LOEHMANN'S DEPARTMENT STORE               :

     Defendant.                 :
------------------------------------------------------------X

STATE OF NEW YORK  )
         ) ss.:
COUNTY OF NEW YORK  )

  I, LAURIE RODRIGUEZ, a legal secretary employed by Troutman Sanders LLP, being duly

sworn, state:

  I am not a party to the within action; I am over eighteen (18) years of age; and I reside in Hazlet

Township, New Jersey.

  On May 8, 2008, I served a copy of a **Memorandum of Law of Loehmann's Inc. In**

**Support of Motion to Dismiss**, by depositing a true copy of the same, enclosed in a postage paid

wrapper, via regular mail, in an official depository under the exclusive care and custody of the

U.S. Postal Service within New York State, and by depositing a true copy of same enclosed in a

wrapper, via overnight mail under the exclusive care and custody of the FedEx, addressed to the

following person at the last known address set forth below:

  To:  Ms. Nolita Caridad Lorquet
     1281 Eastern Parkway, #5C
     Brooklyn, New York 11213

              _____
              Laurie Rodriguez

Sworn to before me this
8th day of May, 2008

*Christina M. West-Russo*

CHRISTINA M. WEST-RUSSO
Notary Public, State of New York
No. 01WE6133842
Qualified in Suffolk County
Commission Expires Sept. 19, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NOLITA CARIDAD LORQUET,                    :         08 CIV 2787 (DLC)

                Plaintiff,            :

LOEHMANN'S DEPARTMENT STORE        :

                Defendant.            :
------------------------------------------------------------X


## APPENDIX OF CASES CITED IN DEFENDANT LOEHMANN'S INC. MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT


TROUTMAN SANDERS LLP

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 704-6000
*Attorneys for Defendant*

## Index of Cases

1.  Betancourt v. City of New York HRA, 2007 U.S. Dist LEXIS 74934, 07 Civ. 2165 (DLC)
    (S.D.N.Y. 2007) (Cote, J.)

2.  Bhaduri v. Summit Sec. Servs., 2008 U.S. App. LEXIS 8576 (2d Cir. N.Y. Apr. 21,
    2008)

3.  Boggle-Assegai v. State of Connecticut, 470 F. 3d 498 (2d Cir. 2006)

4.  Butts v. City of New York, 990 F.2d 1397, 1401 (2d Cir. 1993)

5.  EEOC v. Commercial Office Products Company, 486 U.S. 107, 110 (1988)

6.  Ford v. Bernard Fineson Development Center, 81 F.3d 304, 307 (2d Cir. 1996)

7.  Gibson v. New York City Police Department, 1998 Dist Lexis 9246, 97 Civ. 4021 (DLC)
    (S.D.N.Y.1998) (Cote, J.).

8.  Hogans v. Dell Magazines, 2008 U.S. Dist LEXIS 20898, 07 Civ. 7721 (DLC) (S.D.N.Y.
    2008) (Cote, J.)

9.  McPherson v. New York City Department of Education, 457 F. 3d 211 ( 2d Cir. 2006)

10. Occidental Life Ins. Co. v. EEOC, 432 U.S. 355, 359 (1977

11. United States v. Kubrick, 444 U.S. 111, 117, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979).

6 of 39 DOCUMENTS

**ANGEL DELGADO BETANCOURT, Plaintiff, -v- CITY OF NEW YORK HRA/DSS and DC-37 LOCAL 1549, Defendants.**

**07 Civ. 2165 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 74934*

**October 9, 2007, Decided**
**October 9, 2007, Filed**

**COUNSEL:** [*1] Pro se Plaintiff: Angel Delgado Betancourt, Staten Island, NY.

For Defendant City of New York HRA/DSS: Jennaydra Dance Clunis, New York City Law Department, Office of the Corporation Counsel, New York, NY.

For Defendant DC-37 Local 1549: Thomas Michael Cooke, District Council 37, AFSCME, Office of The General Counsel, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*MEMORANDUM OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiff Angel Delgado Betancourt ("Betancourt"), proceeding *pro se*, brings this action against defendant New York City Human Resources Administration/Department of Social Services ("HRA/DSS"), alleging that HRA/DSS discriminated against him on the basis of his national origin and disability in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e to 2000e-17*, and the Americans with Disabilities Act (ADA) of 1990, *42 U.S.C. §§ 12112-12117*, when it failed to promote him, accommodate his disability, and, ultimately, terminated his employment in April 2003. Betancourt also brings a claim against defendant Local 1549, District Council 37, American Federation of State, County and Municipal Employees ("DC-37"), alleging that DC-37 breached [*2] its duty of fair representation by its "incompetence" in representing him during the proceedings related to his termination. Both defendants have filed motions to dismiss. For the reasons stated below, both motions are granted.

BACKGROUND

The following facts are undisputed or taken from the complaint and assumed to be true for the purpose of deciding the motions to dismiss. Betancourt began his employment with HRA/DSS in 1993. In addition to his job responsibilities, he was a "Shop Steward" for DC-37. In 2000, he was suspended for 60 days as a result of an altercation with a co-worker. Following that incident, Betancourt sought treatment from a doctor, and learned that he had bipolar disorder. Following his return to work, Betancourt alleges that HRA/DSS retaliated against him for filing grievances in connection with his union responsibilities by transferring him to the Marcy Avenue Food Stamp Center in Brooklyn, where he worked until his request for a transfer to the offices at 275 Bergen Street was granted in mid-2002. While employed at the Bergen Street office, Betancourt alleges that he was discriminated against on the basis of his national origin and disability when, *inter alia*, [*3] his co-workers and supervisors called him a "troublemaker," insulted his intelligence in vulgar terms, complained about his handwriting, and filed complaints against him "for no reason." Betancourt notes that his fellow employees were African-American, whereas he is Puerto Rican. Betancourt alleges that he complained about these incidents to a supervisor, but that no action was taken.

In response to these incidents, Betancourt states that he filed a complaint with the New York City Commission on Human Rights. [1] As a result of this filing, Betancourt states that his supervisor and assistant manager at the Bergen Street office commenced a disciplinary action against him alleging that, *inter alia*, Betancourt had argued with and threatened him, as a result of which he

was suspended for another 60 days and transferred back to the Dekalb Avenue office.

> 1 A copy of that filing is not attached to the instant complaint, nor does Betancourt state whether any action was taken on it.

In April 2003, a hearing was held regarding the disciplinary charges, as a result of which Betancourt was fired on April 17, 2003. During that hearing, Betancourt states that he was not given an opportunity to call witnesses, [*4] and that the attorney provided to him by DC-37, Mr. Druyan, did not make any arguments on his behalf. Betancourt appealed the termination decision to the New York City Civil Service Commission ("NYCCSC"), which held argument on his appeal on August 17, 2006. Mr. Druyan also represented Betancourt in this proceeding, and again failed to raise any argument on Betancourt's behalf. The NYCCSC denied Betancourt's appeal on August 24, 2006.

On January 9, 2007, Betancourt filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), in which he presented his Title VII and ADA claims. The EEOC issued a Dismissal and Notice of Rights dated January 22, 2007, which states that, "[y]our charge was not timely filed with EEOC." Betancourt then commenced the instant action. His complaint was received by this Court's Pro Se Office on February 21, 2007.

## DISCUSSION

When considering a motion to dismiss under *Rule 12(b)(6)*, a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)* (citation omitted). At the same time, [*5] "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006)* (citation omitted). A court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)* (emphasis in original). In deciding the motion, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004)* (citation omitted). The copies of Betancourt's filing with the EEOC, the letter from HRA/DSS informing Betancourt of the termination of his employment, and the Notice of the decision

of the NYCCSC regarding Betancourt's appeal of the termination, which have been submitted by HRA/DSS in connection with its motion to dismiss, are thus properly considered here.

Defendant HRA/DSS contends [*6] in its motion that Betancourt's Title VII and ADA claims are time-barred. Before an individual may bring a Title VII or ADA suit in federal court, "the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. New York City Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006)* (citing *42 U.S.C. § 2000e-5*); *see also 42 U.S.C. § 12117(a)* (applying the procedural requirements of *§ 2000e-5* to ADA claims). "In addition, the claimant must make the EEOC filing within 300 days of the alleged discriminatory conduct and, before bringing suit, must receive a 'Notice of Right to Sue' letter from the EEOC." *Williams, 458 F.3d at 69.* This timeliness requirement "is analogous to a statute of limitations." *McPherson v. New York City Dep't of Educ., 457 F.3d 211, 214 (2d Cir. 2006)* (citation omitted).

"It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct." *Flaherty v. Metromail Corp., 235 F.3d 133, 137 (2d Cir. 2000).* "[T]he pendency of a grievance, or some other method of collateral review of an employment [*7] decision," however, "does not toll the running of the limitations periods." *Delaware State Coll. v. Ricks, 449 U.S. 250, 261, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)* (citing *Electrical Workers v. Robbins & Myers, Inc., 429 U.S. 229, 97 S. Ct. 441, 50 L. Ed. 2d 427 (1976)).*

Applying these standards to the instant complaint, it is apparent that Betancourt's claims against HRA/DSS are not timely. The latest date on which it could be said that Betancourt learned of the alleged discriminatory conduct is April 28, 2003, the date on which Betancourt was formally notified of the termination of his employment following the disciplinary hearings held earlier that year. *Delaware State Coll., 449 U.S. at 258.* Betancourt's EEOC complaint was dated January 9, 2007, and was thus untimely unless the limitations period was tolled. The Court of Appeals has made clear that "equitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003)* (citation omitted). Betancourt's complaint and affirmation in opposition to the motion to dismiss identify no such circumstances. [2] In particular, Betancourt's [*8] appeal of the termination decision to the NYCCSC did not toll the limitations period for these claims. *See Delaware State Coll., 449 U.S. at 261; Morse v. Univ. of Vt.,*

*973 F.2d 122, 125 (2d Cir. 1992); Gibson v. New York City Police Dep't, No. 97 Civ. 4091 (DLC), 1998 U.S. Dist. LEXIS 9246, 1998 WL 338079, at *1-*2 (S.D.N.Y. June 25, 1998), aff'd mem., 201 F.3d 431 (2d Cir. 1999).* HRA/DSS's motion to dismiss is therefore granted.

> 2  In fact, Betancourt has submitted, in connection with his opposition to the motion, a letter from the EEOC dated June 12, 2003, informing him that he had "300 days from the (last) date of harm to file a charge with our agency."

Defendant DC-37's motion to dismiss must be granted on similar grounds. Because Betancourt was an employee of HRA/DSS, his duty of fair representation claim must be grounded in state law, rather than federal law, as city agencies are not "employers" within the meaning of either the National Labor Relations Act or the Labor Management Relations Act. *See Police Dep't of the City of Chicago v. Mosley, 408 U.S. 92, 102 n.9, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972); see also 29 U.S.C. § 142(3) (incorporating 29 U.S.C. §§ 152); Manfredi v. Hazleton City Auth., Water Dep't, 793 F.2d 101, 102-04 (3d Cir. 1986).* [*9] "Under New York state law, a claim against a union for violating the duty of fair representation is subject to a four-month statute of limitations." *Williams, 458 F.3d at 69* (citing *N.Y. C.P.L.R. § 217(2)(a)*). The latest date on which it can be said that Betancourt became aware of DC-37's "incompeten[t]" representation was August 24, 2006, when the NYCCSC affirmed the termination of his employment with HRA/DSS. As noted above, however, Betancourt's complaint was received by this Court's Pro Se Office on Feb-

ruary 21, 2007, 181 days (or approximately six months) after the limitations period on this claim began to run.

In Betancourt's opposition to DC-37's motion, he claims that the "Waiver of Informal Conference" form, submitted by DC-37 as Exhibit C to its affirmation in support of its motion to dismiss, contains a forged signature. Even assuming the truth of this allegation, it is not relevant to the question of whether the lateness of Betancourt's filing can be excused, and Betancourt has not offered any additional grounds for a finding that the limitations period should be equitably or otherwise tolled. *See Williams, 458 F.3d at 70* (affirming dismissal following 213-day delay). DC-37's [*10] motion to dismiss is granted.[3]

> 3  In light of this conclusion, it is not necessary to reach the other grounds for dismissal or summary judgment raised in DC-37's motion.

CONCLUSION

The June 12, 2007, and July 13, 2007, motions to dismiss filed on behalf of HRA/DSS and DC-37, respectively, are granted and the complaint is dismissed. The Clerk of Court shall close the case.

SO ORDERED.

Dated: New York, New York

October 9, 2007

DENISE COTE

United States District Judge

LEXSEE

**GOUR G. BHADURI, Plaintiff-Appellee-Cross-Appellant, -v.- SUMMIT SECU-
RITY SERVICES, INC., Defendant-Appellant-Cross-Appellee.**

**06-5526-cv, 07-0851-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2008 U.S. App. LEXIS 8576*

**April 21, 2008, Decided**

**NOTICE:** PLEASE REFER TO FEDERAL RULES
OF APPELLATE PROCEDURE RULE 32.1 GOVERN-
ING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
  Appeal from judgment of the United States District
Court for the Southern District of New York (Baer, J.)
dismissing his action with prejudice after bench trial.
*Bhaduri v. Summit Sec. Servs., 2007 U.S. Dist. LEXIS
2985 (S.D.N.Y., Jan. 17, 2007)*

**COUNSEL:** FOR PLAINTIFF-APPELLEE: GOUR G.
BHADURI, Pro se, Brooklyn, NY.

FOR DEFENDANT-APPELLANT: ALAN M. SCLAR,
ESQ., Silverman Schlar Shin & Byrne, New York, NY.

**JUDGES:** PRESENT: HON. DENNIS JACOBS, Chief
Judge, HON. ROBERT A. KATZMANN, HON. BAR-
RINGTON D. PARKER, Circuit Judges.

**OPINION**

*SUMMARY ORDER*

  Appeal from judgment of the United States District
Court for the Southern District of New York (Baer, J.)
dismissing his action with prejudice after bench trial.

  **UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the district court be **AFFIRMED.**

  Gour G. Bhaduri appeals from judgment entered by
the United States District Court for the Southern District
of New York (Baer, J.) on January 17, 2007, dismissing
with prejudice his claims under Title VII of the Civil
Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* ("Title
VII"), and the Age Discrimination in Employment Act of
1964, *29 U.S.C. § 621, et seq.* ("ADEA"), after a bench
trial. Summit Security Services, Inc. seeks to withdraw

its cross-appeal. We assume the parties' familiarity  [*2]
with the underlying facts, the procedural history, and the
issues on appeal. We review the district court's legal
conclusions *de novo* and its findings of fact for clear er-
ror. *See, e.g., United States v. Coppola, 85 F.3d 1015,
1019 (2d Cir. 1996).*

  Bhaduri's hostile work environment claim was time-
barred. The only instance of harassment substantiated by
the record occurred in October 2001. Bhaduri's February
28, 2005 EEOC charge of discrimination was filed long
after the statutory time limit had expired. *See 42 U.S.C. §
2000e-5(e)(1)* (requiring that claimants file an EEOC
charge of discrimination within 180 days of the alleged
unlawful employment action or, if the claimant has al-
ready filed the charge with a state or local equal em-
ployment agency, within 300 days of the alleged dis-
criminatory action); *see also Van Zant v. KLM Royal
Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996)* ("This
statutory requirement is analogous to a statute of limita-
tions.").

  To establish a *prima facie* claim of wage disparity
under either Title VII or the ADEA, a plaintiff must
demonstrate that (1) he belongs to a protected class, (2)
he was qualified for the job, (3) he suffered an adverse
employment action,  [*3] and (4) the adverse employ-
ment action occurred under circumstances giving rise to
an inference of discriminatory intent. *See Sanders v. New
York City Human Res. Admin., 361 F.3d 749, 755 (2d
Cir. 2004).* But Bhaduri failed to establish that he suf-
fered any adverse employment action. Indeed, Bhaduri
was the highest paid employee at his assigned worksite,
and he never requested to be transferred to a site at which
he would have been paid more.

  As Bhaduri succeeded neither in timely charging
discrimination under Title VII nor in establishing a
*prima facie* case of wage discrimination under either
Title VII or the ADEA, his claims were properly dis-
missed.

2008 U.S. App. LEXIS 8576, *

We have considered Bhaduri's remaining arguments and find them to be without merit. Bhaduri's submission of documents that are not in the district court record is construed as a motion to supplement the record, and is denied. For the foregoing reasons, the judgment of the district court is **AFFIRMED**. Summit's cross-appeal is **DISMISSED**.

LEXSEE 470 F. 3D 498

**FEMI BOGLE-ASSEGAI, Plaintiff-Appellant, - v. - STATE OF CONNECTICUT, CONNECTICUT COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES; and CYNTHIA WATTS-ELDER, in her official capacity as Executive Director, Connecticut Commission on Human Rights and Opportunities, ("CHRO") and LEANNE APPLETON, in her individual and official capacity as Director of Finance of CHRO; and DONALD NEWTON, in his individual and official capacity as CHRO Chief of Field Operations, Defendants-Appellees.**

**Docket No. 05-1858-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*470 F.3d 498; 2006 U.S. App. LEXIS 29370; 99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716; 66 Fed. R. Serv. 3d (Callaghan) 1340*

April 27, 2006, Argued
November 29, 2006, Decided

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by Bogle-Assegai v. Conn., 2008 U.S. LEXIS 1168 (U.S., Jan. 22, 2008)

**PRIOR HISTORY:**     [**1]  Appeal from a judgment of the United States District Court for the District of Connecticut, Holly B. Fitzsimmons, Magistrate Judge, dismissing employment discrimination claims, see *42 U.S.C. §§ 1981, 1983*; Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, on grounds of lack of service of process, *Eleventh Amendment* immunity, and untimeliness.

**DISPOSITION:**  Affirmed.

**COUNSEL:** JOSEPHINE SMALLS MILLER, Danbury, Connecticut (Cynthia R. Jennings, The Barrister Law Group, Hartford, Connecticut, on the brief), for Plaintiff-Appellant.

JOSEPH A. JORDANO, Assistant Attorney General, Hartford, Connecticut (Richard Blumenthal, Attorney General of the State of Connecticut, Hartford, Connecticut, on the brief), for Defendants-Appellees.

**JUDGES:** Before: KEARSE, McLAUGHLIN, and SACK, Circuit Judges.

**OPINION BY:** KEARSE

**OPINION**

    [*499] KEARSE, *Circuit Judge*:

Plaintiff Femi Bogle-Assegai, a former employee of defendant Connecticut Commission on Human Rights and Opportunities ("CHRO"), appeals from a judgment of the United States District Court for the District of Connecticut, Holly B. Fitzsimmons, *Magistrate Judge*, dismissing her [**2]  complaint alleging principally that CHRO and various of its officials discriminated against her and terminated her employment in violation of her rights under *42 U.S.C. § 1981*, as enforced through *42 U.S.C. § 1983*; Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*; and state law. The district court granted defendants' motions to dismiss Bogle-Assegai's *§§ 1981* and *1983* claims and her state-law claims on the grounds that (a) defendants State of Connecticut (the "State"), CHRO, and CHRO employees in their official capacities had *Eleventh Amendment* immunity against such claims, and (b) the individual defendants had not been served with process in their individual capacities. The court granted summary judgment dismissing Bogle-Assegai's Title VII claims on the ground that they were time-barred because she had not asserted them in an administrative complaint within 180 days of the allegedly unlawful employment actions. On appeal, Bogle-Assegai contends principally (1) that her Title VII claims are not time-barred, and (2) that she should have been given an opportunity to remedy the flaws in the [**3]  service of process. For the reasons that follow, we affirm.

I. BACKGROUND

Except as indicated below, the facts, as asserted in defendants' motion for summary judgment and admitted

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

by Bogle-Assegai in response to that motion, include the following.

### A. The Parties and the Course of Bogle-Assegai's Employment

Bogle-Assegai, an African-American of Jamaican descent, was first employed by CHRO in the early 1990s as an investigator, initially in a provisional position and thereafter in a permanent position. In 1995, she was promoted to be regional manager of CHRO's office in Bridgeport; in 1997, she became regional manager of its Waterbury office.

Defendant Cynthia Watts-Elder was executive director of CHRO from March 1999 until August 2003. Defendant Leanne Appleton was CHRO's fiscal administrative supervisor from January 1994 until 2004.

Defendant Donald Newton, a CHRO employee for more than 30 years, began serving as its chief of field operations in 1999. In that capacity, he supervised CHRO's regional managers. He continually [*500] reminded all regional managers, including Bogle-Assegai, that they were expected to be at work every day in accordance with their approved schedules.

[**4] Bogle-Assegai, in her two positions as manager of CHRO regional offices, was responsible for supervising the staffs and operations of those offices. Her scheduled working hours were 8 a.m. to 5 p.m. In early 2001, Newton questioned Bogle-Assegai about a time sheet representing that she had worked eight hours on January 26, 2001, a day on which Newton had telephoned her office at 10 a.m. and been informed that she was not in. Bogle-Assegai responded that she had in fact been in the office when Newton called, because she had arrived at work that day at 9:30 a.m. (not by 8 a.m. as her schedule required). Newton sought additional information to shed light on the discrepancy between Bogle-Assegai's insistence that she had been in her office by 9:30 a.m. and the staff member's statement that Bogle-Assegai had not arrived by 10 a.m.

As Bogle-Assegai had an official parking space in a garage with an electronic swipe-card access system, Newton asked Appleton to obtain the access-card records for January 26, 2001, from the garage operator. She did so, and the records for that date showed that Bogle-Assegai had arrived in the garage at 10:30 a.m. Further, other access-card records, whose [**5] accuracy Bogle-Assegai does not concede, showed numerous occasions when Bogle-Assegai arrived several hours late for work, occasions when she left work before the scheduled end of the day, and occasions when she both arrived late and left early. For example, for the period November 13, 2000, through February 22, 2001--which encompassed 68 non-holiday weekdays--the access-card records

showed that Bogle-Assegai arrived more than one hour late 34 times, including 15 days on which she arrived more than two hours late. After a review of these records, Watts-Elder requested an audit of all CHRO employee time sheets. Examination of Bogle-Assegai's time sheets revealed numerous hours claimed as work time that were contradicted by the garage access-card records of her times of arrival and departure.

On March 1, 2001, Watts-Elder informed Bogle-Assegai in writing that an investigation of her time records had been conducted and that, based on that investigation, CHRO was considering formal discipline, including dismissal. CHRO held a formal hearing on March 12; Bogle-Assegai attended, but she refused to participate or answer questions. She requested and was granted an opportunity to provide [**6] a written response; but her response provided no information addressing the discrepancies between her time sheets and the garage access-card data.

On March 29, 2001, Bogle-Assegai received a letter from Watts-Elder, stating that Bogle-Assegai's employment with CHRO would be terminated effective April 12, 2001. (See Letter from Watts-Elder to Bogle-Assegai dated March 29, 2001 ("Termination Letter").) The Termination Letter also informed Bogle-Assegai that "[a]lthough your dismissal will be effective April 12, 2001, and you will be paid through that date, from this day forward, you will neither be expected (nor authorized) to report to work." (Id. at 1.) The letter stated that Bogle-Assegai was being dismissed for the good of CHRO, "as a result of [her] fraudulent use of state time." (Id.)

On October 1, 2001, Bogle-Assegai filed an administrative complaint with the United States Equal Employment Opportunity Commission ("EEOC"). She thereafter received a right-to-sue letter.

[*501] B. The Present Action and the Motions To Dismiss

Bogle-Assegai commenced the present action in December 2002 against the State and CHRO, against Watts-Elder in her official capacity, [**7] and against Appleton and Newton in their official and individual capacities, alleging that Bogle-Assegai had been the victim of discrimination on the basis of race, color, and national origin. The complaint alleged that the State and CHRO had subjected her to a hostile work environment and terminated her employment in violation of Title VII. Invoking 42 U.S.C. § 1983, it alleged that defendants had discriminated against Bogle-Assegai on the basis of race, color, and national origin in violation of 42 U.S.C. § 1981 and her right to equal protection. The complaint also alleged that defendants' conduct violated the Connecticut Fair Employment Practices Act ("CFEPA"),

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

*Conn. Gen. Stat. §§ 46a-70, 46a-71.* The parties consented to have the case assigned to a magistrate judge for all purposes.

Following discovery, defendants moved to dismiss Bogle-Assegai's claims on various grounds. Appleton and Newton, who in their amended answer to the complaint had alleged insufficiency of service of process, sought dismissal pursuant to *Fed. R. Civ. P. 12(b)(5)* of the claims asserted against [**8] them in their individual capacities, arguing that they had not been served personally. They submitted affidavits stating that they had been served only through the office of the State Attorney General and that they had not authorized that office to accept service on their behalf.

In addition, all defendants moved pursuant to *Fed. R. Civ. P. 56* for summary judgment dismissing Bogle-Assegai's *§§ 1981 and 1983* claims against the State, CHRO, and the individual defendants in their official capacities on the ground that those claims were barred by the *Eleventh Amendment.* Defendants contended that the *Eleventh Amendment* also barred Bogle-Assegai's pursuit of her state-law claims in federal court, as "the Connecticut legislature only authorized suit in the *Connecticut Superior Court*" on such claims, "not in the federal court." (Defendants' Memorandum in Support of Their Motion for Summary Judgment ("Defendants' Summary Judgment Memorandum") at 39 (emphasis in original).)

Defendants sought summary judgment dismissing Bogle-Assegai's Title VII claims on the ground that they were time-barred because she had not filed her administrative charge with [**9] the EEOC within the 180-day period specified by *42 U.S.C. § 2000e-5(e)(1)* for filings with the EEOC. Defendants noted that the period for Bogle-Assegai to file an administrative claim of discriminatory discharge began on the date on which she received notification that her employment would thereafter be terminated (*see* Defendants' Summary Judgment Memorandum at 23 (citing *Delaware State College v. Ricks, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980))*; that Bogle-Assegai had received formal notice of termination on March 29, 2001; and that she had filed her charge with the EEOC on October 1, 2001, more than 180 days later. Defendants observed that *§ 2000e-5(e)(1)* provides that the filing period is 300 days rather than 180 days where a claimant has filed her claims with a state or local agency, but they pointed out that Bogle-Assegai

did not institute proceedings with a state or local agency (i.e. CHRO) with authority to grant relief in compliance with 42 [U.]S.C. *§ 2000e-5(e)*, nor did the EEOC defer the Complainant's charge to the state agency . . . in Connecticut for an investigation. Therefore, the appropriate [**10] limitations period is 180 days from March 29, 2001. . . .

[*502] Since there was no dual filing with both CHRO and EEOC (it was filed *only* with EEOC), the plaintiff is *not* entitled to 300 days and her Title VII claim is untimely and must be dismissed for this reason [among others]. *AMTRAK v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 . . . (2002).*

(Defendants' Summary Judgment Memorandum at 24 (emphases in original).)

Defendants also argued that Bogle-Assegai could not present a prima facie case of prohibited discrimination, asserting, *inter alia*, that her fraudulent reporting of time worked had been the sole reason for her dismissal. (*See id.* at 25-31; *see also* Defendants' *Rule 56(a)*1 Statement of Facts P 97 ("Plaintiff was terminated for falsifying her time records and the theft of state time."); Plaintiff's *Rule 56(b)*1 Statement of Facts P 97 ("Admit.").)

Bogle-Assegai opposed defendants' motions to dismiss, arguing principally that she could present a prima facie case of discrimination. As to the motions of Appleton and Newton to dismiss the individual-capacity claims asserted against them, however, Bogle-Assegai admitted that those [**11] defendants had not been personally served and that they had not authorized anyone to accept personal service on their behalf (*see* Defendants' *Rule 56(a)*1 Statement of Facts PP 5, 7; Plaintiff's *Rule 56(B)*1 Statement of Facts PP 5, 7), and she did not offer any argument as to why the individual-capacity claims against them should not be dismissed for lack of service of process. Nor did Bogle-Assegai offer any argument as to why the State, CHRO, and the individual defendants in their official capacities did not have *Eleventh Amendment* immunity with respect to her *§§ 1981 and 1983* claims or her state-law claims as asserted in this action.

With respect to defendants' contention that her Title VII claims were time-barred, Bogle-Assegai argued as follows:

The defendants argue that the statute began to run on March 29, 2001, when Mrs. Bogle-Assegai was informed that she would be terminated. Mrs. Bogle-Assegai suggests that the court should not use the date that the defendant indicates she "would" be terminated; but rather the date that she was in fact terminated. Mrs.

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

Bogle-Assegai was effectively terminated April 12, 2001. Further, the question whether a court may, for purposes [**12] of determining liability, review all such conduct, including those acts that occur outside the filing period, turns on the statutory requirement that a charge be filed within a certain number of days "after the alleged unlawful employment practice occurred." Because such a claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," it does not matter that some of the component acts fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability. *AMTRAK v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).*

(Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Bogle-Assegai Memorandum Opposing Summary Judgment") at 5-6.)

### C. The Decision of the District Court

In a Ruling on Motion for Summary Judgment, dated March 10, 2005 ("District Court Opinion"), the district court granted defendants' motions and dismissed the complaint. The court first granted the motion to dismiss the claims asserted [*503] against [**13] Appleton and Newton in their individual capacities, noting that it was undisputed that process had been served on them only by service on the Office of the Attorney General. *See* District Court Opinion at 5, 7. The court held that, as those defendants had not authorized anyone to accept service of process for them in their individual capacities, service on a State office was insufficient to constitute personal service on them for claims against them in their individual capacities.

The district court next concluded that the *Eleventh Amendment* barred Bogle-Assegai's claims under *§§ 1981* and *1983* against the State, CHRO, and the individual defendants in their official capacities, holding that the State had not waived its sovereign immunity and that "Congress's enactment of *§ 1981* and *§ 1983* did not override the immunity that the states and their agencies enjoy under the *Eleventh Amendment*." *Id.* at 9. The court ruled that the *Eleventh Amendment* also required the dismissal of Bogle-Assegai's state-law claims. The court noted that the State had "waived its immunity to suit in state court for CFE[P]A claims. But it has not clearly

expressed a waiver to suit in federal court. [**14] " *Id.* (internal quotation marks omitted).

Finally, the district court concluded that Bogle-Assegai's Title VII claims were untimely. The court stated that Title VII requires a plaintiff to file an administrative complaint with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred," *42 U.S.C. § 2000e-5(e)*; and that a claim of discriminatory termination of employment "accrues on the date the termination decision is made and communicated to the employee," District Court Opinion at 10-11 (citing *Delaware State College v. Ricks, 449 U.S. at 258*). The court found that

> [i]n this case, plaintiff received her formal notice of termination on March 29, 2001. . . . The termination notice stated that she was no longer authorized to report to work after March 29, 2001. . . . Her administrative charge was filed on October 1, 2001, 186 days following her formal notice of termination. . . . Plaintiff's contention that the limitations period begins to run as of the effective date of her termination, April 12, 2001, is unsupported by the case law.

District Court Opinion at 11.

The district [**15] court noted that "[u]nder certain circumstances, the [180-day] filing period is extended to three hundred (300) days," *i.e.*, where "the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from" the alleged "unlawful employment practice," *id.* at 10 n.7, but that "[h]ere, plaintiff only filed a claim with the EEOC; thus the 180 day limitations period applies," *id.* The court found that there was no evidence of a "continuing violation" that could extend the 180-day filing period.

Judgment was entered dismissing the complaint, and this appeal followed.

### II. DISCUSSION

On appeal, Bogle-Assegai contends principally that the district court erred in dismissing her Title VII claims as time-barred, arguing that they were subject to the 300-day, rather than the 180-day, filing period. She also contends, *inter alia*, that the court should not have dismissed her claims against Appleton and Newton in their individual capacities but, at worst, should have given her an extension of time to effect personal service on them. We are unpersuaded.

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

[*504]  A. *The Filing Period Applicable to the Title VII Claims*

[**16]  Bogle-Assegai contends that the district court erred in dismissing her Title VII claims as untimely, arguing principally that the applicable period for the filing of her administrative charge, which she filed 186 days after she received the Termination Letter, was not 180 days but 300 days. She argues that the State has a work-sharing agreement with the EEOC, and that under such agreements the filing of an administrative charge with either the EEOC or the State agency (here CHRO) is deemed a filing with each agency--a dual filing--and is timely if made within 300 days. We reject this contention because it was not raised in the district court and because Bogle-Assegai has failed to present any reasonable ground for its consideration by this Court.

"[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994).* "However, because th[is] rule is prudential, not jurisdictional, we have discretion to consider waived arguments," *Sniado v. Bank Austria AG, 378 F.3d 210, 213 (2d Cir.), vacated on other grounds, 542 U.S. 917, 124 S. Ct. 2870, 159 L. Ed. 2d 774 (2004),* [**17]  and "[w]e have exercised this discretion where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional factfinding," *Allianz Insurance Co. v. Lerner, 416 F.3d 109, 114 (2d Cir. 2005)* (internal quotation marks omitted). Nonetheless, the circumstances normally "do not militate in favor of an exercise of discretion to address . . . new arguments on appeal" where those arguments were "available to the [parties] below" and they "proffer no reason for their failure to raise the arguments below." *Id.*

It is clear that Bogle-Assegai did not make her present argument to the district court, although she had ample incentive to do so. Defendants' motion for summary judgment asserted that "there was no dual filing with both CHRO and EEOC (it was filed *only* with EEOC)," and thus that "plaintiff is *not* entitled to 300 days and her Title VII claim is untimely and must be dismissed . . . ." (Defendants' Summary Judgment Memorandum at 24 (emphases in original)). As described in Part I.B. above, Bogle-Assegai's response to this untimeliness contention made no reference to a work-sharing agreement, or [**18]  to the concept of dual filing, or to any possibility that the applicable period was 300 days. Her memorandum argued only that defendants had used the wrong starting date for calculating the 180-day period and that the 180-day deadline had been met. (*See* Bogle-Assegai Memorandum Opposing Summary Judgment at 5 ("the court should not use the [March 29] date that the defendant indicates she 'would' be terminated; but rather the

date that she was in fact . . . . effectively terminated[,] April 12").)

At oral argument of this appeal, we asked counsel to review the record and inform this Court whether Bogle-Assegai had in fact argued in the district court that the 300-day filing period applied to her claims. In response, Bogle-Assegai's counsel submitted a letter stating that "counsel for Plaintiff-Appellant has made a diligent search of the record below and finds that with regard to the 300-day filing rule, Plaintiff-Appellant did not specifically argue the 300-day rule." (Letter from Bogle-Assegai's attorney Josephine Smalls Miller to this Court dated April 22, 2006 ("Miller Letter").)

Bogle-Assegai's counsel argued, however, that the complaint's citation of *42 U.S.C. § 2000e-5* [**19]  , which "provides for the 180-day filing period and the 300-day filing [*505]  period in deferral states . . . . was sufficient to raise the issue for all subsequent purposes." (Miller Letter.) We disagree. The mere citation to a statute that provides alternative filing periods, the applicability of each turning on whether the EEOC has or does not have a work-sharing agreement with the state agency, does not constitute an assertion that there in fact existed such an agreement at the pertinent time and that the longer period applies. We see nothing in the record to indicate that Bogle-Assegai raised the issue of the existence of a work-sharing agreement before the district court or that she in any way suggested to that court that the filing period applicable to her was 300 days.

Bogle-Assegai urges us nonetheless to entertain her present 300-day contention, arguing that we should take judicial notice that the EEOC regularly enters into such work-sharing agreements, that the existence of such an agreement presents an issue that is purely legal, and that CHRO should not be allowed to deny the existence of a work-sharing agreement on which she relied. These arguments are meritless.

Bogle-Assegai's [**20]  contention that "[t]his court may take judicial notice of the fact that the [EEOC] *regularly* enters into work-sharing agreements with state fair employment practices [*sic*]" (Bogle-Assegai reply brief on appeal at 2 (emphasis added)) is not a sound basis for consideration of her new argument. Even if we were to take judicial notice of that practice in general, it would not ineluctably follow that there existed such an agreement between the EEOC and CHRO on October 1, 2001, in particular.

Further, despite Bogle-Assegai's assertion that "the issue is purely legal and there is no need for additional fact-finding" (*id.* at 1 (internal quotation marks omitted)), the question of whether there existed a work-sharing agreement between the EEOC and CHRO on October 1, 2001, is a question of fact, not a question of

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

law. Defendants state that no such agreement was in ef-
fect on that date (*see* Defendants' brief on appeal at 9
n.2); and if Bogle-Assegai had proffered any evidence
that such an agreement did in fact exist on that date,
there plainly would be a need for factfinding.

Moreover, Bogle-Assegai has not given this Court
any indication that she would be able to offer [**21]
evidence that in fact such an agreement existed at the
time she filed her administrative charge. Her brief re-
peatedly refers to and purports to quote *"the work-
sharing agreement"* (emphasis added) between the EEOC
and CHRO, as if the existence of such an agreement at
the pertinent time were established (*see, e.g.,* Bogle-
Assegai brief on appeal at 15 ("In the instant case, the
relevant portions of the work-sharing agreement between
the EEOC and CHRO state[] . . . ."); *see also id.* at 17
n.2, 19, 29; Bogle-Assegai reply brief on appeal at 1, 3,
5). But not one of these quotes or references is accompa-
nied by a citation to an agreement or to any evidence.

Bogle-Assegai calls our attention to the decision in
*Lewis v. Connecticut Department of Corrections, 355 F.
Supp. 2d 607 (D. Conn. 2005)* ("*Lewis*"), as an indication
that there existed a work-sharing agreement between the
EEOC and CHRO. That case does not, however, show
that such an agreement existed at the time pertinent to
Bogle-Assegai. The *Lewis* court noted that the work-
sharing agreement that had been submitted to that court
by that plaintiff stated:

Charges that are received
[**22] by the [CHRO],
whether in person or by
mail, and jurisdictional
with the EEOC and timely
filed by the charging
[*506] party or his/her
representative will be
automatically dual-filed
with the EEOC and vice
versa. . . .

FY 2001 EEOC/FEPA Worksharing
Agreement Between Connecticut Com-
mission on Human Rights and Opportuni-
ties and Equal Employment Opportunity
Commission, Pl.'s Index of Evidence in
Supp. of Objection to Summ. J. . . . .

*355 F. Supp. 2d at 615 n.4* (emphasis omitted). As cited,
however, the document quoted by the *Lewis* district court
was a "FY 2001" work-sharing agreement, and regard-
less of whether "FY 2001" referred to the fiscal year of
Connecticut or to that of the federal government, it did
not encompass October 1, 2001, the date on which
Bogle-Assegai's administrative charge was filed. Fiscal
years of Connecticut end on June 30 of each calendar
year, *see Conn. Gen. Stat. § 4-35* (2006); fiscal years of
the United States end on September 30 of each calendar
year, *see* Bill Heniff Jr., Cong. Research Serv., The Fed-
eral Fiscal Year 1 (2003), *available at*
http://www.rules.house.gov/archives/crs_reports.htm;
and [**23] *"[e]ach fiscal year is identified by the calen-
dar year in which it ends and commonly is referred to as
'FY.'* For example, [federal] FY 2003 began October 1,
2002, and ends September 30, 2003," *id.* (emphasis
added); *see also* Memorandum from the Comptroller of
the State of Connecticut on Fiscal Year 2006 Year-End
Instructions (2006), *available at*
http://www.osc.state.ct.us/2006memos/fiscalyearend/fyei
nstructions.htm (describing monies deposited prior to
July 1, 2006 as "Fiscal Year 2006" receipts). Thus, the
Connecticut FY 2001 ran from July 1, 2000, through
June 30, 2001; the United States FY 2001 ran from Oc-
tober 1, 2000, through September 30, 2001; and which-
ever government's "FY 2001" was referred to in the title
of the work-sharing agreement quoted in *Lewis*, that FY
ended before the filing of Bogle-Assegai's administrative
charge with the EEOC on October 1, 2001.

Finally, Bogle-Assegai's argument that "CHRO
should not be permitted to work an injustice upon claim-
ants, such as *Plaintiff-Appellant, who relied upon the
existent [sic] of the charge processing agreement*"
(Bogle-Assegai reply brief on appeal at 4-5 (emphasis
added)) fails for lack of any [**24] evidence whatever
to support its factual premise. Bogle-Assegai, in filing
her administrative charge 186 days after her receipt of
the Termination Letter, cannot be found to have relied on
the existence of a work-sharing agreement. Had she so
relied, she would have argued the existence of such an
agreement in the district court. Instead, she argued that
the 180 days began to run on the effective date of termi-
nation rather than on the earlier date of notice of termina-
tion. And even after the district court granted summary
judgment dismissing the Title VII claims, stating that
"the 180 day limitations period applies," District Court
Opinion at 10 n.7, Bogle-Assegai did not move for rear-
gument on the ground that the applicable period was 300
days or that there was a work-sharing agreement. Bogle-
Assegai did move in November 2005 to reopen the
judgment pursuant to *Fed. R. Civ. P. 60(b)*, but she did
so on entirely different grounds.

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

In sum, faced with a summary judgment motion expressly asserting that her charge had not been dually filed with the state agency and that the 300-day filing period therefore did not apply to her claims, Bogle-Assegai [**25] had every incentive and opportunity to contest that argument. She made no argument to the district court in opposition. And in arguing to this Court that the 300-day period is applicable, she has proffered no reason for her failure to make that argument in the district court [*507] and has pointed to no evidence that would support her factual premises. In the circumstances, appellate consideration of her unpreserved argument is unwarranted. We affirm the district court's dismissal of Bogle-Assegai's Title VII claims on the ground that her administrative charge was not timely filed.

### B. The Dismissals for Improper Service of Process

Bogle-Assegai contends that the district court erred in dismissing her claims against Appleton and Newton in their individual capacities for improper service of process, arguing that those defendants had actual notice of her claims and did not show that the improper service caused her prejudice. She also contends that the district court should have given her additional time pursuant to *Fed. R. Civ. P. 4(m)* to effect service on them personally. Her contentions lack merit.

*Rule 4(e) of the Federal Rules of Civil Procedure* [**26] states in pertinent part that

> [u]nless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed . . . may be effected in any judicial district of the United States:
>
> > **(1)** pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or
> >
> > **(2)** by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by

> delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

*Fed. R. Civ. P. 4(e).* In the present case, Bogle-Assegai conceded that Appleton and Newton had not been served personally and that they had not authorized anyone to accept personal service on their behalf. Hence Bogle-Assegai did not meet the requirements of *Rule 4(e)(2)* and would [**27] have been able to show that service was proper only if Connecticut law permitted service on a defendant in his or her individual capacity by serving the Attorney General.

Connecticut law, however, provides that delivery to the Attorney General constitutes service on an individual state officer or employee "as" an officer or employee:

> Service of civil process in any civil action or proceeding maintainable against . . . the state or . . . *any officer*, servant, agent *or employee* of the state or of any such institution, board, commission, department or administrative tribunal, *as such*, may be made by leaving a true and attested copy of the process, including the declaration or complaint, with the Attorney General or at his office in Hartford.

*Conn. Gen. Stat. § 52-64* (2005) (emphases added). This provision on its face does not authorize service through the Attorney General's office on an individual State employee in his or her individual capacity.

With respect to an individual who is an officer or employee of the State but is not sued as such, Connecticut law requires that service be made by "leaving [the summons and complaint] [**28] with the defendant[] or at his usual place of abode," *Conn. Gen. Stat. § 52-57(a)* (emphasis added). See, e.g., *Banerjee v. Roberts, 641 F. Supp. 1093, 1099 (D. Conn. 1986)* (service "through the Connecticut Attorney General" sufficed to serve the "defendants in their official capacities" but was "not" a "method[] [*508] authorized" for "serv[ing them] with process in their individual capacities"); cf. *Armstrong v. Sears, 33 F.3d 182, 186-87 (2d Cir. 1994)* ("in a *Bivens* case, personal service should be made upon the individual defendant in accordance with *Rule 4(e) instead of* upon that individual as a government officer in accor-

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

dance with *Rule 4(i)(2)*" (emphasis in original)). Accordingly, service on Appleton and Newton was not properly effected on them in their individual capacities.

Bogle-Assegai contends, however, that the district court should simply have given her additional time pursuant to *Rule 4(m)* to effect service on Appleton and Newton personally. That Rule provides, in pertinent part, as follows:

> If service of the summons and complaint is not made upon a defendant within 120 days after [**29] the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that *if the plaintiff shows good cause for the failure*, the court shall extend the time for service *for an appropriate period.*

*Fed. R. Civ. P. 4(m)* (emphases added); *see, e.g., Romandette v. Weetabix Co., 807 F.2d 309, 311 (2d Cir. 1986)* ("By the explicit terms of *Rule 4(j)* [predecessor to the present *Rule 4(m), see Fed. R. Civ. P. 4* Advisory Committee Note (1993)], the court can disregard a failure to meet the 120-day limit if the plaintiff can show 'good cause why such service was not made.'").

*Rule 4(m)* provides little relief for Bogle-Assegai. Appleton and Newton raised the matter of improper service in their amended answer to the complaint in July 2003, and they requested dismissal on that ground in September 2004. In response to the motion to dismiss, Bogle-Assegai conceded that those defendants had not been properly [**30] served in their individual capacities; but she offered no excuse whatever for the defective service. Further, despite having been informed that Appleton and Newton objected to the improper service at least as early as July 2003, and despite the continued pendency of the lawsuit until March 2005, Bogle-Assegai never attempted to remedy the defect by asking the district court to extend her time to effect personal service. It is plain therefore that Bogle-Assegai did not make the showing of good cause that could have allowed the district court, in accordance with *Rule 4(m)*, to extend her time to effect proper service.

Although Bogle-Assegai (a) relies on *Romandette v. Weetabix Co.* for the proposition that defective service must be excused where the defendant has received actual notice and has shown no prejudice, and (b) suggests that she was not required to show good cause in order to be given an extension of time to make proper service, her

reliance is misplaced and her suggestion is unsupported by any authority of this Court. In *Romandette*, in which process had been mailed to the defendant rather than served personally, Romandette was an incarcerated *pro se* litigant who [**31] was "entitled to rely on service by the U.S. Marshals," *807 F.2d at 311.* He had "timely requested that the Marshals effect personal service," and the Marshals Service "had indicated that it would personally serve" the defendant. *Id. at 310.* Clearly, "Romandette had done everything in his power to effect personal service through the Marshal[]s Service," and we concluded that he "plainly exhibited good cause," *id. at 311.* Bogle-Assegai has not called to our attention any case in which this Court has ruled that the good-cause requirement specified in *Rule 4(m)* may be disregarded, and we are aware of no such case.

[*509] In any event, Bogle-Assegai, who was neither a *pro se* litigant nor incarcerated, made no showing whatever as to any effort on her part to effect personal service on Appleton and Newton. And given that she also made no effort to show good cause for her failure and never requested an extension of time during the 600-odd days when the case was pending after she first learned of the Appleton/Newton objections to service, we hardly think an extension of the 120-day period, in lieu of dismissal, could have been an extension for [**32] "an appropriate period." Accordingly, we see no error or abuse of discretion in the district court's decision to dismiss.

### C. Other Contentions

Bogle-Assegai makes other arguments in her brief on appeal that do not require extended discussion. She contends, *inter alia*, that the district court erred in dismissing her *§§ 1981* and *1983* claims, arguing that they were "timely filed" (Bogle-Assegai brief on appeal at 24) as they do not require pre-suit administrative proceedings and are governed by a three-year statute of limitations (*see id.* at 24-25). The district court did not, however, dismiss those claims on the ground that they were time-barred. The *§§ 1981* and *1983* claims were dismissed on the ground that as to those claims the State, CHRO, and the individual defendants in their official capacities were entitled to *Eleventh Amendment* immunity. Bogle-Assegai has presented no argument disputing that immunity, either in the district court or on this appeal.

Bogle-Assegai also argues that the State, CHRO, and the individual defendants in their official capacities are not entitled to *Eleventh Amendment* immunity with respect to her claims under Title VII. However, the [**33] district court did not dismiss Bogle-Assegai's Title VII claims on the ground of *Eleventh Amendment* immunity but rather, as discussed in Parts I.C. and II.A.

470 F.3d 498, *; 2006 U.S. App. LEXIS 29370, **;
99 Fair Empl. Prac. Cas. (BNA) 610; 89 Empl. Prac. Dec. (CCH) P42,716

above, on the ground that Bogle-Assegai's filing of her administrative complaint with the EEOC was untimely.

Bogle-Assegai's arguments going to the merits of her claims of discriminatory and disparate treatment are moot in light of the dismissals on the grounds of improper service, sovereign immunity, and untimeliness.

Finally, we note that Bogle-Assegai's briefs on appeal do not challenge the dismissal of her state-law claims in any respect. Thus, the dismissal of those claims stands as well.

CONCLUSION

We have considered all of Bogle-Assegai's arguments on this appeal to the extent that they are properly before us, and we have found them to be without merit. The judgment of the district court is affirmed.

LEXSEE 990 F.2D 1397

### GENEVA BUTTS, Plaintiff-Appellant, v. THE CITY OF NEW YORK DEPART-MENT OF HOUSING PRESERVATION AND DEVELOPMENT, Defendant-Appellee.

Docket No. 92-7850

### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*990 F.2d 1397; 1993 U.S. App. LEXIS 5819; 61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146*

December 8, 1992, Argued
March 24, 1993, Decided

**SUBSEQUENT HISTORY:** As Amended March 31, 1993.

**PRIOR HISTORY:** [**1] Appeal by Plaintiff Geneva Butts from an order of the United States District Court for the Southern District of New York (Louis J. Freeh, Judge), of July 7, 1992, dismissing in its entirety her employment discrimination action under Title VII and *42 U.S.C. § 1981*, on the grounds that her Title VII claims were all either time-barred or not raised in her charge to the Equal Employment Opportunity Commission, that her *§ 1981* claims do not state a cause of action under *Patterson v. Mc Lean Credit Union, 491 U.S. 164, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)*, and that the Civil Rights Act of 1991 does not apply retroactively.

**DISPOSITION:** Affirmed in part, reversed in part, and remanded.

**COUNSEL:** ERIC SCHNAPPER (Julius L. Chambers, NAACP Legal Defense and Educational Fund, Inc., C. Vernon Mason, New York, New York, of Counsel), for Plaintiff-Appellant.

ALAN G. KRAMS (Fay Leoussis, O. Peter Sherwood, New York City Corporation Counsel, of Counsel), for Defendant-Appellee.

**JUDGES:** Before: MESKILL, Chief Judge, MA-HONEY, and WALKER, Circuit Judges.

**OPINION BY:** WALKER

**OPINION**

[*1399] WALKER, *Circuit Judge:*

Plaintiff Geneva Butts appeals from an order of the United States District Court for the Southern District of New [**2] York (Louis J. Freeh, *Judge*), dated July 7, 1992, dismissing in its entirety Plaintiff's employment discrimination action brought against the City of New York Department of Housing Preservation and Development (the "City") under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* ("Title VII"), *42 U.S.C. § 1981*, and state common law. Plaintiff, an African-American woman, alleges that the City denied her promotions and discriminated against her in the terms and conditions of her employment based on her race and sex.

The district court dismissed Plaintiff's complaint in its entirety pursuant to *Fed. R. Civ. P. 12(b)(1)* and *(6)*. Her various Title VII claims were dismissed on the grounds that they were either time-barred or had not been raised in her discrimination charge with the Equal Employment Opportunity Commission (the "EEOC"). The district court, relying on *Patterson v. McLean Credit Union, 491 U.S. 164, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)*, dismissed Plaintiff's *§ 1981* terms and conditions claims, since, [*1400] under *Patterson*, a *§ 1981* cause of action will lie for discrimination [**3] in refusing to enter a contract but not for discrimination in contract performance. The district court also dismissed her promotion claims, apparently because it found that the promotions would not have created a "new and distinct" relation between employee and employer as required by *Patterson. See id. at 185.* The district court further held that the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991)(the "Act"), which, largely to nullify the effect of *Patterson*, extended *§ 1981* to include promotion claims and other terms and conditions claims, applied prospectively only and therefore did not make Plaintiff's claims actionable. The court also dismissed

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

Plaintiff's state common law claims, but she does not raise this on appeal.

We affirm the district court's decision that the Civil Rights Act of 1991 does not apply retroactively to Plaintiff's § 1981 claims, and, thus, its dismissal of Plaintiff's § 1981 claims for discrimination in the terms and conditions of her employment. However, since we believe Plaintiff's complaint states a cause of action under *Patterson* as to her timely § 1981 promotion claims, we reverse their dismissal. [**4] We also reverse the dismissal of the two Title VII claims alleging that Butts was excluded from department reorganization meetings based on her race and sex, but affirm the dismissal of the remainder of her Title VII claims.

## BACKGROUND

The City hired Geneva Butts in April, 1972 as a Computer Systems Manager and has continuously employed her ever since. On November 22, 1989, Butts filed a charge of discrimination with the EEOC. The charge alleged that starting in October, 1987, the City systematically discriminated against her because of her race and sex in the terms and conditions of her employment. This was done, she alleged, by excluding her from meetings and duties to which her position should have entitled her, cutting her off from her supervisors, defaming her, and by denying her promotional opportunities. She claimed that notwithstanding her promotion in April, 1987 to the title of Acting Deputy Director of the Computer Center, she was denied any increased authority; that though placed in charge of the Computer Center from June to September, 1987, she only had ten telephone conversations over that period with the Deputy Commissioner to whom she reported; that from 1987 to the [**5] present, she was excluded from department reorganization meetings in which she believed she should have been included; and that starting in October, 1987, she was discouraged from applying for higher positions in the Department and her work performance was unfairly criticized. She further alleged that in November, 1989, the same month in which she filed her charge, the City, in a measure designed to reduce the number of African-Americans in its employ, was undertaking to move her group from Harlem to a location in midtown Manhattan.

The EEOC investigated Plaintiff's allegations and, on May 7, 1991, dismissed her charge. The EEOC found that the alleged relocation of the computer group from Harlem to midtown had not occurred. The EEOC also concluded that the rest of her allegations were time-barred, since they occurred in 1987, outside the 300-day limitations period for filing EEOC charges applicable to claims arising in New York. *42 U.S.C. § 2000e-5(e)*.

Butts filed the present action on August 5, 1991, and her amended complaint on March 16, 1992. She claimed that from 1987 on the City denied her promotions and discriminated against her in the [**6] terms and conditions of her employment based on her race and sex. She specified five instances in which she allegedly was denied promotional opportunities. Two of these promotion denials allegedly occurred in 1987. The next incident is said to have occurred in 1989, when she inquired into the possibility of her promotion to the newly-created position of Director of Systems Architecture, "but was not given a clear response." The fourth and fifth took place in May, 1990, and June, 1991, when, on each occasion, she applied for the vacant position of [*1401] Deputy Commissioner of the Office of Management and Administration, was never granted an interview, and the position went to a caucasian man.

Butts also alleged that she continually was deprived of the responsibility and power her position entailed. She claimed that from 1987 to the present she was repeatedly denied access to her supervisors; that in 1987, although she was promoted from Deputy Director to Director, persons formerly her subordinates were placed at her level of responsibility; and that, in 1988, the City eliminated her duty as Computer Training Liaison and excluded her from a study of ways to improve the efficiency of the Department's [**7] information systems. Also, while dropping the earlier claim that the City was going to move her department from Harlem to midtown, she claimed that discrimination occurred when she was excluded from discussions about the proposed move.

The City moved to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(1)* and *(6)*. On July 7, 1992, the district court granted Defendant's motion in its entirety. The court ruled that the Title VII claims either were time-barred as occurring more than 300 days before the filing of the EEOC charge, or were absent from the charge entirely, thereby depriving the district court of jurisdiction to hear them. The district court dismissed Plaintiff's § 1981 claims on the ground that they all involved issues of contract performance, which are not actionable under *Patterson*. The court also ruled that the 1991 Civil Rights Act, which would have made any timely contract performance claims actionable under § 1981, did not apply retroactively. This appeal followed.

## DISCUSSION

### I. The Title VII Claims

The district court dismissed Plaintiff's Title VII claims on the grounds that a number of them were not filed within the 300-day period as required by *42 U.S.C. § 2000e-5* [**8] *(e)*, and the remainder were not included in the EEOC charge and therefore the court was without jurisdiction over them.

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

When a plaintiff fails to file a timely charge with the EEOC, the claim is time-barred. *Gomes v. Avco Corp., 964 F.2d 1330, 1332-33 (2d Cir. 1992); see also Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 71 L. Ed. 2d 234, 102 S. Ct. 1127 (1982).* In states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days. *42 U.S.C. § 2000e-5(e).* Two of the five promotion claims in Plaintiff's complaint, and most of her claims of discrimination in the terms and conditions of her employment, allegedly occurred in 1987 and 1988. Since her EEOC charge was not filed until November 22, 1989, these claims are time-barred.

A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is "reasonably related" to that alleged in the EEOC charge. *Stewart v. United States Immigration and Naturalization Service, 762 F.2d 193, 198 (2d Cir. 1985);* [**9] *Almendral v. New York State Office of Mental Health, 743 F.2d 963, 967 (2d Cir. 1984); Goodman v. Heublein, Inc., 645 F.2d 127, 131 (2d Cir. 1981); Kirkland v. Buffalo Bd. of Educ., 622 F.2d 1066, 1068 (2d Cir. 1980).* This exhaustion requirement is an essential element of Title VII's statutory scheme. As we noted in *Miller v. International Tel. & Tel., 755 F.2d 20, 26 (2d Cir.), cert. denied, 474 U.S. 851, 88 L. Ed. 2d 122, 106 S. Ct. 148 (1985),* with respect to an analogous EEOC charge requirement in the Age Discrimination in Employment Act, *29 U.S.C. § 621, et seq.*: "the purpose of the notice provision, which is to encourage settlement of discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *See also Stewart, 762 F.2d at 198* ("the purpose of the [Title VII] exhaustion requirement . . . is to give the [*1402] administrative agency the opportunity to investigate, mediate, [**10] and take remedial action . . .").

Three of the promotion claims in Plaintiff's civil action involve alleged acts of discrimination occurring in 1989 and 1990. Butts claims that in 1989, she was denied promotion to Director of Systems Architecture and that in May, 1990 and again in June, 1991, after she filed her EEOC charge, she was denied promotion to Deputy Commissioner of the Office of Management and Administration. However, the first promotion allegation was never raised in the November 22, 1989 EEOC charge and Butts did not file a second EEOC charge alleging either this or the two incidents she says occurred after she filed her charge. Since these charges were never presented to the EEOC, the district court was without juris-

diction to hear them. Similarly, her various terms and conditions claims either were not alleged in her EEOC charge or are time-barred.

Butts argues that the allegations that were not in her EEOC charge are "reasonably related" to the allegations that were in her EEOC charge and can be brought on that basis. We disagree as to all but two of her claims.

We have recognized three kinds of situations where claims not alleged in an EEOC charge are sufficiently [**11] related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action. We have loosely referred to these claims as "reasonably related" to the allegations in the EEOC charge. While the three are each animated by the common notion of fairness to civil rights litigants, their "reasonableness" derives from separate rationales.

The first type of "reasonably related" claim we have recognized is essentially an allowance of loose pleading. Recognizing that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims she is suffering, we have allowed claims not raised in the charge to be brought in a civil action where the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Smith v. American President Lines, Ltd., 571 F.2d 102, 107 n.10 (2d Cir. 1978); see also Gomes, 964 F.2d at 1334; Silver v. Mohasco Corp., 602 F.2d 1083, 1090 (2d Cir. 1979),* [**12] *rev'd on other grounds, 447 U.S. 807, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980).*

The second type of "reasonably related" claim is one alleging retaliation by an employer against an employee for filing an EEOC charge. *Malarkey v. Texaco, Inc., 983 F.2d 1204 (2d Cir. 1993); Owens v. New York City Housing Authority, 934 F.2d 405, 410-11 (2d Cir.), cert. denied, 116 L. Ed. 2d 451, 112 S. Ct. 431 (1991); Goodman, 645 F.2d at 131; Kirkland, 622 F.2d at 1068.* In such cases the EEOC charge requirement is not excused because the new claims likely would have been discovered by the EEOC investigation. While this is possible, it is equally possible that the retaliation would come after the EEOC investigation was completed. *See Malarkey, Slip Op. at 1145* ("We see no reason why a retaliation claim must arise before administrative proceedings terminate in order to be reasonably related"). Rather, in such situations, we have relaxed the exhaustion requirement based on the close connection of the retaliatory act to both the initial discriminatory conduct [**13] and the filing of the charge itself. *Owens, 934 F.2d at 410-11.* The EEOC already will have had the opportunity to investigate and mediate the claims arising from the under-

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

lying discriminatory acts alleged. Due to the very nature of retaliation, the principle benefits of EEOC involvement, mediation of claims and conciliation, are much less likely to result from a second investigation. Indeed, requiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination.

The third type of reasonably related claim is where a plaintiff alleges further [*1403] incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *See Almendral, 743 F.2d at 967* (discrimination through manipulating civil service rules was reasonably related to EEOC charge alleging manipulation of rules since it alleged "essentially the same" acts). Such an incident might not fall within the scope of the EEOC investigation arising from [**14] the charge, since it might occur after the investigation was completed, as was the case in *Almendral. Id. at 966-67*. However, the values associated with exhaustion are not entirely lost because the EEOC would have had the opportunity to investigate, if not the particular discriminatory incident, the method of discrimination manifested in prior charged incidents. The fact that a charge alleging the same method was not resolved by the EEOC to the plaintiff's satisfaction makes it more likely that a new charge alleging the later incident would meet the same fate. Our holding that such conduct is "reasonably related" implicitly recognizes the cost to a plaintiff of requiring exhaustion in circumstances where the likelihood of a successful settlement is limited.

In this case, the majority of Plaintiff's claims are not reasonably related to timely allegations in her EEOC charge under any of the three theories. Most of the allegations in her EEOC charge are time-barred and thus cannot serve as predicates for allegations in the complaint said to be reasonably related. Of the timely allegations in the charge, all but two are too vague to serve as predicates [**15] for allegations in the complaint. For example, Butts alleged in the charge that she had "consistently been the target of discriminatory practices and treatment" from "October of 1987 to [the] present." While part of this claim relates to conduct occurring in 1989, which is within the limitations period, the allegation was insufficiently specific to enable the EEOC to investigate it. The same is true for Plaintiff's allegation that she was "denied promotional opportunities and consideration based on my race and sex." Were we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investi-

gatory and mediation goals would be defeated. *See Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992).*

However, two of Plaintiff's terms and conditions claims are reasonably related to allegations in her EEOC charge, under the first theory stated above. Plaintiff alleged in the charge that "after October 1987, . . . [Plaintiff's supervisor] held [**16] department reorganization meetings without informing me of the meetings or results." In her complaint, she claims that "on or about 1988" she was excluded from discussions relating to her department's participation in a city-wide study of ways to improve efficiency. She also alleges in her complaint that she was excluded from discussions about the proposed move of the department. We note parenthetically that when Plaintiff alleged the move itself in her EEOC charge as an act of discrimination, the EEOC upon investigation found that the move never took place, and Plaintiff has dropped the claim.

An EEOC investigation into the charge of exclusion from department reorganization meetings likely would have included an inquiry into her exclusion from the meetings set forth in her complaint. Exclusion from discussions about the departmental move and about potential changes to improve efficiency are closely enough related to exclusion from "department reorganization" meetings that it is reasonable to conclude that Plaintiff gave the EEOC notice of these incidents. We therefore find these claims to be reasonably related to the one in her EEOC charge and that the district court erred in dismissing [**17] them.

We note, however, that Plaintiff's EEOC charge was vague as to the dates of these incidents, merely stating that the exclusion from meetings took place "after October 1987." Since the charge allegations were timely only as to acts occurring on or after a date 300 days before November 22, 1989, when Butts filed the charge, on remand the [*1404] district court only may hear the two claims insofar as they relate to acts occurring on or after this date.

Finally, Plaintiff argued before the district court that she should be permitted to bring her time-barred claims based on the "continuous violation" exception to the Title VII statute of limitations. She appears to have abandoned this argument on appeal. In any event, the continuous violation exception applies only where discrimination is accomplished through a specific official policy or mechanism, which is not alleged here. *See, e.g., Cook v. Pan American World Airways, Inc., 771 F.2d 635 (2d Cir. 1985)*(discriminatory seniority list), *cert. denied, 474 U.S. 1109, 88 L. Ed. 2d 929, 106 S. Ct. 895 (1986)*; *Association Against Discrimination in Employment, Inc. v. Bridgeport, 647 F.2d 256 (2d Cir. 1981)* [**18] (dis-

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

criminatory fire department tests), *cert. denied*, 455 U.S. 988, 71 L. Ed. 2d 847, 102 S. Ct. 1611 (1982).

We therefore affirm the district court's dismissal of Plaintiff's Title VII claims as to all but the two claims discussed above.

## II. Retroactivity of the Civil Rights Act of 1991

Plaintiff also alleges that the same acts of discrimination cited in her Title VII claim violated *42 U.S.C. § 1981*. *Section 1981* provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." *42 U.S.C. § 1981(a)*. In *Patterson v. McLean Credit Union*, 491 U.S. 164, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989), the Supreme Court held that *§ 1981* redresses discrimination in contract formation but not in contract performance. Thus, under *Patterson*, discrimination in the terms and conditions of employment is not actionable under *§ 1981*. The *Patterson* Court acknowledged, however, that discrimination in promotion could give rise to a cause of action under *§ 1981*, but only where "the promotion rises [**19] to the level of an opportunity for a new and distinct relation between the employee and the employer . . . ." *Id. at 185*.

While the 1989 decision in *Patterson* is the latest pronouncement by the Supreme Court on *§ 1981*, it is not the end of the story. The *Patterson* decision was disfavored by some in Congress and prompted legislative efforts to overcome what was perceived to be *Patterson's* limiting effect on private civil rights enforcement. In the 1991 Civil Rights Act, among other changes in the civil rights laws, Congress amended *§ 1981* to reach terms and conditions claims, including promotion claims. The Act, in a new definitions section, provided that the term "make and enforce contracts" in *§ 1981* "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *42 U.S.C. § 1981(b)*.

The Act took effect on November 21, 1991. The last act of discrimination alleged in Plaintiff's complaint occurred in 1990. Not surprisingly, since Plaintiff's complaint alleging discrimination in promotion [**20] and in the terms and conditions of her employment clearly would state a cause of action under the amended *§ 1981*, she argues that the 1991 Act applies retroactively. If it does, there is no need to inquire into whether Plaintiff's promotion claims state a cause of action under *Patterson*.

The 1991 Act contains no express provision stating whether the Act as a whole is to be applied retroactively or prospectively only, although it does provide that two

sections unrelated to this case are to be applied only prospectively. Thus, to determine the retroactivity question, we must examine the Act's language, its legislative history, the significance of the two sections where prospectivity is specified in relation to the Act as a whole, and view the Act in light of applicable presumptions. *See generally United States v. Thompson/Center Arms Co., 119 L. Ed. 2d 308, 112 S. Ct. 2102, 2107-09 (1992)* ("ordinary rules of statutory construction" include examination of wording, legislative [*1405] history and purpose, and the role of a given section in relation to the entire act).

### A. Legislative History of the 1991 Civil Rights Act

No formal legislative history, in the form of committee [**21] reports or conference reports, accompanies the 1991 Act, much less any agreed-upon statement of congressional intent on the retroactivity issue. *See Gersman v. Group Health Ass'n, Inc., 298 U.S. App. D.C. 23, 975 F.2d 886, 891 (D.C. Cir. 1992), petition for cert. filed, 61 U.S.L.W. 3523* (Jan. 13, 1993). This does not mean, however, that the retroactivity issue was not very much on the minds of the legislators. Rather, unable to agree on the matter, they agreed to disagree and left the matter for the courts to decide.

The Congressional Record is replete with floor speeches by Senators and Representatives stating either that the bill is intended to apply prospectively only or that it was meant to apply retroactively. See cases collected in *Davis v. San Francisco, 976 F.2d 1536, 1554 (1992), reh'g denied, vacated in part as moot, and remanded in part, 984 F.2d 345, (9th Cir. 1993); see also Luddington v. Indiana Bell Tel. Co., 966 F.2d 225, 227 (7th Cir. 1992), petition for cert. filed, 61 U.S.L.W. 3446* (Dec. 3, [**22] 1992). The Supreme Court, while recognizing that floor speeches may be helpful in discerning congressional intent, *see Regents of the University of California v. Public Employment Relations Bd., 485 U.S. 589, 595-96, 99 L. Ed. 2d 664, 108 S. Ct. 1404 (1988)*, has noted that the "contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history," *Weinberger v. Rossi, 456 U.S. 25, 35, 71 L. Ed. 2d 715, 102 S. Ct. 1510 n.15 (1982)*. Floor speeches are of particularly limited assistance in resolving highly controversial issues of congressional intent. Since any member can make a floor speech, there is scant utility in totaling up the number of speeches on each side of an issue and attempting to divine congressional intent from the quantity of Congressional Record pages generated on either side.

A bit more enlightenment is possible from looking at the sequence of events that led to the 1991 Act's passage and the maneuvering of those on both sides of the retroactivity issue. In 1990, Congress presented President

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

Bush with a civil rights bill, containing the same pro-scription against discrimination in the terms and condi-tions of employment as the 1991 [**23] version, that was expressly retroactive. The President vetoed the bill and criticized its "unfair retroactivity rules" in his veto message. President's Message to the Senate Returning Without Approval the Civil Rights Act of 1990, 26 Weekly Comp. Pres. Doc. 1632, 1634 (Oct. 22, 1990). When the 1991 bill was sent to the President, it did not contain a retroactivity provision. In his statement upon signing the 1991 Act, the President instructed "all offi-cials in the executive branch" to follow "as authoritative interpretive guidance" memoranda of law inserted into the Congressional Record by Senator Dole which stated, among other things, that the 1991 Act should not be con-sidered to be retroactive. Statement of President George Bush Upon Signing S1745, 1991 U.S.C.C.A.N. 768, 769 (Nov. 21, 1991)(adopting memoranda at 137 Cong. Rec. S15472 (daily ed. Oct. 30, 1991) and 137 Cong. Rec. S15953 (daily ed. Nov. 5, 1991)).

This sequence of events was sufficient to persuade the Eighth Circuit that the 1991 Act was intended to ap-ply prospectively only. *Fray v. Omaha World Herald Co., 960 F.2d 1370 (8th Cir. 1992)*. The court reasoned: "When a bill mandating retroactivity [**24] fails to pass, and a law omitting that mandate is then enacted, the legislative intent was surely that the new law be prospec-tive only; any other conclusion simply ignores the reali-ties of the legislative process." *Id. at 1378; see also Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Wisconsin Employment Relations Bd., 340 U.S. 383, 392, 95 L. Ed. 364, 71 S. Ct. 359 n.15 (1951)*(Congress's non-inclusion of a provision in a bill's later version criticized by the President upon vetoing an earlier version demonstrates Congress's abandonment of the position contained in the provision).

[*1406] While we would agree with the principle enunciated in *Fray* as a general matter, its application in this case is undermined by complicating facts. To be sure, Congress abandoned any attempt to make the Civil Rights Act explicitly retroactive in its final version. However, Congress also rejected numerous proposals by the President and allied Senators and Representatives explicitly to make the Act prospective only. *See, e.g.*, 137 Cong. Rec. H3898 (daily ed. June 4, 1991)(proposal of Representative Michel containing prospective-only provision). As Judge [**25] Posner concluded after re-viewing these circumstances:

It seems futile to search for a legislative intent, bearing in mind that the President is by virtue of the veto power a key par-ticipant in the legislative process. Presi-dent Bush would probably have vetoed a statute that contained an express provision for retroactivity--he had done so the pre-vious session and his veto had not been overridden--but the Democratic majority in both houses would equally have "ve-toed" an express provision for prospective application. As so often happens, the con-tenders could not agree, so they dumped the question into the judiciary's lap with-out guidance.

*Luddington, 966 F.2d at 227*. The accuracy of this ob-servation is reinforced by the candid admissions of bill sponsors Senators Danforth and Kennedy that the various Senate floor statements were inconclusive on the retroac-tivity question and that it would be left for the courts to resolve. 137 Cong. Rec. S15324-25 (daily ed. Oct. 29, 1991) (Sen. Danforth: "a court would be well advised to take with a large grain of salt floor debate and statements placed into the Congressional Record which purport to create an interpretation [**26] for the legislation that is before us"); 137 Cong. Rec. S15485 (daily ed. Oct. 30, 1991) (Sen. Kennedy: retroactivity "will be up to the courts to determine").

Every circuit except the Eighth that has considered the issue has held that the legislative history is ambiguous as to whether the 1991 Act should be applied retroactively. *Baynes v. AT&T Technologies, Inc., 976 F.2d 1370, 1372 (11th Cir. 1992); Gersman, 975 F.2d at 891 (D.C. Cir.); Luddington, 966 F.2d at 227 (7th Cir.); Vogel v. Cincinnati, 959 F.2d 594, 597-98 (6th Cir.), cert. denied, 121 L. Ed. 2d 49, 113 S. Ct. 86 (1992); Johnson v. Uncle Ben's, Inc., 965 F.2d 1363, 1373 (5th Cir. 1992), petition for cert. filed, 61 U.S.L.W. 3356 (Sept. 29, 1992)*. We agree that the legislative history is ambiguous. Moreover, in light of the inability of the prospective-only and retro-active factions within Congress to insert their respective provisions into the final version of the 1991 Act, we be-lieve that the Act is "deliberately ambiguous" [**27] regarding retroactivity and that we thus can infer an af-firmative intent to make the Act neither prospective-only nor retroactive but to leave the issue to the judiciary. *See Johnson, 965 F.2d at 1373* (Act is "deliberately ambigu-ous"); *see also Luddington, 966 F.2d at 227*.

Plaintiff argues that the Act was intended to restore pre-*Patterson* law and that therefore a presumption of retroactivity is appropriate. She relies on our decision in *Leake v. Long Island Jewish Medical Center, 869 F.2d 130 (2d Cir. 1989)*(per curiam), *aff'g substantially for reasons stated at 695 F. Supp. 1414 (E.D.N.Y. 1988)*. However, this reliance is misplaced. In *Leake*, we held that the Civil Rights Restoration Act of 1987 (the "Res-toration Act"), which effectively overturned the Supreme

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

Court's decisions in *Grove City College v. Bell, 465 U.S. 555, 79 L. Ed. 2d 516, 104 S. Ct. 1211 (1984)*(holding that a ban on discrimination by schools receiving Title IX funds applies only to the specific program receiving aid and not to the entire school), and *Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 635-36, 104 S. Ct. 1248, 79 L. Ed. 2d 568 (1984)* [**28] (applying *Grove City* to the Rehabilitation Act of 1973), applied retroactively to the plaintiff's Rehabilitation Act claim. But in *Leake*, we adopted the reasoning of the district court that the Restoration Act's stated purpose to "restore" and "clarify" the meaning of language in the Rehabilitation Act created an inference that Congress intended the statute to apply retroactively. *Leake*, 695 F. Supp. at 1417-18. This inference was supported by sponsors' [*1407] floor speeches stating that the Restoration Act would apply retroactively. *Id. at 1416-17.* Similarly, in *Mrs. W. v. Tirozzi, 832 F.2d 748, 755 (2d Cir. 1987)*, we found "clear legislative history" that amendments to *42 U.S.C. § 1983* "simply codify a congressional purpose long in place which Congress believed the Supreme Court had misinterpreted," giving rise to an inference that Congress intended the amendments to be applied retroactively.

*Leake* and *Tirozzi* do not establish a new rule of construction that restorative legislation is presumed to apply retroactively, as some district courts in [**29] this circuit have held. *See, e.g., Kemp v. Flygt Corp., 791 F. Supp. 48, 51 (D.Conn. 1992); McLaughlin v. New York, 784 F. Supp. 961, 972 (N.D.N.Y. 1992).* Rather, *Leake* and *Tirozzi* simply invite courts to use restorative language and intent as but one means of discerning congressional intent as to retroactivity. *See Smith v. Petra Cablevision Corp., 793 F. Supp. 417, 430 n.13 (E.D.N.Y. 1992)*(conflicting legislative history of Civil Rights Act of 1991 precludes application of the *Leake* inference of retroactivity).

In the present case, Congress deliberately deleted all "restore" language in drafting the 1991 version. *Compare* Civil Rights Act of 1990, *printed in* 136 Cong. Rec. S9966, S9966 (daily ed. July 18, 1990)(stating that purpose is to "respond to the Supreme Court's recent decisions by restoring the civil rights protections that were dramatically limited by those decisions . . ."), *with* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1071 (1991)(purpose is "to respond to recent decisions of the Supreme Court by expanding the scope of relevant [**30] civil rights statutes . . ."). If anything, this tips the scale in favor of non-retroactivity. In any event, restorative purpose is irrelevant here since, as discussed above, the legislative history makes clear that Congress deliberately expressed no view as to the retroactivity of the Act.

*B. The Two Prospectivity Exceptions*

Plaintiff argues that two sections of the Act, which provide for prospective-only application to certain classes of defendants, require the inference that the rest of the Act was retroactive. The Ninth Circuit so held in *Reynolds v. Martin*, No. 91-15237, 1993 WL 27657 (9th Cir. Feb. 9, 1993), following the "cardinal principle of statutory construction . . . to save and not to destroy[,] . . . giving effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section. . . ." *Id.* at * 3 (quoting *United States v. Menasche, 348 U.S. 528, 538-39, 99 L. Ed. 615, 75 S. Ct. 513 (1955)).* While we certainly would not assail this elementary canon of construction, we disagree with the Ninth Circuit's invocation of it here and question whether the court fully appreciated the particular context in which the two provisions were [**31] inserted into the 1991 Act.

Section 402(b) provides that the 1991 Act will apply prospectively only to "any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983." This narrowly-tailored provision was designed to benefit the defendant-petitioner in *Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989)*(Title VII disparate impact case that provided part of the impetus for Congress's enactment of the 1991 Act), and was inserted at the last minute at the urging of the Senators from Alaska to protect a major employer in their state. *See* 137 Cong. Rec. S15469 (daily ed. Oct. 31, 1991)(statement of Sen. Adams); 137 Cong. Rec. S15478 (daily ed. Oct. 30, 1991)(statement of Sen. Dole); 137 Cong. Rec. S15953 (daily ed. Nov. 5, 1991)(statement of Sen. Dole); 137 Cong. Rec. H9555-56 (daily ed. Nov. 7, 1991)(statement of Del. Faleomavaega); *see also Gersman, 975 F.2d at 889-90; Johnson, 965 F.2d at 1372 n.4; Mozee v. American Commercial Marine Service Co., 963 F.2d 929, 933 (7th [**32] Cir.), cert. denied, 121 L. Ed. 2d 148, 113 S. Ct. 207 (1992).* When this provision was added to the bill, Senator Murkowski of Alaska and Senator Dole assured their colleagues that no inference as to the retroactivity of the entire bill should be drawn from it. 137 Cong. Rec. S15493 (daily ed. Oct. 30, 1991)(statement [*1408] of Sen. Murkowski); 137 Cong. Rec. S15953 (daily ed. Nov. 5, 1991)(statement of Sen. Dole).

The second of the two provisions, § 109, extends the protection of Title VII and the Americans with Disabilities Act to United States citizens working overseas for United States companies. Subsection (c) provides that § 109 applies only to future conduct. This explicit prospective-only provision is uninformed by any legislative history.

In contrast to the Ninth Circuit in *Reynolds*, the Fifth, Seventh, and D.C. Circuits all have held that these two provisions are properly read as "insurance policies"

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

against the possibility that a court would deem the entire Act to apply retroactively. *Gersman, 975 F.2d at 890* (the two provisions are merely "insurance policies"); *Johnson, 965 F.2d at 1372-73; Mozee, 963 F.2d at 933* [**33] (holding that § 402(b) is "nothing more than a clear assurance" that the Act would not apply retroactively to the *Wards Cove* case regardless of the retroactivity of Act generally, and that § 109(c) also appears to be an "extra assurance"). We agree. The two provisions deal with matters that are relatively insignificant to the 1991 Act as a whole. Moreover, there is no suggestion that either was added against a background assumption that Congress intended the entire Act to be retroactive. They seem to have been inserted by individual legislators to protect constituent interests against the possibility that the statute ultimately would be held retroactive in the full knowledge that the retroactivity question was an open one that could go either way in the courts. The floor statements of Senators Dole and Murkowski that no inference should be drawn from the addition of § 402(b) considerably bolster this conclusion.

The Ninth Circuit in *Reynolds* argued that § 402 (b) and § 109(c) must be read in conjunction with § 402(a), which provides that "except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." The panel, reasoning [**34] that the phrase "as otherwise specifically provided" referred to sections 402(b) and 109(c), concluded that the plain meaning of "shall take effect upon enactment" must be that the rest of the Act applies retroactively. *Reynolds v. Martin,* 1993 WL at * 3- * 4. However, the history of the passage of the Act belies this reading. The 1990 Civil Rights Act contained six provisions which specified, for each section of the act, the extent to which such section would apply retroactively. *See, e.g.,* Civil Rights Act of 1990, Sec. 15(a)(6), *printed in* 136 Cong. Rec. S9966, S9968 (daily ed. July 18, 1990)("[the *§ 1981* amendments] shall apply to all proceedings pending on or commenced after June 15, 1989"). In light of the deletion of these retroactivity provisions in the 1991 Act, and the legislative history indicating the failure of various factions to make the Act either expressly prospective-only or expressly retroactive, we fail to see how the inclusion in the 1991 Act of the phrase "shall take effect upon enactment" can be read to mean that the Act shall apply retroactively.

We do agree with the *Reynolds* court, however, that it is the duty of reviewing courts to give effect [**35] to every clause and word of a statute where possible. We easily do so with respect to the phrase "except as otherwise provided" since the Act, in various sections, requires certain things to take place in the future. Section 204(b), for example, states that the Glass Ceiling Commission established by § 203 shall present a report to the

President and Congress "not later than 15 months after the date of the enactment of this Act." Section 303(b)(4) states that the first Director of the Office of Senate Fair Employment Practices "shall be appointed and begin service within 90 days after the date of enactment of this Act." Thus the better reading of § 402(a) is that the Act's provisions will become law and will begin to be in force as of the date of enactment, but certain mandates of the Act need not be implemented until some later date. Whether the Act's general provisions being in force means that they will be applied retroactively is a separate question that is left unresolved by the Act's language and its legislative history.

[*1409] C.

*Applicable Retroactivity Presumption Absent Congressional Intent*

Since neither the 1991 Act's language nor its legislative history indicates whether [**36] it should be applied retroactively or prospectively only, we turn to certain presumptions the Supreme Court has established for courts to apply when a statute is silent as to retroactivity and Congress has failed otherwise to indicate its intention. In this endeavor we are, somewhat regrettably, faced with two lines of authority in apparent conflict. In *Bradley v. Richmond School Bd., 416 U.S. 696, 711, 40 L. Ed. 2d 476, 94 S. Ct. 2006 (1974),* the Court held that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." In contrast to *Bradley's* retroactivity presumption, in *Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 102 L. Ed. 2d 493, 109 S. Ct. 468 (1988),* the Court held that "retroactivity is not favored in the law. Thus, congressional enactments . . . will not be construed to have retroactive effect unless their language clearly requires this result." *Bowen* did not overrule, or even refer to, *Bradley.* Likewise *Bradley* does not overrule the cases preceding it on which *Bowen* relied for authority. *E.g., Miller v. United States, 294 U.S. 435, 439, 79 L. Ed. 977, 55 S. Ct. 440 (1935)* [**37] (cited in *Bowen, 488 U.S. at 208*). Justice Scalia noted in his concurrence in *Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 108 L. Ed. 2d 842, 110 S. Ct. 1570 (1990),* that these two lines of cases are "in irreconcilable contradiction" and urged the Court to resolve the issue, *id. at 841* (Scalia, J., concurring), but the Court did not reach the question since it found clear congressional intent to apply the statute at issue prospectively only. *Id. at 837-38.*

While we tend to agree with Justice Scalia that the lines of cases are "in irreconcilable contradiction," it is

Case 1:08-cv-02787-DLC    Document 5-2    Filed 05/09/2008    Page 25 of 27

Page 9

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

beyond our authority to choose one and disregard the other. *Cf. Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 104 L. Ed. 2d 526, 109 S. Ct. 1917 (1989)(Courts of Appeals must follow Supreme Court case that directly applies and may not depart from it because it conflicts with reasoning of another line of decisions).

The principle of *Bowen*, that absent an explicit directive or legislative history to the contrary, a statute should be applied only prospectively, is the more established doctrine in [**38] our jurisprudence. In *United States v. Security Industrial Bank*, 459 U.S. 70, 79, 74 L. Ed. 2d 235, 103 S. Ct. 407 (1982), a post-*Bradley* case, the Supreme Court noted that "the principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." The Court in *Security Industrial Bank*, *id.* at 79-80, also quoted the statement from *United States Fidelity & Guaranty Co. v. United States ex rel. Struthers Wells Co.*, 209 U.S. 306, 314, 52 L. Ed. 804, 28 S. Ct. 537 (1908), that "the presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other." See also cases collected in *Bowen*, 488 U.S. at 208. While the Ex Post Facto Clause of Article I, Section 9 of the United States Constitution applies only to criminal statutes, the fundamental principle animating that clause, that persons be given an opportunity to conform their conduct to the law before incurring its sanctions, is equally applicable to civil cases. *See Luddington*, 966 F.2d at 227-28; [**39] Lon Fuller, *The Morality of Law* 38-39, 51-63 (1969). Judge Posner has noted that while courts are not compelled to apply this principle to civil cases by the Constitution, "conformity to it is the right policy for courts to follow in default of other guidance." *Luddington*, 966 F.2d at 228.

Against this jurisprudential background, reflected in Supreme Court case law, the Court handed down *Bradley*. In *Bradley*, after the district court had entered judgment in favor of the plaintiffs in a school desegregation case and while the appeal [*1410] was pending, Congress enacted § 718 of the Educational Amendments of 1972, 20 U.S.C. § 1617, which provided for the recovery of attorneys' fees in school desegregation cases. The *Bradley* Court ruled that a new rule established in a statute should be applied to a case on appeal unless there is a statutory directive to the contrary, whether explicitly or in the legislative history, or if applying the statute retroactively would cause manifest injustice. *416 U.S. at 711-16*. The Court in *Bradley* relied on an earlier case, *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 21 L. Ed. 2d 474, 89 S. Ct. 518 (1969), [**40] which applied retroactively a Department of Housing and Urban Development regulation changing the procedures by

which local housing authorities may evict tenants. The regulation in *Thorpe*, like the attorneys' fees statute in *Bradley*, was promulgated while the case was on appeal: it had been decided by the North Carolina Supreme Court but was pending before the United States Supreme Court. *Id.* at 271-72.

*Thorpe* and *Bradley* cited prior Supreme Court cases in support, but every case cited either involved statutes in which the Court found clear retroactive language or intent, or dealt with changes in the law due to a *judicial* decision. *See Kaiser*, 494 U.S. at 846-48 (Scalia, J., concurring). Contrary to the general presumption of nonretroactivity of statutes, new rules announced in judicial decisions generally are presumed to apply retroactively. *See James B. Beam Distilling Co. v. Georgia*, 115 L. Ed. 2d 481, 111 S. Ct. 2439 (1991).

All of the circuits that have addressed the issue of which presumption ought to apply in the context of the 1991 Act have applied a presumption of prospectivity, [**41] and all have followed *Bowen*, except the Eleventh Circuit, which ruled that the Act should be applied prospectively only under either the *Bradley* or the *Bowen* test, since it found it would be "manifestly unjust" to the defendants to apply the Act retroactively. *Baynes*, 976 F.2d at 1373-75. Some of these circuits have relied on the Supreme Court's decision in *Bennett v. New Jersey*, 470 U.S. 632, 84 L. Ed. 2d 572, 105 S. Ct. 1555 (1985), that *Bradley* does not apply to changes in substantive rights and therefore does not apply to the 1991 Act. *See Gersman*, 975 F.2d at 898-99 (D.C. Cir.); *Johnson*, 965 F.2d at 1374 (5th Cir.); *Mozee*, 963 F.2d 929 at 936 (7th Cir.); *see also Vogel*, 959 F.2d at 598 (6th Cir.). Still other circuits have chosen the *Bowen* line over the *Bradley* line outright. *Holt v. Michigan Dept. of Corrections*, 974 F.2d 771, 773-74 (6th Cir. 1992); *Luddington*, 966 F.2d 225 at 227-29 (noting that Title VII changes were changes in procedure, remedies, and evidence, but noting nonetheless [**42] that these changes could impact reliance interests and should not be applied retroactively). The Eighth Circuit did not reach the *Bradley/Bowen* issue since it found a legislative intent to apply the Act prospectively only, but stated that *Bowen* was "the better rule." *Fray*, 960 F.2d at 1378.

In the Second Circuit we have sought to harmonize *Bradley* and *Bowen* along the line that Justice Scalia noted in his concurrence in *Kaiser*. *Thorpe*, *Bradley*, and the cases they cite, as well as *Bennett*, involved in specific situation where the legislative change occurred while the case was pending on appeal. Justice Scalia wrote: "It is doubtful . . . whether the *Thorpe-Bradley* presumption of retroactivity survives at all. It it does, however, it *only* survives (as it was begotten) as a special rule applicable to changes in law after initial adjudication." *Kaiser*, 494 U.S. at 854 (Scalia, J., concurring). Justice Scalia's inter-

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

pretation of *Bradley* and *Thorpe* is the law of this circuit. In *Litton Systems, Inc. v. American Tel. & Tel. Co., 746 F.2d 168, 174 (2d Cir. 1984)*, [**43] we held:

> We do not understand *Bradley* to mean . . . that the only cognizable basis for a construction against retroactivity is either explicit statutory language or unequivocal congressional intent. Determination of retroactivity remains a matter of statutory construction, albeit with a presumption in favor of retroactivity as to judgments pending on direct review, contrary to the normal presumption against retroactivity in other circumstances.

*See also United States v. Target Rock Corp.,* No. 90 Civ. 4414 at 20, *1992 WL* [*1411] *157677, 1992 U.S. Dist. LEXIS 9858* (E.D.N.Y. June 30, 1992).

While this court has cited *Bradley* since *Litton* was decided in cases that were not pending on appeal when the legislative change was enacted, in these cases we did not apply the *Bradley* presumption, but instead either found that congressional intent was unambiguous and only cited language from *Bradley* for the unremarkable proposition that congressional intent is dispositive, *e.g., Taub, Hummel & Schnall v. Atlantic Container Line, Ltd., 894 F.2d 526, 529 (2d Cir. 1990)* (statute expressly prospective-only); *Counsel v. Dow, 849 F.2d 731, 736 n.4* [**44] *(2d Cir.)* (congressional intent unambiguous), *cert. denied, 488 U.S. 955, 109* S. JCt. 391, *102 L. Ed. 2d 380 (1988)*, or cited it for the similarly settled principle that new rules announced by court decisions are presumed to apply retroactively, *e.g., Gonzalez v. Home Ins. Co., 909 F.2d 716, 723 (2d Cir. 1990)* (*Patterson* decision applies retroactively).

This distinction between cases pending on appeal and cases yet to be decided by the district court poses an obvious problem. Under our interpretation of *Bradley*, the litigant whose claim has already been heard before the district court under the old statute but is pending on appeal will have the new statute presumptively applied, but a litigant whose case is yet to be decided by the district court will have the old statute presumptively applied. While we believe, notwithstanding *Bradley*, that *Bowen* and the overwhelming weight of Supreme Court precedent support the proposition that there should never be a presumption of retroactivity where congressional intent is ambiguous, if a presumption of retroactivity were to apply to only one of the above situations, it would seem that it should be the reverse [**45] of our *Bradley/Bowen* distinction: where a district court has already rendered a decision under the former statute

when the new statute is passed, there is a lesser, not greater, reason to presume retroactivity. The Seventh Circuit and Justice Scalia also have noted this anomaly. *See Kaiser, 494 U.S. at 854-55* (Scalia, J., concurring); *Mozee, 963 F.2d at 936* ("such a distinction has no basis in policy"). However, given that we have concluded that *Bowen* sets forth the general rule and *Bradley* the exception, we are forced to distinguish *Bradley*, and, absent further guidance from the Supreme Court, we see no compelling reason not to follow *Litton*. We therefore follow *Bowen's* presumption that the Act is to be applied prospectively only as to Plaintiff's § *1981* suit and decline to follow the *Bradley* retroactivity presumption, since her cause of action accrued prior to the Act's November 21, 1991 effective date and was not pending on appeal at that time.

III.  Plaintiff's § *1981* claims under *Patterson v. McLean Credit Union*

Since the 1991 Act does not apply to Plaintiff's case, we must apply the [**46] law as it existed prior to the Act. Under *Patterson*, a claim of discrimination in promotions is actionable under § *1981* "only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer . . . ." *Patterson, 491 U.S. at 185*. The *Patterson* Court did not elaborate on the meaning of "new and distinct" relation, except by citing *Hishon v. King & Spalding, 467 U.S. 69, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*, a Title VII case involving an associate in a law firm who had been denied partnership, presumably to indicate that elevation to partnership would create a "new and distinct" relation. *491 U.S. at 185-86*. The elevation from associate to partner is perhaps the paradigm of a new and distinct relation. *Hishon* does not assist, however, in defining the border between actionable and non-actionable promotions under § *1981*.

*Patterson* held that 1981 only provides a cause of action for discrimination in making and entering contracts, and not for discrimination in the performance of contracts. *Id. at 176-178*. With respect to promotions, [**47] the inquiry is whether a promotion effectively creates a new contract between employer and employee or is simply the fulfillment of a stated promise or an implicit expectation in the original contract. If the former, it is actionable under *Patterson;* if the latter it [*1412] is not, since it is a matter of contract performance and not formation. *See Johnson v. Uncle Ben's, Inc., 965 F.2d 1363, 1371-72 (5th Cir. 1992)* (promotions that are no more than "a fulfillment of expectations implicit in the original employment contract" are not actionable under § *1981*), *petition for cert. filed*, Sept. 29, 1992.

Promotions understood by the parties to be given routinely upon satisfactory job performance do not give

990 F.2d 1397, *; 1993 U.S. App. LEXIS 5819, **;
61 Fair Empl. Prac. Cas. (BNA) 579; 61 Empl. Prac. Dec. (CCH) P42,146

rise to a new employment contract. Similarly, moving an employee from one position to another as part of a reallocation of personnel resources, not involving a substantial increase in status or responsibility, is apt to be implicit in the original contract and thus would not give rise to § 1981 liability under *Patterson*, even though the move might entail a salary increase or somewhat more responsibility. However, any promotion that creates a qualitatively [**48] different relation between the employer and employee, for example, a move from factory worker to foreman, foreman to foreman supervisor, or manager to officer, likely would create a new and distinct relation giving rise to a § 1981 action under *Patterson*.

The inquiry should not be confined to titles; it should examine actual changes in responsibility and status. It is also relevant to evaluate whether the promotion is the type of routine advancement for which only present employees typically qualify, or whether it is to a position that would be open to somebody outside the organization. *See Malhotra v. Cotter & Co., 885 F.2d 1305, 1311 (7th Cir. 1989); see also Johnson, 965 F.2d at 1370-72.* Because determining whether a promotion would create a new and distinct relation will require some factual inquiry into the changes in responsibility and status it will involve, it generally is inappropriate to dispose of a § 1981 promotion claim based on *Patterson* at the pleading stage. *See Aiken v. Bucks Ass'n for Retarded Citizens, Inc., Civ. No. 91-2672, 1991 U.S. Dist. LEXIS 16670 (E.D.Pa. [**49] Nov. 14, 1991); Revis v. Slocomb Ind., Inc., 765 F. Supp. 1212, 1215 (D. Del. 1991).*

Plaintiff has three promotion claims under § 1981 that fall within the applicable three-year statute of limitations. In *Goodman v. Lukens Steel Co., 482 U.S. 656, 660-62, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)*, the Supreme Court held that in § 1981 actions, a court should look to the state statute of limitations for personal injury actions. The applicable New York statute is C.P.L.R. § 214(5). The district court mistakenly relied on *Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 44 L. Ed. 2d 295, 95 S. Ct. 1716 (1975)*, and held that C.P.L.R. § 214(2), which sets forth the limitations period for actions based upon a statute, was the proper limiting

period. The outcome is the same, however, because both § 214(5) and § 214(2) set forth three-year limitations periods. Since Butts filed her complaint on August 5, 1991, her two 1987 promotion claims are time-barred, but the three claims based on denials of promotions in 1989 are not.

Plaintiff's three timely promotion discrimination claims involve alleged denials of promotion from Computer System Manager on one occasion [**50] to Deputy Commissioner of the Office of Management and Administration and on two occasions to Director of Systems Architecture. The positions of Deputy Commissioner or Director of Systems Architecture could entail substantially different, and greater, supervisory and policy-making responsibilities and a corresponding change in status so as to amount to a new and distinct relation between Butts and the City. But this determination cannot be made simply by examining the complaint. We therefore find that the district court erred in dismissing under *Patterson* Plaintiff's three timely promotion claims and remand them for further consideration.

CONCLUSION

For the reasons set forth above, we affirm the district court's dismissal of Plaintiff's Title VII claims, except for the two claims relating to her exclusion from reorganization meetings, as to which we reverse. We affirm the district court's finding that the § 1981 amendments of the Civil Rights Act of 1991 do not apply retroactively, and affirm its dismissal of Plaintiff's § 1981 claims for discrimination in the terms and conditions of her employment. We also affirm the district court's [*1413] dismissal of Plaintiff's untimely promotion [**51] discrimination claims under § 1981. However, we reverse the district court's dismissal of Plaintiff's timely § 1981 promotion claims alleging the City's failure to promote her to Deputy Commissioner of the Office of Management and Administration and Director of Systems Architecture. We remand the case to the district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded. The parties shall bear their own costs.

LEXSEE 486 U.S. 107

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION v. COMMERCIAL OFFICE PRODUCTS CO.

### No. 86-1696

### SUPREME COURT OF THE UNITED STATES

*486 U.S. 107; 108 S. Ct. 1666; 100 L. Ed. 2d 96; 1988 U.S. LEXIS 2072; 56 U.S.L.W. 4424; 46 Fair Empl. Prac. Cas. (BNA) 1265; 46 Empl. Prac. Dec. (CCH) P37,964*

**January 13, 1988, Argued**
**May 16, 1988, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT.

**DISPOSITION:** *803 F.2d 581*, reversed and remanded.

**DECISION:**

State agency's waiver of right to initial processing of job discrimination charge held to "terminate" its proceedings under *42 USCS 2000e-5(c)* so that EEOC may immediately start processing charge.

**SUMMARY:**

Under 706(e) of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e-5(e)*), a complainant alleging employment discrimination must file his or her charge with the Equal Employment Opportunity Commission (EEOC) within 180 days of the occurrence of the alleged unlawful act, or within 300 days if the proceedings are initially instituted with a state or local employment discrimination agency. Section 706(c) (*42 USCS 2000e-5(c)*) provides that no employment discrimination charge may be filed with the EEOC until 60 days have elapsed from initial filing of the charge with a state or local agency, unless that agency's proceedings "have been earlier terminated." The combined effect of these two provisions has been described in a United States Supreme Court decision as requiring a complainant to file his or her charge with the state or local agency, or to have the EEOC refer the charge to that agency, within 240 days, unless that agency terminates its proceedings before 300 days, in which case the complaint is timely if it is filed not more than 300 days after the alleged unlawful act. A complainant in Colorado, alleging that her employer had discharged her because of her sex in violation

of Title VII, filed an employment discrimination charge with the EEOC 290 days after her discharge. The EEOC notified the Colorado Civil Rights Division (CCRD) that the EEOC would initially process the charge, pursuant to a work-sharing agreement between the EEOC and the CCRD. The CCRD notified the complainant that it had waived its right to initial processing but that it retained jurisdiction to act on the charge after the conclusion of the EEOC's proceedings. The EEOC issued an administrative subpoena for information relevant to the complainant's charge. The employer refused to comply, maintaining that the EEOC lacked jurisdiction to investigate the charge because the charge had not been timely filed. The EEOC brought an action in the United States District Court for the District of Colorado seeking judicial enforcement of the subpoena. The District Court concluded that the charge had not been timely filed, and accordingly dismissed the enforcement action. The United States Court of Appeals for the Tenth Circuit, affirming the District Court's judgment, held that (1) the extended 300-day federal filing period was applicable, even though the charge had not been filed with the CCRD within Colorado's own 180-day statute of limitations, but (2) the complainant's charge had not been filed during the 300-day period because the CCRD had not "terminated" its proceedings within the meaning of 706(c), and thus the 60-day deferral period had not expired until after the 300-day limit (*803 F2d 581*).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Marshall, J., joined by Brennan, White, and Blackmun, JJ., and joined in pertinent part by O'Connor, J., it was held that the complainant's charge was timely filed under Title VII, because (1) a state or local employment discrimination agency's decision to waive its right under 706(c) to the initial processing of an employment discrimination charge during the 60-day deferral period, pursuant to a work-sharing agreement between that agency and the

EEOC, constitutes a termination of its proceedings, even where the agency retains authority to reactivate its proceedings after the EEOC's resolution of the charge, since an understanding of the word "terminated" as including a cessation for a specified period of time accords with (a) common usage, and (b) the EEOC's interpretation of 706(c); and (2) a complainant who fails to comply with a state's limitations period when filing an employment discrimination charge with a state or local agency is nonetheless entitled to the extended 300-day federal period for filing such a charge with the EEOC under 706(e).

O'Connor, J., concurring in part and concurring in the judgment, expressed the view that (1) sufficient ambiguity existed in 706(c) to warrant deference to the EEOC's construction of the word "terminated," but (2) part of the opinion of Marshall, J., went too far by suggesting that the EEOC's position was the only one permissible.

Stevens, J., joined by Rehnquist, Ch. J., and Scalia, J., dissented, expressing the view that the Court's decision was not faithful to the plain language of the statute, to the legislative compromise that made it possible to enact the Civil Rights Act of 1964, or to the Court's prior interpretation of the statute.

Kennedy, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

CIVIL RIGHTS §61

STATUTES §160.4

Equal Employment Opportunity Commission -- timely filing of charges -- deference to administrative construction -- commonly accepted meaning --

Headnote:[1A][1B][1C][1D]

Under 706(c) of Title VII of the Civil Rights Act of 1964 (42 USCS 2000e-5(c))--which provides that no employment discrimination charge may be filed with the Equal Employment Opportunity Commission (EEOC) until 60 days have elapsed from initial filing of the charge with a state or local agency, unless that agency's proceedings have been earlier terminated--a state or local employment discrimination agency's decision to waive its right under 706(c) to the initial processing of an employment discrimination charge during the 60-day deferral period, pursuant to a work-sharing agreement between that agency and the EEOC, constitutes a "termination" of its proceedings so as to permit the EEOC to deem a charge filed and to begin to process it immediately; the state or local agency need not completely re-

linquish its authority to act on the charge in the future in order for its proceedings to be "terminated," because (1) in common usage, the definition of "termination" includes "cessation in time," and (2) the EEOC's interpretation of Title VII, to the effect that a state terminates its proceedings when it declares that it will not proceed for a specified interval of time, is reasonable since it is supported by the legislative history of the deferral provisions of Title VII, the purposes of those provisions, and the language of other sections of the Act, and deference to that interpretation is therefore appropriate. (Stevens, J., Rehnquist, Ch. J., and Scalia, J., dissented from this holding.)

[***LEdHN2]

CIVIL RIGHTS §61

Equal Employment Opportunity Commission -- timely filing of charges -- untimely state claim --

Headnote:[2A][2B][2C]

State time limits for filing employment discrimination claims do not determine the applicable federal time limit; a complainant who fails to comply with a state's limitations period when filing an employment discrimination charge with a state or local agency is nonetheless entitled to the extended 300-day federal period for filing such a charge with the Equal Employment Opportunity Commission under 706(e) of Title VII of the Civil Rights Act of 1964 (42 USCS 2000e-5(e))--which extends the filing period to 300 days after the occurrence of the alleged unlawful act where proceedings are initially instituted with a state or local agency with authority to grant or seek relief from the practice charged--since (1) 706(e) contains no express requirement of timely state filing, (2) no such requirement should be created in light of the remedial scheme of Title VII, in which laypersons, rather than lawyers, are expected to initiate the process, and (3) the importation of state limitations periods into 706(e) would embroil the EEOC in complicated issues of state law. (Stevens, J., Rehnquist, Ch. J., and Scalia, J., dissented from this holding.)

[***LEdHN3]

CIVIL RIGHTS §61

Equal Employment Opportunity Commission -- timely filing of charges --

Headnote:[3A][3B]

The purpose of 706(c) of Title VII of the Civil Rights Act of 1964 (42 USCS 2000e-5(c))--which provides that no employment discrimination charge may be filed with the Equal Employment Opportunity Commission (EEOC) until 60 days have elapsed from initial fil-

486 U.S. 107, *; 108 S. Ct. 1666, **;
100 L. Ed. 2d 96, ***; 1988 U.S. LEXIS 2072

ing of the charge with a state or local agency, unless that agency's proceedings have been earlier terminated--is to give states and localities an opportunity to combat discrimination free from premature federal intervention; under 706(c), the EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the agency's proceedings within the meaning of the Act, and the EEOC may hold the charge in "suspended animation" during the agency's 60-day period of exclusive jurisdiction; in light of the 60-day deferral period, a complainant must file a charge with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event in order to insure that it may be filed with the EEOC within the 300-day limit provided by 706(e) (*42 USCS 2000e-5(e)*); if the complainant does not file within 240 days, the charge still may be timely filed with the EEOC if the state or local agency terminates its proceedings before 300 days.

[***LEdHN4]

APPEAL §1692.6

CIVIL RIGHTS §61

remand -- jurisdiction -- Equal Employment Opportunity Commission -- timely filing of charges --

Headnote:[4A][4B]

An employment discrimination charge is timely filed with the Equal Employment Opportunity Commission (EEOC) where (1) the complainant files the charge with the EEOC 290 days after the alleged discriminatory act took place, (2) the EEOC notifies the agency that is authorized by the complainant's state to process charges of employment discrimination that the EEOC will initially process the charge pursuant to a work-sharing agreement between the EEOC and the state agency, and (3) the state agency indicates that it waives its right under 706(c) of Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e-5(c)*) to initially process the charge, but retains jurisdiction to act on the charge after the conclusion of the EEOC's proceedings; such a charge is timely filed under Title VII, because (1) the 300-day federal filing period, provided by 706(e) of Title VII (*42 USCS 2000e-5(e)*) to a complainant who initially institutes employment discrimination proceedings with a state or local agency, is applicable to the case, and (2) the 300-day limit has been complied with, since the state agency's waiver of its right to initially process the charge constitutes a "termination" of its proceedings within the 300-day limit for the purposes of 706(c), which provides that no employment discrimination charge may be filed with the EEOC until 60 days have elapsed from initial filing of the charge with a state or local agency, unless that agency's proceedings have been earlier terminated; ac-

cordingly, on certiorari to review a United States Court of Appeals decision in the case, which upheld the dismissal of an EEOC subpoena enforcement action on the ground that the EEOC lacked jurisdiction over the complainant's charge because it was not timely filed, the United States Supreme Court will reverse the decision and remand the case for further proceedings. (Stevens, J., Rehnquist, Ch. J., and Scalia, J., dissented from this holding.)

[***LEdHN5]

STATUTES §160.4

Equal Employment Opportunity Commission -- timely filing of charges -- deference to administrative construction --

Headnote:[5]

The Equal Employment Opportunity Commission's (EEOC's) interpretation of ambiguous language in Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), for which statute it has primary enforcement responsibility, need only be reasonable to be entitled to deference, and it need not be the best interpretation by grammatical or any other standards.

**SYLLABUS**

Under § 706(e) of Title VII of the Civil Rights Act of 1964 (Act), a complainant must file a discrimination charge with the Equal Employment Opportunity Commission (EEOC) within 180 days of the occurrence of the alleged unlawful employment practice, or within 300 days if the proceedings are initially instituted with a state or local agency having "authority to grant or seek relief." Under § 706(c), no charge may be filed with the EEOC until 60 days have elapsed from the initial filing of the charge with an authorized state or local agency, unless that agency's proceedings "have been earlier terminated." This Court has held that, in light of § 706(c)'s deferral period, a charge must be filed with, or referred by the EEOC to, the state or local agency within 240 days of the alleged discriminatory event in order to ensure that it may be filed within § 706(e)'s extended 300-day limit, unless the state or local agency terminates its proceedings before 300 days. *Mohasco Corp. v. Silver*, 447 U.S. 807, 65 L. Ed. 2d 532, 100 S. Ct. 2486. The Colorado Civil Rights Division (CCRD) and the EEOC have entered into a worksharing agreement, which provides that each will process certain categories of charges and that the CCRD waives § 706(c)'s 60-day deferral period with respect to those charges processed by the EEOC but retains jurisdiction to act on such charges after the EEOC's proceedings conclude. Alleging that, 290 days earlier, respondent had discharged her because of her sex in violation of Title VII, Suanne Leerssen filed a charge with

486 U.S. 107, *; 108 S. Ct. 1666, **;
100 L. Ed. 2d 96, ***; 1988 U.S. LEXIS 2072

the EEOC, which undertook the initial charge processing pursuant to the worksharing agreement. The CCRD informed Leerssen that it had waived its right in this regard but retained jurisdiction under the agreement. Respondent refused to comply with the EEOC's administrative subpoena, and the District Court denied enforcement of the subpoena, on the ground that the EEOC lacked jurisdiction because the charge was not timely filed within § 706(e)'s 300-day period. The Court of Appeals agreed and therefore affirmed, although it rejected respondent's contention that the 300-day period was inapplicable because Leerssen had not filed the charge with the CCRD within the 180-day limitations period provided by state law.

*Held:* The judgment is reversed, and the case is remanded.

JUSTICE MARSHALL delivered the opinion of the Court with respect to Parts I, II-A, and III, concluding that:

1. A state agency's decision to waive § 706(c)'s 60-day period, pursuant to a worksharing agreement with the EEOC, "terminates" the agency's proceedings within the meaning of § 706(c), so that the EEOC may immediately deem the charge filed and begin to process it. Respondent's contention, and the Court of Appeals' holding, that the CCRD did not "terminate" its proceedings because it retained jurisdiction to act on the EEOC's resolution of the charge must be rejected in favor of the EEOC's position that a state agency "terminates" its proceedings when it declares that it will not proceed, if it does so at all, for a specified interval of time, since the interpretation of ambiguous language in the Act by the EEOC, the agency having primary enforcement responsibility, is entitled to deference where it is reasonable. The reasonableness of the EEOC's interpretation of "terminate" in its statutory context is more than amply supported by the legislative history of Title VII's deferral provisions, the purposes of those provisions, and the language of other sections of the Act. Pp. 114-116.

2. A complainant who files a charge that is untimely under state law is nonetheless entitled to § 706(e)'s extended 300-day federal filing period. That section's "authority to grant or seek relief" phrase does not preclude this conclusion on the theory that a state or local agency lacks the requisite authority in the absence of a timely filing under state law, since the phrase refers merely to enabling legislation establishing such agencies, not to state limitations requirements. Rather, the reasoning of *Oscar Mayer & Co. v. Evans, 441 U.S. 750, 60 L. Ed. 2d 609, 99 S. Ct. 2066,* is entirely apposite even though that case involved the filing provisions of the Age Discrimination in Employment Act, since those provisions are virtually *in haec verba* with the Title VII provisions at

issue here. Thus, the failure to file a timely state-law claim does not automatically preclude application of Title VII's 300-day period, since the Act contains no express requirement of timely state filing, and such a requirement should not be imported in light of the Act's remedial purposes and the fact that lay-persons, rather than lawyers, are expected to initiate the process and would be confused by an additional state-law filing requirement. Moreover, such a requirement would embroil the EEOC in complicated state-law issues which it has neither the time nor the expertise to determine. Thus, *Mohasco's* 240-day filing rule applies in such cases. Pp. 122-125.

COUNSEL: Richard J. Lazarus argued the cause for petitioner. With him on the briefs were Solicitor General Fried, Deputy Solicitor General Ayer, Charles A. Shanor, Gwendolyn Young Reams, Vella M. Fink, and Donna J. Brusoski.

James L. Stone argued the cause for respondent. With him on the brief was Brent T. Johnson. *

    *   A brief of amici curiae urging reversal was filed for the State of Colorado et al. by Duane Woodard, Attorney General of Colorado, Charles B. Howe, Deputy Attorney General, Richard H. Forman, Solicitor General, Mary Ann F. Whiteside, First Assistant Attorney General, Joseph I. Lieberman, Attorney General of Connecticut, Frederick D. Cooke, Jr., Acting Corporation Counsel of the District of Columbia, William L. Webster, Attorney General of Missouri, W. Cary Edwards, Attorney General of New Jersey, Robert Abrams, Attorney General of New York, Jim Mattox, Attorney General of Texas, Donald J. Hanaway, Attorney General of Wisconsin, and Joseph B. Meyer, Attorney General of Wyoming.

    Robert E. Williams, Douglas S. McDowell, and Jeffrey A. Norris filed a brief for the Equal Employment Advisory Council as amicus curiae.

JUDGES: MARSHALL, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A, and III, in which BRENNAN, WHITE, BLACKMUN, and O'CONNOR, JJ., joined, and an opinion with respect to Parts II-B and II-C, in which BRENNAN, WHITE, and BLACKMUN, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, post, p. 125. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, post, p. 126. KENNEDY, J., took no part in the consideration or decision of the case.

486 U.S. 107, *; 108 S. Ct. 1666, **;
100 L. Ed. 2d 96, ***; 1988 U.S. LEXIS 2072

**OPINION BY:** MARSHALL

**OPINION**

[*109]  [***103]  [**1668]  JUSTICE MARSHALL announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A, and III, and an opinion with respect to Parts II-B and II-C, in which JUSTICE BRENNAN, JUSTICE WHITE, and JUSTICE BLACKMUN joined.

[***LEdHR1A]  [1A]  [***LEdHR2A]  [2A]This case raises two questions regarding the time limits for filing charges of employment discrimination with the Equal Employment Opportunity Commission (EEOC) under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, *42 U.S. C. § 2000e et seq.* The primary question presented is whether a state agency's decision to waive its exclusive 60-day period for initial processing of a discrimination charge, pursuant to a worksharing agreement with the EEOC, "terminates" the [*110] agency's proceedings within the meaning of § 706(c) of Title VII, 78 Stat. 260, as amended in 1972, 86 Stat. 104, *42 U.S. C. § 2000e-5(c),* so that the EEOC immediately may deem the charge filed. In addition, we must decide whether a complainant who files a discrimination charge that is untimely under state law is nonetheless entitled to the extended 300-day federal filing period of § 706(e) of Title VII, 78 Stat. 260, as amended in 1972, 86 Stat. 105, *42 U.S. C. § 2000e-5(e).*

I

The time limit provisions of Title VII as interpreted by this Court establish the following procedures for filing discrimination charges with the EEOC. As a general rule, a complainant must file a discrimination charge with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice. § 706(e), *42 U.S. C. § 2000e-5(e).* [1] If a complainant initially institutes [**1669] proceedings with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days. *Ibid.*

1  Section 706(e) provides:

"A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with author-

ity to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency." 86 Stat. 105, *42 U.S. C. § 2000e-5(e).*

[***LEdHR3A]  [3A]In order to give States and localities an opportunity to combat discrimination free from premature federal intervention, [*111] the Act provides that no charge may be filed with the EEOC until 60 days have elapsed from initial filing of the charge with an authorized state or [***104] local agency, unless that agency's proceedings "have been earlier terminated." § 706(c), *42 U.S. C. § 2000e-5(c).* [2] The EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the agency's proceedings within the meaning of the Act, and the EEOC may hold the charge in "'suspended animation'" during the agency's 60-day period of exclusive jurisdiction. *Love v. Pullman Co., 404 U.S. 522, 525-526, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972).* In light of the 60-day deferral period, a complainant must file a charge with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event in order to ensure that it may be filed with the EEOC within the 300-day limit. See *Mohasco Corp. v. Silver, 447 U.S. 807, 814, n. 16, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980).* If the complainant does not file within 240 days, the charge still may be timely filed with the [*112] EEOC if the state or local agency terminates its proceedings before 300 days. See *ibid.*

2  Section 706(c) provides:

"In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under [subsection (b)] of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-

day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority." 86 Stat. 104, *42 U.S. C. § 2000e-5(c)*.

[***LEdHR1B] [1B]The central question in this case is whether a state agency's waiver of the 60-day deferral period, pursuant to a worksharing agreement with the EEOC, constitutes a "termination" of its proceedings so as to permit the EEOC to deem a charge filed and to begin to process it immediately. This question is of substantial importance because the EEOC has used its statutory authority to enter into worksharing agreements with approximately three-quarters of the 109 state and local agencies authorized to enforce state and local employment discrimination laws. See § 709(b), 86 Stat. 107-108, *42 U.S. C. § 2000e-8(b)* (authorizing the EEOC to "enter into written agreements" with state and local agencies to promote "effective enforcement" of the Act); Brief for Petitioner 4 (EEOC has entered into worksharing agreements with approximately 81 of 109 authorized state and local agencies).

[**1670] These worksharing agreements typically provide that the state or local agency will process certain categories of charges and that the EEOC will process others, with the state or local agency waiving the 60-day deferral period in the latter instance. See, *e. g.*, Worksharing Agreement between Colorado Civil Rights Division and EEOC, App. to Pet. for Cert. 48a-49a. In either instance, the nonprocessing party to the worksharing agreement generally reserves [***105] the right to review the initial processing party's resolution of the charge and to investigate the charge further after the initial processing party has completed its proceedings. See, *e. g., id.*, at 47a. Whether a waiver of the 60-day deferral period pursuant to a worksharing agreement constitutes a "termination" of a state or local agency's proceedings will determine not only when the EEOC may initiate its proceedings, but also whether an entire class of charges may be timely filed with the EEOC in the first instance.

[***LEdHR4A] [4A]The facts of the instant case concretely reflect what is at stake. On March 26, 1984, Suanne Leerssen filed a charge of [*113] discrimination with petitioner EEOC. She alleged that 290 days earlier, respondent Commercial Office Products Company had discharged her because of her sex in violation of Title

VII. On March 30, the EEOC sent a copy of Leerssen's charge and a charge transmittal form to the Colorado Civil Rights Division (CCRD), which is authorized by the State to process charges of employment discrimination. The form stated that the EEOC would initially process the charge, pursuant to the worksharing agreement between the EEOC and the CCRD.

The CCRD returned the transmittal form to the EEOC, indicating on the form that the CCRD waived its right under Title VII to initially process the charge. On April 4, the CCRD sent a form letter to Leerssen explaining that it had waived its right to initial processing but stating that it still retained jurisdiction to act on the charge after the conclusion of the EEOC's proceedings. If the CCRD's waiver "terminated" its proceedings, then Leerssen's charge was filed with the EEOC just under the 300-day limit. If the waiver was not a "termination," however, then the charge was not timely filed with the EEOC because the 60-day deferral period did not expire until well after the 300-day limit.

The timeliness issue was raised in this case when the EEOC issued an administrative subpoena for information relevant to Leerssen's charge. Respondent refused to comply with the subpoena, maintaining that the EEOC lacked jurisdiction to investigate the charge because it was not timely filed. The EEOC commenced an action in the United States District Court for the District of Colorado seeking judicial enforcement of the subpoena. The District Court agreed with respondent and dismissed the EEOC's enforcement action, holding that the EEOC lacked jurisdiction over Leerssen's charge because it was not timely filed. See Civil Action No. 85-K-1385 (June 6, 1985), App. to Pet. for Cert. 23a.

The Court of Appeals for the Tenth Circuit affirmed. *803 F.2d 581 (1986)*. As a threshold matter, the Court of Appeals [*114] rejected respondent's contention that the extended 300-day federal filing period was inapplicable because Leerssen had failed to file her charge with the CCRD within the State's own 180-day limitations period. *Id., at 585-586*, and n. 3. The Court of Appeals agreed with the District Court, however, that Leerssen's charge was not filed within the 300-day period and that the EEOC therefore lacked jurisdiction over the charge. The Court of Appeals reasoned that a state agency "terminates" its proceedings within the meaning of § 706(c) only [***106] when it "completely surrenders its jurisdiction over a charge." *Id., at 587*. Because the CCRD retained jurisdiction over Leerssen's charge, reserving the right to act at the conclusion of the EEOC's proceedings, it did not "finally and unequivocally terminate its authority" over the charge as the plain language of the [**1671] statute required. *Id., at 590*. The Court of Appeals expressly disagreed with the decision of the First Circuit in *Isaac v. Harvard University, 769 F.2d 817*

*(1985)*. The First Circuit had upheld the EEOC's view that a waiver of the right to initially process a charge constitutes a "termination," reasoning that the language of the Act is ambiguous and that the history and purposes of the Act support the EEOC's construction. Judge McKay dissented from the opinion of the Court of Appeals in this case, arguing that the EEOC should prevail for the reasons offered by the First Circuit.

We granted certiorari to resolve the conflict between the *First and the Tenth Circuits, 482 U.S. 926 (1987)*, and we now reverse.

II

A

[***LEdHR1C]  [1C]First and foremost, respondent defends the judgment of the Court of Appeals on the ground that the language of the statute unambiguously precludes the conclusion that the CCRD's waiver of the deferral period "terminated" its proceedings. According to respondent, "terminated" means only "'completed'" or "'ended.'" Brief for Respondent 14. Respondent [*115] urges that this definition is met only when a state agency, in the words of the Court of Appeals, "completely relinquish[es] its authority to act on the charge at that point *or in the future.*" *803 F.2d at 589, n. 13* (emphasis in original). Because the CCRD retained authority to reactivate its proceedings after the EEOC's resolution of the charge, respondent maintains that the CCRD did not "terminate" its proceedings within the meaning of the Act.

We cannot agree with respondent and the Court of Appeals that "terminate" must mean "to end for all time." Rather, we find persuasive the determination of the First Circuit that the definition of "termination" also includes "cessation in time." The First Circuit noted that this definition is included in both Webster's Third New International Dictionary 2359 (1976) (definition of "terminate") and Black's Law Dictionary 1319 (5th ed. 1979) (definition of "termination"). See *Isaac, 769 F.2d at 820, 821, n. 5.* Moreover, the First Circuit correctly observed that common usage of the words "terminate," "complete," or "end" often includes a time element, as in "ending negotiations despite the likely inevitability of their resumption" or "terminating work on the job-site knowing that it will resume the next day." *Id., at 821.* These observations support the EEOC's contention that a state agency "terminates" its proceedings when it declares that it will not proceed, if it does so at all, for a specified interval of time.

[***LEdHR1D]  [1D] [***LEdHR5]  [5]To be sure, "terminate" also may bear the meaning proposed by respondent. Indeed, it may bear that meaning more naturally or more frequently in common usage. But it is axiomatic that the EEOC's interpretation of Title VII, for

which it has primary enforcement responsibility, need not be the best one by [***107] grammatical or any other standards. Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference. See *Oscar Mayer & Co. v. Evans, 441 U.S. 750, 761, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979).* The reasonableness of the EEOC's interpretation of "terminate" [*116] in its statutory context is more than amply supported by the legislative history of the deferral provisions of Title VII, the purposes of those provisions, and the language of other sections of the Act, as described in detail below. Deference is therefore appropriate.

B

The legislative history of the deferral provisions of Title VII demonstrates that the EEOC's interpretation of § 706(c) is far more consistent with the purposes of the Act than respondent's contrary construction.

The deferral provisions of § 706 were enacted as part of a compromise forged [**1672] during the course of one of the longest filibusters in the Senate's history. The bill that had passed the House provided for "deferral" to state and local enforcement efforts only in the sense that it directed the EEOC to enter into agreements with state agencies providing for the suspension of federal enforcement in certain circumstances. See H. R. 7152, 88th Cong., 2d Sess., § 708, 110 Cong. Rec. 2511-251 (1964). The House bill further directed the EEOC to rescind any agreement with a state agency if the EEOC determined that the agency was no longer effectively exercising its power to combat discrimination. See *ibid.* In the Senate, this bill met with strenuous opposition on the ground that it placed the EEOC in the position of monitoring state enforcement efforts, granting States exclusive jurisdiction over local discrimination claims only upon the EEOC's determination that state efforts were effective. See, *e. g., id.,* at 6449 (remarks of Sen. Dirksen). The bill's opponents voiced their concerns against the backdrop of the federal-state civil rights conflicts of the early 1960's, which no doubt intensified their fear of "the steady and deeper intrusion of the Federal power." See *id.,* at 8193 (remarks of Sen. Dirksen). These concerns were resolved by the "Dirksen-Mansfield substitute," which proposed the 60-day deferral [*117] period now in § 706(c) of the Act. See 110 Cong. Rec., at 11926-11935.

The proponents of the Dirksen-Mansfield substitute identified two goals of the deferral provisions, both of which fully support the EEOC's conclusion that States may, if they choose, waive the 60-day deferral period but retain jurisdiction over discrimination charges by entering into worksharing agreements with the EEOC. First, the proponents of the substitute deferral provisions ex-

plained that the 60-day deferral period was meant to give States a "reasonable opportunity to act under State law before the commencement of any Federal proceedings." *Id.*, at 12708 (remarks of Sen. Humphrey). [3] [***108] Nothing in the waiver provisions of the worksharing agreements impinges on the opportunity of the States to have an exclusive 60-day period for processing a discrimination charge. The waiver of that opportunity in specified instances is a voluntary choice made through individually negotiated agreements, not an imposition by the Federal Government. Indeed, eight worksharing States and the District of Columbia filed a brief as *amici* in this case, explaining their satisfaction with the operation of the waiver provisions of the worksharing agreements: "By clarifying primary [*118] responsibility for different categories of charges, worksharing agreements benefit both the EEOC and the states." Brief for Colorado et al. as *Amici Curiae* 5. Moreover, most worksharing agreements are flexible, permitting States to express interest in cases ordinarily waived under the agreement and to call upon the EEOC to refrain from assuming jurisdiction in such cases. See, *e. g.*, Worksharing Agreement Between CCRD and EEOC, App. to Pet. for Cert. 49a.

[3]    This point was made by other Senators and has been emphasized by this Court in our previous Title VII cases. See, *e. g.*, 110 Cong. Rec. 12688 (1964) (remarks of Sen. Saltonstall) (deferral provisions preserve "the opportunity and authority of the State and local governments to work out their own problems if they are willing to do so"); *id.*, at 14313 (remarks of Sen. Miller) (deferral provisions "giv[e] the States the opportunity to carry out their responsibilities first"); *Mohasco Corp. v. Silver, 447 U.S. 807, 821, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980)* (deferral provisions "give state agencies an opportunity to redress the evil at which the federal legislation was aimed, and to avoid federal intervention unless its need was demonstrated"); *Oscar Mayer & Co. v. Evans, 441 U.S. 750, 755, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979)* (deferral provisions "give state agencies a limited opportunity to resolve problems of employment discrimination and thereby to make unnecessary, resort to federal relief by victims of the discrimination"); *Love v. Pullman Co., 404 U.S. 522, 526, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972)* (deferral provisions "give state agencies a prior opportunity to consider discrimination complaints").

In contrast, respondent's argument that States should not be permitted to waive the deferral period because its creation reflected [**1673] a congressional preference for state as opposed to federal enforcement is entirely at odds with the voluntarism stressed by the proponents of deferral. Congress clearly foresaw the possibility that States might decline to take advantage of the opportunity for enforcement afforded them by the deferral provisions. It therefore gave the EEOC the authority and responsibility to act when a State is "unable or unwilling" to provide relief. 110 Cong. Rec. 12725 (1964) (remarks of Sen. Humphrey). This Court, too, has recognized that Congress envisioned federal intervention when "States decline, for whatever reason, to take advantage of [their] opportunities" to settle grievances in "a voluntary and localized manner." *Oscar Mayer & Co. v. Evans, 441 U.S. at 761.* As counsel for the EEOC explained, deferral was meant to work as "a carrot, but not a stick," affording States an opportunity to act, but not penalizing their failure to do so other than by authorizing federal intervention. See Tr. of Oral Arg. 11. The waiver provisions of worksharing agreements are fully consistent with this goal.

In addition to providing States with an opportunity to forestall federal intervention, the deferral provisions were meant to promote "time economy and the expeditious handling of cases." 110 Cong. Rec. 9790 (1964) (remarks of Sen. Dirksen). [4] [***109] Respondent's proposed interpretation of § 706(c), [*119] adopted by the Court of Appeals, is irreconcilable with this purpose because it would result in extraordinary inefficiency without furthering any other goal of the Act. The EEOC would be required to wait 60 days before processing its share of discrimination claims under a worksharing agreement, even though both the EEOC and the relevant state and local agency agree that the State or locality will take no action during that period. Or, in an effort to avoid this pointless 60-day delay, state and local agencies could abandon their worksharing agreements with the EEOC and attempt to initially process all charges during the 60-day deferral period, a solution suggested by respondent. See Brief for Respondent 29-30. Such a solution would create an enormous backlog of discrimination charges in States and localities, preventing them from securing for their citizens the quick attention to discrimination claims afforded under worksharing agreements. Or, in another scenario proposed by respondent, see *id.*, at 29, n. 29, state or local agencies could rewrite their worksharing agreements with the EEOC to provide for "termination" of state or local proceedings in accordance with respondent's definition of that term -- complete relinquishment of jurisdiction. This solution would prevent a pointless 60-day delay, but it would also preclude a State's reactivation of a discrimination charge upon the conclusion of federal proceedings. [5] Requiring that States completely [*120] relinquish authority over claims in order to avoid needless delay turns on its head the dual purposes of the deferral provisions: deference to the States and efficient processing of claims. As the

*amici* States observe, such a requirement "frustrates the congressional intent to ensure state and local agencies the opportunity to employ their expertise to [**1674] resolve discrimination complaints." Brief for Colorado et al. as *Amici Curiae* 1.

    4  Respondent's contrary contention that the compromise provisions represented Congress' choice of deferral over efficiency, see Brief for Respondent 24, finds no support in the comments of Senator Dirksen, the chief architect of the compromise. His remarks make clear that he believed the compromise would promote efficiency while respecting state prerogatives. See, *e. g.,* 110 Cong. Rec. 8193 (1964) (deferral provisions will "assure individual complainants that they will have fair and expeditious consideration of their grievances").

    5  Reactivation of state proceedings after the conclusion of federal proceedings serves the useful function of permitting States to enforce their discrimination laws when these laws are more protective than Title VII. For example, Title VII does not give the EEOC jurisdiction to enforce the Act against employers of fewer than 15 employees or against bona fide private membership clubs. § 701(b), *42 U.S. C. § 2000e(b)*. Each year, the CCRD reactivates four to five charges in which the EEOC has determined after investigation that it lacks jurisdiction. Brief for Colorado et al. as *Amici Curiae* 7.

    The most dramatic result of respondent's reading of the deferral provisions is the preclusion of any federal relief for an entire class of discrimination claims. All claims filed with the EEOC in worksharing States more than 240 but less than 300 days after the alleged discriminatory event, like Leerssen's claim in this case, will be rendered untimely because the 60-day deferral period will not expire within the 300-day filing limit. [6] Respondent's interpretation thus requires the 60-day deferral period -- which was passed on behalf of state and local agencies -- to render untimely a [***110] claim filed within the federal 300-day limit, despite the joint efforts of the EEOC and the state or local agency to avoid that result. As petitioner epigrammatically observes, a claim like Leerssen's that is filed with the EEOC within the last 60 days of the federal filing period is "too early until it is too late." Brief for Petitioner 25. This severe consequence, in conjunction with the pointless delay described above, demonstrates that respondent's interpretation of the language of § 706(c) leads to "absurd or futile results . . . 'plainly at variance with the policy of the legislation as a whole,'" which this Court need not and should not countenance. *United States v. American* [*121] *Trucking Assns., Inc., 310 U.S. 534, 543, 84 L. Ed. 1345, 60 S.*

*Ct. 1059 (1940),* quoting *Ozawa v. United States, 260 U.S. 178, 194, 67 L. Ed. 199, 43 S. Ct. 65 (1922).*

    6  All of the worksharing States, with the possible exception of Oklahoma and Tennessee, retain jurisdiction over a charge when they waive the 60-day deferral period. Brief for Petitioner 27, n. 24. Hence, none of these States "terminates" its proceedings by its waiver under respondent's interpretation of that term.

C

    The EEOC's construction of § 706(c) also finds support in other, related sections of Title VII. These sections reinforce our reading of the legislative history that the 1964 Congress did not intend to preclude the operation of the waiver provisions of the worksharing agreements now widely in force.

    Section 706(d) provides that when a member of the EEOC, rather than an individual complainant, files a discrimination charge in a State or locality with concurrent jurisdiction, "the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days . . . *unless a shorter period is requested,* to act." *42 U.S. C. § 2000e-5(d)* (emphasis added). This language clearly permits state and local agencies to waive the 60-day deferral period and thus authorize the EEOC to take immediate action in cases arising under § 706(d). There is every reason to believe that Congress intended the same result in § 706(c), notwithstanding the variance in language. The legislative history of the deferral provisions reflects the legislators' understanding that the time limits of §§ 706(c) and (d) were the same. See, *e. g.,* 110 Cong. Rec. 12690 (1964) (remarks of Sen. Saltonstall); *id.,* at 15896 (remarks of Rep. Celler). Moreover, this Court already has recognized in *Love v. Pullman Co., 404 U.S. at 526-527, n. 6,* that "the difference in wording between [the two sections] seems to be only a reflection of the different persons who initiate the charge." We concluded in *Love* that "there is no reason to think" that Congress meant to permit the EEOC to hold a claim in abeyance during the deferral period under § 706(d), but not under § 706(c) -- even though the former section expressly authorizes such action, and the latter section does not. *Ibid.* Similarly, in the instant case, there is no reason [*122] to think that Congress meant to make the deferral period waivable by States under § 706(d) when the EEOC files a claim, but mandatory under § 706(c) when an individual files a claim.

    [**1675]  The EEOC's interpretation of § 706(c) also finds support in provisions of the Act calling for formal cooperation between the EEOC and state and

486 U.S. 107, *; 108 S. Ct. 1666, **;
100 L. Ed. 2d 96, ***; 1988 U.S. LEXIS 2072

local agencies. Section 705(g)(1) gives the EEOC the power "to cooperate with and, with their consent, utilize regional, State, local, [***111] and other agencies." 78 Stat. 258, *42 U.S. C. § 2000e-4(g)(1)*. Section 709(b) specifies that "in furtherance of such cooperative efforts, the Commission may enter into written agreements with such State or local agencies." 86 Stat. 108, *42 U.S. C. § 2000e-8(b)*. These sections clearly envision the establishment of some sort of worksharing agreements between the EEOC and state and local agencies, and they in no way preclude provisions designed to avoid unnecessary duplication of effort or waste of time. Because the EEOC's interpretation of the "termination" requirement of § 706(c) is necessary to give effect to such provisions in most of the existing worksharing agreements, we find that interpretation more consistent with the cooperative focus of the Act than respondent's contrary construction.

III

[***LEdHR2B]  [2B]In the alternative, respondent argues in support of the result below that the extended 300-day federal filing period is inapplicable to this case because the complainant failed to file her discrimination charge with the CCRD within Colorado's 180-day limitations period. Respondent reasons that the extended 300-day filing period applies only when "the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief" from the practice charged, § 706(e), *42 U.S. C. § 2000e-5(e)*, and that in the absence of a timely filing under state law, a state agency lacks the requisite "authority to grant or seek [*123] relief." The Tenth Circuit rejected this argument below, as has every other Circuit to consider the question, [7] on the ground that the words "authority to grant or seek relief" refer merely to enabling legislation that establishes state or local agencies, not to state limitations requirements. We join the Circuits in concluding that state time limits for filing discrimination claims do not determine the applicable federal time limit.

> [7]  See *Gilardi v. Schroeder, 833 F.2d 1226, 1230-1231 (CA7 1987)*; *Mennor v. Fort Hood National Bank, 829 F.2d 553, 556 (CA5 1987)*; *Maurya v. Peabody Coal Co., 823 F.2d 933, 935 (CA6 1987)*, cert. denied, *484 U.S. 1067, 98 L. Ed. 2d 994, 108 S. Ct. 1030 (1988)*; *EEOC v. Shamrock Optical Co., 788 F.2d 491, 493-494 (CA8 1986)*; *Thomas v. Florida Power & Light Co., 764 F.2d 768, 771 (CA11 1985)*; *Howze v. Jones & Laughlin Steel Corp. 750 F.2d 1208, 1211 (CA3 1984)*.

Although respondent is correct that this Court's opinion in *Oscar Mayer & Co. v. Evans, 441 U.S. 750, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979)*, did not decide

the precise issue we address  today, see Brief for Respondent 36, the reasoning of *Oscar Mayer* provides significant guidance. In *Oscar Mayer*, we found in the Age Discrimination in Employment Act of 1967 (ADEA) context that a complainant's failure to file a claim within a state limitations period did not automatically render his federal claim untimely. We reasoned that the federal statute contained no express requirement of timely state filing, *441 U.S. at 759*, and we declined to create such a requirement in light of the remedial purpose of the ADEA and our recognition that it is a "'statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.'" *Id., at 761*, quoting *Love v. Pullman Co., supra, at 527*. [***112]  In the instant case, we decide the separate question whether under Title VII, untimely filing under state law automatically precludes the application of the extended 300-day federal filing period, but the reasoning of *Oscar Mayer* is entirely apposite. As we noted in *Oscar Mayer* itself, the filing provisions of the ADEA and Title VII are "virtually *in haec verba*," the former [*124] having been patterned after the latter. *441 U.S. at 755*. Title VII, like the ADEA, contains no express reference to timeliness under [**1676] state law. In addition, the policy considerations that militate against importing such a hurdle into the federal ADEA scheme are identical in the Title VII context: Title VII also is a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.

[***LEdHR2C]  [2C] [***LEdHR3B]  [3B]The importation of state limitations periods into § 706(e) not only would confuse lay complainants, but also would embroil the EEOC in complicated issues of state law. In order for the EEOC to determine the timeliness of a charge filed with it between 180 and 300 days, it first would have to determine whether the charge had been timely filed under state law, because the answer to the latter question would establish which of the two federal limitations periods should apply. This state-law determination is not a simple matter. The EEOC first would have to determine whether a state limitations period was jurisdictional or nonjurisdictional. And if the limitations period was nonjurisdictional, like Colorado's in this case, the EEOC would have to decide whether it was waived or equitably tolled. The EEOC has neither the time nor the expertise to make such determinations under the varying laws of the many deferral States and has accordingly construed the extended 300-day period to be available regardless of the state filing. See *52 Fed. Reg. 10224 (1987)*. In contrast to the difficulties presented by respondent's argument, our broadly worded statement in *Mohasco Corp. v. Silver, 447 U.S. 807, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980)*, a case presenting a related issue regarding the application of the extended 300-day federal filing period, that a complainant "need only file his

charge within 240 days of the alleged discriminatory employment practice in order to ensure that his federal rights will be preserved," *id., at 814, n. 16,* establishes a rule that is both easily understood by complainants and easily administered by the EEOC. We reaffirm that rule today.

[*125] [***LEdHR4B] [4B]Because we find that the extended 300-day federal limitations period is applicable to this case and that the CCRD's waiver of the 60-day deferral period "terminated" its proceedings within that 300-day limit, we conclude that Leerssen's claim was timely filed under Title VII. We therefore reverse the decision of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

## CONCUR BY: O'CONNOR (In Part)

## CONCUR

[***113] JUSTICE O'CONNOR concurring in part and concurring in the judgment.

I join Parts I and III of the Court's opinion. I also join Part II-A, in which the Court correctly concludes that in light of the statute's language, structure, and legislative history, sufficient ambiguity exists to warrant deference to the agency's construction of the word "terminated" in § 706(c). Indeed, deference is particularly appropriate on this type of technical issue of agency procedure. But while I agree with much of what the majority says in Parts II-B and II-C in indicating that the agency's construction is reasonable, in my view the majority goes too far by suggesting that the agency's position is the only one permissible. For example, the majority labels the respondent's position "absurd," *ante,* at 120, which of course implies that we would refuse to countenance an agency decision to adopt such an approach. See, *e. g., NLRB v. Food and Commercial Workers, 484 U.S. 112, 123, 98 L. Ed. 2d 429, 108 S. Ct. 413 (1987)* (agency given deference only "as long as its interpretation is rational and consistent with the statute"); *Chevron U.S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)* (agency regulations given deference "unless they are arbitrary, capricious, or manifestly contrary to the statute"). Any such implication is incorrect. As the dissent concisely points out, *post* at 126, [*126] and n. 1, the agency could quite reasonably conclude that the statutory language warrants giving the word [**1677] "terminated" what the Court recognizes is its more natural reading, *ante,* at 115.

In short, I believe the result in this case is correct solely due to the traditional deference accorded the EEOC in interpretation of this statute. Because Parts II-B and II-C could be read to go beyond this view, I join only Parts I, II-A, and III of the Court's opinion and in the judgment.

## DISSENT BY: STEVENS

## DISSENT

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

In my opinion the Court's decision is not faithful to the plain language of the statute, [1] to the legislative [***114] compromise [*127] that made it possible to enact the Civil Rights Act of 1964, [2] or to our prior interpretation of the very provision the Court construes today. [3] Accordingly, I respectfully dissent.

1    In a deferral State, § 706(c) of Title VII, 86 Stat. 104, *42 U.S. C. § 2000e-5(c),* provides that "no charge may be filed . . . before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier *terminated.*" (Emphasis added.) The Court reasons that as used in § 706(c) "termination" might mean a temporary "cessation in time" and thus is sufficiently ambiguous to require deference to the EEOC's interpretation. *Ante,* at 115-116. I doubt that Congress chose the word "terminated" to convey something other than absolute finality, which the majority recognizes is the meaning the word bears "more naturally or more frequently in common usage." *Ante,* at 115. The context in which the word "terminate" is used may inform the reader that the termination being referred to is an ending at or for a particular time. This is true of the examples given by the majority. See *ibid.* In the phrase "terminating work on the job-site knowing that it will resume the next day," it is the words used after the word "terminating" that convey the promise of future events, not the word "terminating" itself. The context in which "terminate" is used in § 706(c), however, negates the possibility that future activity by the State was contemplated, because Congress provided that state proceedings must have been *earlier* terminated.

The majority seeks to construe the statute in a manner that preserves an opportunity for a State to reactivate its proceedings upon the conclusion of federal proceedings. Although such an advantage may be prudent, it is not conferred by the statute, and the failure to afford it does not "tur[n]

486 U.S. 107, *; 108 S. Ct. 1666, **;
100 L. Ed. 2d 96, ***; 1988 U.S. LEXIS 2072

on its head" the purposes of the statute. See *ante*, at 120. That the statute operates to prevent concurrent jurisdiction over claims filed over 240 days after the prohibited practice occurred does not frustrate congressional intent to protect state enforcement efforts. What is being denied is not state, but federal intervention.

2   See *Mohasco Corp. v. Silver, 447 U.S. 807, 819-822, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980)*. Although it is perfectly clear that nothing in the legislative history contains any suggestion that complainants in deferral States were to be allowed to proceed with less diligence than those in nondeferral States (who must file within 180 days), the Court assumes that the entire class of claims filed after 240 days is entitled to specially favored treatment. See *ante*, at 120-121; *Moore v. Sunbeam Corp., 459 F.2d 811, 822-826, 829-830 (CA7 1972)*.

3   In *Mohasco, supra, at 821,* we stated:

   "Congress chose to prohibit the filing of any federal charge until after state proceedings had been completed or until 60 days had passed, whichever came sooner."

## REFERENCES

*15 Am Jur 2d, Civil Rights 294, 307, 314, 315*

21 Federal Procedure, L Ed, Job Discrimination 50:4-50:7, 50:12, 50:13, 50:84-50:89

12 Federal Procedural Forms, L Ed, Job Discrimination 45:111

16 Am Jur Pl & Pr Forms (Rev), Labor and Labor Relations, Forms 330-333

21 Am Jur Trials 1, Employment Discrimination Action Under Federal Civil Rights Acts

*42 USCS 2000e-5(c), 2000e-5(e)*

RIA   Employment   Coordinator   EP-32,501--EP-32,551.20, EP-32.551.80, EP-32.581

US L Ed Digest, Appeal 1692.6; Civil Rights 61; Statutes 160.4

Index to Annotations, Equal Employment Opportunity; Limitation of Time; Termination and Expiration

Annotation References:

Supreme Court's view as to weight and effect to be given, on subsequent judicial construction, to prior administrative construction of statute. *39 L Ed 2d 942.*

Equitable considerations as tolling, for purposes of civil action, time limitations of 706 of Civil Rights Act of 1964, as amended (*42 USCS 2000e-5(e)*), for filing charge with Equal Opportunity Employment Commission. 53 ALR Fed 859.

Sufficiency of state remedy under *42 USCS 2000e-5(c)* to require 60-day deferral by Equal Employment Opportunity Commission to allow state time to act. 45 ALR Fed 347.

Effect of prior state agency adjudication upon court action for unlawful employment practices under 706 of Civil Rights Act of 1964 (*42 USCS 2000e-5*). 20 ALR Fed 963.

Time requirements for civil action for violation of equal employment opportunity provisions under 706 of Civil Rights Act of 1964 (*42 USCS 2000e-5*). 4 ALR Fed 833.

LEXSEE 81 F.3D 304

**GEORGE FORD, Plaintiff-Appellant, v. BERNARD FINESON DEVELOPMENT CENTER, Defendant-Appellee.**

**Docket No. 95-7241**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*81 F.3d 304; 1996 U.S. App. LEXIS 7452; 70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036*

**October 6, 1995, Argued
April 10, 1996, Decided**

**SUBSEQUENT HISTORY:**    [**1]  As Amended May 31, 1996.

**PRIOR HISTORY:**    The district court dismissed the plaintiff's Title VII and ADEA claims as time-barred, for failure to file a timely charge with the EEOC. We hold that the charge was timely. We therefore reverse the ruling of the district court on the plaintiff's discrimination claims, and remand for further proceedings on the merits of these claims. We affirm the district court's ruling that the plaintiff has abandoned his retaliation claim.

**DISPOSITION:**    Affirmed

**COUNSEL:** NED W. BRANTHOVER, Morgan & Finnegan, New York, NY (Scott B. Howard, New York, NY, on the brief) for Plaintiff-Appellant.

VALERIE SINGLETON, Assistant Attorney General of the State of New York, New York, NY (Dennis C. Vacco, Attorney General, and Ronald Turbin, Assistant Attorney General, New York, NY, on the brief) for Defendant-Appellee.

**JUDGES:** Before: WINTER, JACOBS and LEVAL, Circuit Judges.

**OPINION BY:** JACOBS

**OPINION**

[*305] JACOBS, *Circuit Judge*:

"Title VII [] is a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 124, 100 L. Ed. 2d 96, 108 S. Ct. 1666 (1988). Layperson George Ford initiated the process under Title VII and the ADEA, alleging illegal discrimination by his employer. Under the [**2] rules governing his case, Ford had 300 days in which to file a charge with the EEOC. Ford filed his charge on day 281 with New York State's antidiscrimination agency, which is authorized to act as the EEOC's agent, and asked the agency to forward the charge to the EEOC. The EEOC received it the same day.

Unfortunately, the 300-day rule is qualified in ways that bedevil lawyers as well as laypersons. In this case, for instance, the timeliness of Ford's EEOC filing is a question that implicates statutory provisions, federal administrative rules, subtle interpretive precedents, and a state-federal inter-agency "Worksharing Agreement" that allocates initial claim-handling responsibility. The district court held that Ford filed his charge too late and therefore dismissed his claims as time-barred. We reverse in part and remand.

I

George Ford was fired on July 3, 1990 by the Bernard Fineson Development Center ("the Center"), a state mental health center, for an alleged act of sexual harassment. [1] He claims that he was fired because he is African-American, is a man, and was over 40 years of age (or because of any one of these characteristics). On April 9, 1991--281 days after his [**3] termination--he filed a formal discrimination charge against the Center with New York State's antidiscrimination agency, the Division of Human Rights ("the DHR"). The same day, the DHR "transmitted" the charge to the federal antidiscrimination agency (the EEOC), using an inter-agency form. The form has check-off boxes for the transmitting agency to indicate whether it intends to process the charge or whether it wants the receiving agency to process the charge. No box was checked. The key question in this case is what effect to give Ford's April 9 filing with the

81 F.3d 304, *; 1996 U.S. App. LEXIS 7452, **;
70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036

DHR. We examine this filing document in further detail below.

    1  Although the date of Ford's termination was sharply contested in the district court, Ford concedes on appeal that July 3, 1990 is the proper date.

After the April 9 filing and transmittal, the DHR launched a four-month investigation into Ford's claims, and the EEOC apparently took no immediate action. On August 21, 1991, the DHR issued a determination that there was "no probable cause to [**4] believe" Ford's claims of race, sex, and age discrimination. The DHR notified Ford that "you have the right to request EEOC review of this action. To secure a review, you must request it in writing within 15 days of your receipt of this letter." Nine days later (August 30), Ford wrote to the EEOC, asking it to review the DHR's denial of his claims. [*306] Four months later, the EEOC denied his claims and issued a right-to-sue letter.

On January 17, 1992, Ford filed his complaint in the United States District Court for the Eastern District of New York (Glasser, J.), alleging that the Center had violated Title VII of the Civil Rights Act of 1964, *42 USC §§ 2000e to 2000e-17*, and the Age Discrimination in Employment Act (ADEA), *29 USC §§ 621-634*. [1] For reasons not apparent from the record, it took the Center almost two years to answer the complaint. The Center then moved for summary judgment, arguing that Ford's claims were time-barred because his charge had not been timely filed with the EEOC, and that Ford did not present a prima facie case of discrimination under either Title VII or the ADEA. The district court heard the motion on January 27, 1995, and stayed Ford's request for discovery [**5] pending a ruling on the timeliness issue. On February 8, 1995, the district court held that (i) Ford's August 30 letter constituted his filing with the EEOC, and (ii) his claims were therefore time-barred by the 300-day limitations period, because the letter was filed 424 days after the alleged discrimination. *Ford v. Bernard Fineson Dev. Ctr.*, 1995 WL 62681, * 4 (EDNY). On appeal, Ford claims that both conclusions are in error.

    2  Ford also checked off a box on his form complaint alleging "retaliation," although he made no retaliation claim in his April 9 charge. He never supported this claim in the district court, and appears to have abandoned it entirely on appeal. We discuss this claim in section IV.

## II

Ford argues that a proper and integral reading of Title VII, the ADEA, the applicable EEOC regulations, and the "Worksharing Agreement" between the EEOC and the DHR, supports the conclusion that his April 9, 1991 charge was a timely filing with the EEOC. Before we engage the merits of this argument, two [**6] preliminary matters must be resolved.

    A. Title VII and the ADEA authorize the EEOC to enter into cooperation agreements with state and local antidiscrimination agencies. See *42 USC § 2000e-8(b)*; *29 USC § 625(b)*; *EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 112, 100 L. Ed. 2d 96, 108 S. Ct. 1666 (1988)* (EEOC has entered into worksharing agreements with approximately 81 of the 109 state or local antidiscrimination agencies). Although Ford filed his charge with the DHR on April 9, 1991, Ford has only furnished to us a copy of the 1995 version of the Worksharing Agreement between the EEOC and the DHR, [3] explaining that the EEOC discards lapsed Worksharing Agreements after three years. The Center does not assert that the 1995 Agreement differs significantly from the 1991 Worksharing Agreement, arguing instead that Ford incorrectly interprets the 1995 Agreement. There is no indication that the 1991 Agreement, quoted in part in a recent published opinion of the District Court for the Southern District of New York, is materially different from the 1995 Agreement. See *Humphrey v. Council of Jewish Federations, 901 F. Supp. 703, 708 (SDNY 1995)* (quoting the "Worksharing Agreement in effect at the time of the filing [**7] of [the plaintiff's] charges," on June 28 and September 27, 1991); see also note 10 below. The 1992 Worksharing Agreement, quoted in much greater length by the Northern District of New York in *Shumway v. Hendricks, 1994 U.S. Dist. LEXIS 17100, 1994 WL 672656, *2-3 (NDNY)*, is also plainly consistent with the 1995 Agreement. Because Ford has given us only the 1995 Agreement and because the Center does not dispute the applicability of its terms to this case, we adopt the parties' implicit assumption that the text of the 1991 Agreement is not materially different from the 1995 Agreement provided to us. [4]

    3  Worksharing Agreement Between New York State Division of Human Rights and Equal Employment Opportunity Commission for Fiscal Year 1995 ("1995 Worksharing Agreement").

    4  The Center (part of a New York state agency) or its counsel (the New York State Attorney General's Office) may be able to procure a copy of the 1991 Agreement from their companion state agency, the DHR, if the DHR preserves its Worksharing Agreements. If the Center can obtain a copy after remand, the district court may prefer to review the 1991 Agreement to determine in the first instance whether the 1991 terms differ materially from the 1995 terms. If the court concludes that there is a material difference, the analysis employed in this opinion should allow resolution

81 F.3d 304, *; 1996 U.S. App. LEXIS 7452, **;
70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036

of the timeliness issue without the unnecessary delay that would be occasioned by another appeal on this same issue.

[**8]   [*307]  B. The Center urges us to bar Ford from arguing that the April 9 charge constitutes a timely filing with the EEOC, because he did not make this argument to the district court. Although "it is the general rule . . . that a federal appellate court does not consider *an issue* not passed upon below," *Singleton v. Wulff, 428 U.S. 106, 120, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976)* (emphasis added), "the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id at 121.* Unlike the appellant in *Singleton,* who raised an entirely new *issue* on appeal, Ford is proffering a new legal argument that concerns an issue already considered at some length by the district court. We recently held that "in this Circuit, we reserve considerable discretion to review purely legal questions not formally raised in the district court. . . . Arguments made on appeal need not be identical to those made below if they involve only questions of law and additional findings of fact are not required." *In re McLean Indus., Inc., 30 F.3d 385, 387 (2d Cir 1994)* (per curiam) (internal quotations omitted), [**9]  cert denied, *115 S. Ct. 934 (1995).* Ford's argument relies exclusively on legal authorities, and on an inter-agency compact the authenticity of which is not contested by the parties and which operates pursuant to and in the manner of a governmental regulation. [5] Under these circumstances (including the fact that it would be much easier for the Center or its counsel, the Attorney General's office, to obtain a copy of the Agreement than for Ford to do so), we exercise our discretion to consider Ford's argument that his April 9 charge was a timely filing with the EEOC.

5  Worksharing Agreements are much more like government regulations than any sort of contract, since they are agreements between governmental agencies, are authorized by specific statutory provisions, and have been adopted by federal regulations as an integral part of the regulatory scheme. In a sense, they are localized subsets of federal regulations.

In addition, these two-party "agreements" are principally intended to benefit third parties: the claimants who appear before the agencies. See, for example, 1995 Worksharing Agreement P I(B) ("[The DHR] and the EEOC hereby agree to the terms of this Worksharing Agreement, which is designed to provide individuals with an efficient procedure for obtaining redress for their grievances."). As seven circuits have concluded

(see cases cited in section III) and as we conclude today, the waiver provisions of these inter-agency compacts may determine whether a Title VII claimant is entitled to relief. They therefore have the same impact on claimants as a statute or regulation.

[**10]  III

Discrimination claims under Title VII and the ADEA must ordinarily be "filed" with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." *42 USC § 2000e-5(e)(1);* see *29 USC § 626(d)(1).* However, if the alleged discrimination took place in a state or locality that has its own antidiscrimination laws and an agency to enforce those laws, then the time period for "filing" claims with the EEOC is extended to 300 days. [6] *42 USC § 2000e-5(e)(1); 29 USC §§ 626(d)(2), 633(b).* In this case, the discrimination alleged by Ford took place in New York, which has both antidiscrimination laws and an antidiscrimination agency. The 300-day limit therefore applies. Thus, if the charge Ford sent to the DHR on April 9 also constitutes a simultaneous "filing" with the EEOC, his claims were timely. If the April 9 charge does not constitute such a "filing," Ford's claims were properly dismissed.

6  Title VII contains an additional requirement, not found in the ADEA, that must be met before the 180-day period is extended to 300 days: the person bringing the charge must "initially institute[] proceedings" with the state agency. *42 USC § 2000e-5(e)(1).* Ford met that requirement, by filing first with the DHR on April 9.

Under both statutes, the 300-day period may be shortened in some cases: an individual must file the charge with the EEOC within 30 days of receiving notice from the state agency that its proceedings have "terminated." *42 USC § 2000e-5(e)(1);* see *29 USC § 626(d)(2).* That condition is not relevant here.

[**11]  [*308]  The charge that Ford filed with the DHR suggests a simultaneous filing with the EEOC. The text, under the rubric, "Title VII/ADEA EEOC CHARGE NO:____", "charges the above-named respondent(s) with violating Title VII . . . and hereby authorizes [the DHR] to accept this verified complaint on behalf of EEOC subject to the statutory limitation contained in Title VII . . . [and] to accept this verified complaint as a filing under the [ADEA]." The Worksharing Agreement between the two agencies authorized the DHR to accept Ford's charge on behalf of the EEOC: "each [agency] designates the other as its agent for the purpose of receiving and drafting charges." 1995 Worksharing

81 F.3d 304, *; 1996 U.S. App. LEXIS 7452, **;
70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036

Agreement P II(A). If the DHR receives "charges alleging a violation of Title VII [or the] ADEA," it must "refer them to the EEOC." Id P II(B). "Dual filed charges" are to be forwarded by the DHR to the EEOC "within two working days," to the extent possible, using "EEOC Form 212-A." Id P II(E). The DHR used this form to forward the charge to the EEOC on April 9, and the EEOC received it. Neither the DHR nor the EEOC could have missed the fact that the April 9 charge included federal antidiscrimination claims, [**12] brought under Title VII and the ADEA, and that Ford wanted the EEOC to hear his claims. But despite these indications, further analysis is required under the ADEA and Title VII to confirm that the April 9 charge was also filed with the EEOC on April 9.

For Ford's ADEA claim, it is easy to conclude that his April 9 charge constituted a simultaneous "filing" with the EEOC. Under the EEOC's ADEA regulations, a charge is deemed "filed" with the EEOC when "its designated agent" "receives" the charge. *29 CFR § 1626.7(c)(1)(iii)*. In addition, if the EEOC "enters into agreements with state or local agencies which authorize such agencies to receive charges" for the EEOC, then "charges received by one agency under the agreement shall be deemed received by the other agency." Id *§ 1626.10(b),(c)*. Thus, the DHR's receipt of Ford's charge on April 9, 1991 was the equivalent of Ford's filing the charge with the EEOC on that date. His ADEA claim was therefore timely. See *Brodsky v. City Univ. of New York, 56 F.3d 8, 9 (2d Cir 1995)* (ADEA permits simultaneous filing with EEOC and state agency).

Under Title VII, however, the situation is more complicated. The statute provides that, in a state [**13] having its own antidiscrimination agency, a Title VII claim *cannot* be "filed" with the EEOC for 60 days from the date that proceedings are begun with the state agency, "unless such proceedings have been earlier terminated." *42 USC § 2000e-5(c)*. [7] Under this 60-day deferral provision, *receipt* of a discrimination charge by the EEOC (or the state agency) is not the same thing as a "filing" with the EEOC. When the EEOC receives a charge that is subject to the deferral provision, it holds the charge "in 'suspended animation,'" *Love v. Pullman Co., 404 U.S. 522, 526, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972)*, until either (i) 60 days have expired or (ii) the agency proceedings are "terminated." *42 USC § 2000e-5(c)*; *Commercial Office Prods., 486 U.S. at 111-12*. In this case, Ford cannot rely on the first event, since 60 days after April 9 would put him well beyond the 300-day limit for "filing" claims with the EEOC. He therefore must argue, as he does, that the DHR "terminated" its proceedings some time prior to April 28 (the day the 300-day limit expired).

[7] No such provision appears in the ADEA. See *Brodsky, 56 F.3d at 9*. This 60-day deferral provision means that the cautious complainant must file a claim with the state agency within 240 days of the alleged discrimination to ensure timely filing with the EEOC. Laypersons who follow this advice should find the Title VII process a relatively simple one, as the Supreme Court suggested in *Commercial Office Products. 486 U.S. at 111, 124*.

[**14] We know, however, that the DHR did not *complete* its investigation until August 21, well after the 300-day deadline had passed. [8] [*309] If "terminated" means "completed," Ford's argument fails.

[8] From April 11 to July 24, the DHR's investigation consisted of mailing Ford's charge to the Center, and corresponding with Ford and the Center to arrange a mutually convenient date for the DHR's "fact-finding conference." The conference was held on August 7. The DHR's determination was issued on August 21.

In *Commercial Office Products*, the Supreme Court held that the term "terminated," as used in *§ 2000e-5(c)*, does not necessarily mean "completed." *486 U.S. at 114-15*. In that case, a charge was filed with the EEOC on day 290. The EEOC transmitted the charge to the state antidiscrimination agency, with a cover form stating that the EEOC would do the initial processing of the charge. The state agency wrote back that it "waived its right under Title VII to initially [and exclusively] process the charge" during [**15] the initial 60-day period. The Court held that this waiver constituted a "termination" of the state agency's proceedings, even though the agency "still retained jurisdiction to act on the charge after the conclusion of the EEOC's proceedings." *Id at 113*. Deferring to the EEOC's interpretation of the statute, the Court concluded that "a state agency 'terminates' its proceedings when it declares that it will not proceed, if it does so at all, for a specified interval of time." *Id at 115*; see *id at 126* (O'Connor concurring) ("I believe the result in this case is correct solely due to the traditional deference accorded the EEOC in interpretation of this statute.").

The EEOC's interpretation of Title VII and its terms is afforded great deference. See *id at 115*; *Oscar Mayer & Co. v. Evans, 441 U.S. 750, 761, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979)*; *Tolliver v. Xerox Corp., 918 F.2d 1052, 1057 (2d Cir 1990)*. See also *Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)*. The EEOC regulations provide that a state antidiscrimination agency "*may waive its right*" to the period of exclusive processing of charges provided under section 706(c) of title VII [*42 USC § 2000e-5(c)*] with respect [**16] to any charge

81 F.3d 304, *; 1996 U.S. App. LEXIS 7452, **;
70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036

*or category of charges."* *29 CFR § 1601.13(a)(3)(iii)* (emphasis added). If--as in this case--the charging party initially "presents" a document to the state agency and

> requests that the charge be presented to the [EEOC], the charge will be deemed to be filed with the EEOC

> [a] upon expiration of 60 . . . days after a written and signed statement of facts upon which the charge is based was sent to the [state] agency . . . , or

> [b] upon the termination of [the state] agency proceedings, or

> [c] upon waiver of the [state] agency's right to exclusively process the charge,

> whichever is earliest. Such filing is timely if effected within 300 days from the date of the alleged violation.

Id *§ 1601.13(b)(1)*. Thus, although Title VII expressly provides only two triggers for the commencement of EEOC proceedings (expiration of the 60-day period, and "termination" of state agency proceedings), the EEOC regulations add a third: waiver by the state agency of its "right to exclusively process the charge." According to the EEOC, then, when a state agency waives this right, with regard to either a specific [**17] charge or an entire "category of charges," the state agency's proceedings as to that charge or category of charges are deemed automatically "terminated." Such charges are therefore filed with the EEOC whenever the waiver occurs.

Ford argues that the "Worksharing Agreement" between the EEOC and the DHR contains a waiver of the DHR's right to exclusively process an entire category of charges that encompasses his own; that this waiver constituted an immediate "termination" of the DHR's proceedings on April 9, 1991; and that his charge was therefore timely filed under Title VII. The Center responds that this waiver cannot constitute "termination" of the DHR's proceedings because (i) the DHR began its proceedings soon after receiving Ford's charge and continued its handling of the case for four months, and (ii) the EEOC did not actually begin handling the claim until the DHR was done with it, by which point the 300-day limit had expired.

The 1995 Worksharing Agreement provides that:

> [*310] For charges originally received by the EEOC and/or to be initially processed by the EEOC, the [DHR] waives its rights of exclusive jurisdiction to initially process such charges for a period of 60 [**18] days for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day.

> In addition, the EEOC will initially process the following charges:

> -- All Title VII charges received by the [DHR] 240 days or more after the date of violation.

1995 Worksharing Agreement P III(A)(1). Ford's charge included a Title VII claim and was received by the DHR more than 240 days after the date of the Center's alleged discrimination. The EEOC was therefore required to "initially process" the charge under the terms of the Agreement. [9] And as to charges "to be initially processed by the EEOC," like this one, the DHR "waives its rights of exclusive jurisdiction . . . for the purpose of allowing the EEOC to proceed immediately with the processing of such charges." Thus, the DHR's signing of the Agreement effected a waiver of its otherwise exclusive statutory right to handle Ford's case for the first 60 days after it was filed. This waiver allowed the EEOC to proceed "immediately" with Ford's case when it received the charge on April 9.

> [9] Even though P III(A)(1) clearly states that the EEOC will "initially process . . . all Title VII charges" filed after day 240, this provision creates a potential conflict with another provision of the 1995 Worksharing Agreement: under P III(A)(2), *the DHR* "will initially process . . . all charges which allege more than one basis of discrimination where at least one basis is not covered by the laws administered by EEOC but is covered by the [DHR] Ordinance." For example, if a charge filed after day 240 includes claims alleging discrimination on the basis of race (which is unlawful under New York law and Title VII) as well as marital status (which is unlawful under New York law but not Title VII), then both the EEOC (under P III(A)(1)) and the DHR (under P III(A)(2)) could claim the right to "initially proc-

81 F.3d 304, *; 1996 U.S. App. LEXIS 7452, **;
70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036

ess the charge." And, as this case demonstrates, determining which agency is to "initially process" the charge may also determine whether the charge is timely filed with EEOC. This potential conflict is not present here, however, because every basis of discrimination alleged by Ford (race, sex, and age) is covered under either Title VII or the ADEA.

[**19] The unqualified language of the 1995 Agreement makes this waiver self-executing: whether the DHR deferred to the EEOC or, notwithstanding the waiver, undertook its own immediate investigation (as it did here), the DHR's waiver of its right to exclusive jurisdiction went into effect as soon as Ford filed his Title VII charge on the 281st day. [10] Under *Commercial Office Products*, this waiver *may* constitute "termination" of the DHR's proceedings, even if the DHR retained concurrent jurisdiction over the charge. *486 U.S. at 115.* And under the EEOC's regulations, the waiver *does* constitute "termination" of the DHR's proceedings, because all the elements of a timely filing with the EEOC, as defined by *29 CFR § 1601.13(b)(1)*, are met: (i) "a charge [was] initially presented to a [state antidiscrimination] agency"; (ii) "the charging party requested that the charge be presented to the [EEOC]"; and (iii) there was a "waiver of the [state] agency's right to exclusively process the charge." Since the DHR's waiver was effective when Ford filed his charge with the DHR on April 9, the DHR's proceedings "were instantaneously terminated" on that day, *Griffin v. City of Dallas,* [**20] *26 F.3d 610, 613 (5th Cir 1994),* as the term "terminated" has been interpreted by the Supreme Court in *Commercial Office Products* and by the EEOC in its regulations. Ford's charge was therefore simultaneously "filed" with the EEOC on April 9. This filing, on day 281, was timely. [11]

10   The 1991 Agreement, as quoted in *Humphrey v. Council of Jewish Federations, 901 F. Supp. 703, 708 (SDNY 1995),* contains a similar waiver: under the Agreement, the DHR "*waived* its 60 day exclusive jurisdiction 'over all Title VII charges including dual filed charges received between 240 and 300 days after the date of alleged discrimination.'" *Id at 708* (quoting 1991 Worksharing Agreement § III(f)(6)). The Agreement defined a "dual filed charge" as a "charge[] filed with the [DHR] and forwarded for filing with EEOC.'" *Id. at 708 n 2* (quoting 1991 Worksharing Agreement § II(d)).

11   During its investigatory process, even the DHR admitted that Ford's charge was timely filed with the EEOC. The DHR's "Investigation Report" asks the investigator to answer whether the claimant "Meets Statutory Time Limit for Filing: (i) with [State] DHR? (ii) with Federal Agency?"

To both questions, the investigator filled in the word "yes."

[**21]   [*311]   We hold that a Worksharing Agreement may contain a self-executing waiver of a state agency's right to exclusively handle discrimination claims for 60 days, and that this waiver may constitute "termination" of state agency proceedings under *§ 2000e-5(c).* This holding is consistent with the rulings of the seven other circuits that have considered this issue, and with the reasoning of the district courts in our Circuit that have unanimously reached the same conclusion. See *Griffin v. City of Dallas, 26 F.3d 610, 613 (5th Cir 1994); Worthington v. Union Pacific R.R., 948 F.2d 477, 482 (8th Cir 1991); Marlowe v. Bottarelli, 938 F.2d 807, 814 (7th Cir 1991); Trevino-Barton v. Pittsburgh Nat'l Bank, 919 F.2d 874, 880 (3d Cir 1990); EEOC v. Techalloy Maryland, Inc., 894 F.2d 676, 678 (4th Cir 1990); Griffin v. Air Prods. and Chemicals, Inc., 883 F.2d 940, 943 (11th Cir 1989); Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1479 (9th Cir 1989); Mayo v. Securities Industry Ass'n, 1995 U.S. Dist. LEXIS 15200, 1995 WL 608291, *3 (SDNY)* (Haight, J.); *Humphrey v. Council of Jewish Federations, 901 F. Supp. 703, 708 (SDNY 1995)* (Batts, J.); *Shumway v. Hendricks, 1994 U.S. Dist. LEXIS 17100, 1994 WL 672656, * 1* [**22] *(NDNY)* (Scullin, J.); *Dendy v. Waldorf-Astoria Corp., 1993 U.S. Dist. LEXIS 11753, 1993 WL 328833, *2 (SDNY)* (Preska, J.).

The Center invites us to distinguish these cases or deem them unpersuasive because the (Center claims) the fact pattern presented here is unique: a claimant files with the state agency, the agency *actually investigates* the claim (without deferring to the EEOC), and the EEOC *does not investigate* the claim until the state agency's investigation is completed. In these circumstances, says the Center, it is odd to conclude that the DHR "terminated" proceedings on April 9, 1991, when it is uncontested that the DHR began its investigation on that day and did not complete it for four months.

Although we agree that it is counterintuitive to decide that a state agency may "terminate" its proceedings before it has a chance to begin them, that anomaly is inherent in the EEOC's interpretation of the statutory term "terminated." As the Supreme Court conceded in *Commercial Office Products,* "in common usage," the "more natural[] or more frequent[]" meaning of the term "terminated" is "completed" or "ended." *486 U.S. at 115.* But the Court rejected the "natural" reading of the term for [**23] the "liberal" one adopted by the EEOC "in order to serve the purposes of § 706(c) of Title VII [*42 USC § 2000e-5(c)*]." See *Trevino-Barton, 919 F.2d at 880.* In this case, a "liberal" construction of the term "terminated" also serves the twin purposes underlying the 60-day deferral provision. One is to let states "fore-

stall federal intervention" for 60 days while they handle discrimination claims on their own. *Commercial Office Prods., 486 U.S. at 118.* As Congress recognized, "termination" of the state agency's proceedings prior to the expiration of the 60-day period would automatically signal the agency's approval of federal entry into the case. A blanket *waiver* of the state agency's 60-day priority rights gives a similar signal, and is thus consistent with the goal of allowing states a limited priority if they want to exercise it. The other rationale for the deferral provision is to promote the efficient processing of claims. *Id at 118-19.* If, under a Worksharing Agreement, the state agency agrees in advance that the most efficient way to process a certain category of claims is to have the EEOC process them first, then this rationale for the 60-day deferral provision simply [**24] does not apply.

Concluding that the DHR "terminated" its proceedings on April 9 is also consistent with the law of other circuits. The Center is wrong to argue that the DHR's processing of Ford's claim renders the cases cited above inapposite. Several involved situations in which state agencies began processing a charge just after it was filed and continued their proceedings beyond the 300-day limit, despite a Worksharing Agreement waiver stating that the EEOC would initially process the charge. The courts that have faced this situation have held (as we do now) that the "termination" of the agency's proceedings occurred as soon as the state agency received the charge, because the Worksharing [*312] Agreement waiver was self-executing. See, for example, *Marlowe v. Bottarelli, 938 F.2d 807, 809 (7th Cir 1991); Griffin v. Air Prods. and Chemicals, Inc., 883 F.2d 940, 944 (11th Cir 1989); Humphrey v. Council of Jewish Federations, 901 F. Supp. 703, 708 (SDNY 1995).*

Finally, our construction of the term "terminated" is consistent with the need for predictability in a statutory scheme intended to be user-friendly. We remain mindful of the Supreme Court's statement that "laypersons . . . [**25] are expected to initiate the [Title VII] process." *Commercial Office Prods., 486 U.S. at 124.* When state agencies unambiguously waive their statutory right to exclusively process certain discrimination claims, they (and the EEOC) have made an arrangement for the benefit of claimants (as well, presumably, for administrative convenience); the timeliness of a claimant's filing therefore should not be made to depend upon whether one or the other agency follows through on its undertakings under a Worksharing Agreement. It is already difficult enough to understand the deadlines for filing Title VII claims. Claimants who master the intricacies of these deadlines have the right to expect that they will not be penalized by a bureaucrat's noncompliance with the Worksharing Agreement. See *DeMatteis v. Eastman Kodak Co., 520 F.2d 409, 411 (2d Cir 1975)* ("It would be

inequitable . . . and would frustrate the remedial purpose of [Title VII of] the Civil Rights Act . . . to bar the claim of a party who filed suit within the period recommended by the administrative body [the EEOC] which had been established to fully vindicate [the claimant's] statutory rights."). See also *Jackson v. Richards* [**26] *Medical Co., 961 F.2d 575, 587 n 11 (6th Cir 1992)* (claimant entitled to rely on EEOC's erroneous assertion and should not be "penalized for the Commission's mistakes"); *White v. Dallas Indep. School Dist., 581 F.2d 556, 562 (5th Cir 1978)* (in banc) ("The EEOC's failure to follow its own regulations . . . should not redound to [the claimant's] detriment."); *Shumway, 1994 U.S. Dist. LEXIS 17100, 1994 WL 672656, at \*3* ("An administrative agency error should not work to a claimant's detriment."). [12]

12   Our construction of the term "terminated" only limits a state agency's independence to the extent that the Worksharing Agreement does so. Our construction certainly does not bar a state agency from considering a charge after the EEOC has completed its investigation. Nor does it foreclose the agency from considering the charge simultaneously with the EEOC, although this might undermine one of the purposes of the statutory deferral provision and Worksharing Agreements: to process claims as efficiently as possible.

In short, we agree [**27] with every circuit that has considered this issue that the waiver provision of the Worksharing Agreement effects the "termination" of a state agency's proceedings "instantaneously." Agency actions that take place after the claim is filed do not affect the "termination," because the waiver is self-executing.

IV

Ford's timely charge must be considered on its merits. The Center's summary judgment motion was based on three arguments: (i) Ford's charge was untimely; (ii) his "retaliation" claim (not part of his DHR/EEOC charge, see note 2 above) was unsupported; and (iii) he failed to make out a prima facie case of discrimination under Title VII. *Ford, 1995 WL 62681, at \*2.* Having accepted the Center's first argument, the district court did not need to reach the two remaining ones, as it acknowledged. Id at \*4. Nevertheless, the district court "noted in passing" that it agreed with the Center's other two arguments as well. Id. On Ford's retaliation claim, the court noted Ford's concession "at oral argument that he has not supported this claim any further since having raised it by checking a box on the form complaint that was filed [in the district court]. Thus, it will be rejected." [**28] Id. Ford has not contested this ruling on appeal, and our review of the record convinces us that the district court

81 F.3d 304, *; 1996 U.S. App. LEXIS 7452, **;
70 Fair Empl. Prac. Cas. (BNA) 825; 68 Empl. Prac. Dec. (CCH) P44,036

was correct to hold that Ford has effectively abandoned his retaliation claim. We therefore affirm the district court's grant of summary judgment for the plaintiff on this count.

On Ford's discrimination claim, the court noted that "the pleadings and affidavits clearly indicate that plaintiff would fail under the requirements of *Texas Dep't of Community* [*313] *Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* and its progeny." Id. While this may well be so, we do not reach the issue because there is a remaining issue of discovery. Ford asked the court to defer its ruling on the merits of his discrimination claim until he had the opportunity to pursue additional discovery, see Transcript of Hearing on Motion for Summary Judgment, Jan. 27, 1995 at 8 ("If I could have the opportunity to take a couple of depositions in the case, we can present that evidence to Your Honor, and you can see we have a prima facie case on that point."), and the court ruled that "discovery ought to be stayed" until the timeliness issue was decided. *Id at 14.* We therefore remand to the district court so that [**29] it may rule on Ford's discovery request before ruling on the merits of Ford's discrimination claim.

The judgment of the district court is therefore reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion.

30 of 39 DOCUMENTS

**PAMELA GIBSON, Plaintiff, -v- THE NEW YORK CITY POLICE DEPART-MENT, Defendant.**

**97 CIV. 4091 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 9246; 77 Fair Empl. Prac. Cas. (BNA) 626*

**June 24, 1998, Decided
June 25, 1998, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss granted. Judgment entered for defendant.

**COUNSEL:** For plaintiff: James L. Hubbert, Esq., New York, NY.

For defendant: Amy K. Adelman, Alan Schlesinger, Assistant Corporation Counsel, Jeffrey D. Friedlander, Acting Corporation Counsel for the City of New York, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION and ORDER*

DENISE COTE, District Judge:

Pamela Gibson ("Gibson") commenced this Title VII action against the New York City Police Department (the "Department") alleging that the Department's decision not to hire her was based on "racial and sexual discrimination." The Department has now moved to dismiss Gibson's Complaint on a variety of grounds, including its untimeliness. For the reasons stated below, the motion is granted.

The facts necessary to decide this motion are few and may be stated briefly. Gibson took and passed the written examination to become a police officer in 1993, but failed the Department's psychological examination. Gibson received notice that she had been disqualified on approximately November 1, 1994. Although she appealed the Department's decision to the Civil Service Commission [*2] promptly, Gibson failed to file a complaint with the **EEOC** until December 15, 1995. The **EEOC** issued a right to sue letter on January 23, 1997, and Gibson filed this action on April 16, 1997.

While the motion to dismiss points out a number of defects in Gibson's pleading, the Court need only address the issue of timeliness. When a plaintiff fails to file a charge with the **EEOC** within the time required by Title VII, any subsequent lawsuit in time-barred. *Butts v. City of New York, 990 F.2d 1397, 1401 (2d Cir. 1993).* Title VII requires that claims of discrimination be filed with the **EEOC** within 300 days of the alleged discriminatory employment practice. *See 42 U.S.C. § 20000e-5(e).* A district court has jurisdiction to hear only those Title VII claims that either are included in an **EEOC** charge or are based on conduct "reasonably related" to that described in the **EEOC** charge. *Butts, 990 F.2d at 1401.*

Even if the 300 day period begins to run from the date on which Gibson received notice that she would not be hired, instead of the much earlier date on which the decision actually was reached, her lawsuit is **untimely**. Gibson concedes that she filed her claim with the **EEOC** beyond [*3] the required 300 day period, but she contends that the doctrine of equitable tolling excuses her tardiness. Specifically, Gibson argues that the period between November 24, 1994 through July 17, 1995 should be excluded from the computation of the 300 days, inasmuch as it was during this time that she was pursuing her appeal to the New York City Civil Service Commission.

The Second Circuit has made clear that the time limits established by Title VII and its regulations are "analogous to a statute of limitations and [are], therefore, considered subject to waiver, estoppel, and equitable tolling." *Briones v. Runyon, 101 F.3d 287, 290 (2d Cir. 1996). See also Irwin v. Department of Veterans Affairs,*

1998 U.S. Dist. LEXIS 9246, *; 77 Fair Empl. Prac. Cas. (BNA) 626

*498 U.S. 89, 94-95, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990).* Thus, equitable tolling and estoppel may, in certain circumstances, excuse a failure to follow the timing requirements of Title VII. *Irwin, 498 U.S. at 94-95; Briones, 101 F.3d at 290.* In *Irwin* the Supreme Court noted that "courts have typically extended equitable relief only sparingly." *498 U.S. at 96.* Moreover, acknowledging that government employees are not entitled to more favorable treatment than private employees, the Court listed circumstances [*4] in which it had applied equitable tolling in private employment discrimination cases:

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by *filing a defective pleading during the statutory period,* or where the complainant has been *induced or tricked by his adversary's misconduct* into allowing the filing deadline to pass.

*Irwin, 498 U.S. at 96* (emphasis added). *See also Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 60 (2d Cir. 1986)* (employer's conduct must be "extraordinary" to justify applying equitable tolling). [1] The *Irwin* Court also stated, "we have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights"; accordingly, equitable tolling does not "extend to what is at best a garden variety claim of excusable neglect." *Irwin, 498 U.S. at 96. See also South v. Saab Cars USA, Inc., 28 F.3d 9, 12 (2d Cir. 1994)* ("a plaintiff's failure to act diligently is not a reason to invoke equitable tolling").

   1  In *Dillman,* which was decided before *Irwin,* the Second Circuit distinguished between equitable tolling and equitable estoppel, defining equitable tolling as applying where a plaintiff is "unaware of his cause of action." *Dillman, 784 F.2d at 60* (citation and quotation marks omitted). That is not a circumstance that applies to Gibson. *Irwin* did not have occasion to address any distinction between equitable tolling and equitable estoppel.

[*5]  Neither of the circumstances identified in *Irwin* affords Gibson relief. She did not file a timely but defective pleading, and she can point to no trickery by the Department that caused her to delay in filing her claim with the EEOC. Indeed, Gibson would be no more successful had she asserted that equitable estoppel, rather than equitable tolling, excuses her failure to act in a timely fashion. The Second Circuit has noted that equitable estoppel

> "is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." . . . The doctrine properly may be invoked in a case in which the employer has misrepresented the length of the limitations period or in some other way has *"lulled the plaintiff* into believing that it was not necessary for him to commence litigation."

*Dillman, 784 F.2d at 61* (citations omitted) (emphasis added). *See also Cerbone v. ILGWU, 768 F.2d 45, 48-49 (2d Cir. 1985); Angotti v. Kenyon & Kenyon, 929 F. Supp. 651, 655 (S.D.N.Y. 1996).* Here, no conduct by the Department lulled Gibson into believing that she did not need to act within the time limits [*6] prescribed by Title VII. That being the case, her lawsuit is **untimely** and must be dismissed.

*Conclusion*

   Gibson having failed to pursue her administrative remedies in a timely fashion, the defendant's motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendant and close the case.

   SO ORDERED:

   Dated: New York, New York

   June 24, 1998

   DENISE **COTE**

   United States District Judge

124VM2

********* Print Completed *********

Time of Request: Thursday, April 24, 2008  16:01:56 EST

Print Number:    1842:89209665
Number of Lines: 111
Number of Pages:

Send To:  STERN, SHARON
          TROUTMAN SANDERS LLP
          405 LEXINGTON AVE
          NEW YORK, NY 10174-0002

5 of 39 DOCUMENTS

**DEBRA DENISE HOGANS, Plaintiff, -v- DELL MAGAZINES/PENNY PRESS, Defendant.**

07 Civ. 7721 (DLC)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2008 U.S. Dist. LEXIS 20898*

**March 18, 2008, Decided
March 18, 2008, Filed**

**COUNSEL:** [*1] Debra Denise Hogans, Plaintiff, Pro se, Brooklyn, New York.

For Defendant: Steven Eckhaus, Aimee Sato, McCarter & English, LLP, New York, New York.

**JUDGES:** DENISE COTE, District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION & ORDER*

DENISE **COTE**, District Judge:

Plaintiff Debra Denise Hogans, proceeding *pro se*, brought this employment discrimination action against her former employer, defendant Dell Magazines/Penny Press ("Dell"), claiming that defendant terminated her employment in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Dell has moved to dismiss, contending that Hogans has failed to state a claim upon which relief can be granted because she failed to file a charge with the Equal Employment Opportunity Commission ("EEOC") within the prescribed statute of limitations. For the following reasons, the motion to dismiss is granted.

BACKGROUND

The following facts are taken from the Complaint.[1] Hogans worked in Dell's production department for over fourteen years, until her employment was terminated on August 4, 2004. According to Hogans, she was told that the company was "[d]ownsizing." Evidently, she believes [*2] that this explanation was pretextual, as she claims that the termination of her employment was due to her national origin (which is unspecified in the complaint),

age (fifty-three years at the time of her firing), and disability or perceived disability (knee problems, asthma, glaucoma, and osteoporosis). Along these lines, Hogans makes four specific allegations. First, she alleges that her younger, non-disabled co-worker, Evira Matos, was afforded preferential treatment because, although Hogans did "80% of the work in that department," her employment was terminated and Matos took over Hogans' duties. Second, Hogans claims that her "health problems were becoming bothersome to Dell Magazines/Penny Press." Third, she claims that she was targeted by her coworkers with offensive comments about her health and education, as well as offensive behavior, including her coworkers' going through her personal belongings without permission. Finally, Hogans states that on July 13, 2006, "at a boatride I met a new Dell employee and was told they never stopped profit sharing, bonuses or Christmas parties."

[1]  Hogans initiated this action by filing a form Complaint for Employment Discrimination along with [*3] several supporting documents, including her submission to the **EEOC**; the EEOC's response to her claim; and her submission to the New York State Division of Human Rights. Under *Federal Rule of Civil Procedure 12(b)*, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam* (citation omitted); *see Fed. R. Civ. P. 10(c)* ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). The instant Complaint thus includes Hogans' form complaint and all attached documents.

Hogans states that "the alleged discriminatory acts occurred on 8/4/04," the date her employment ended, and that the defendant "is not still committing these acts against me." Nonetheless, she waited nearly three years, until April 2007, to file a form complaint with the EEOC. By letter dated April 30, 2007, the EEOC responded to Hogans' complaint and informed her that, "[u]nder all three of the statutes you invoked, a charge to be timely filed, must be filed with the EEOC within 300 days from [*4] notification of the alleged discriminatory act." According to the EEOC, the clock on Hogans' discrimination claims began to run on the date her employment was terminated, and, therefore, her "charge is untimely filed and the EEOC consequently has no legal jurisdiction to conduct an investigation into this matter."

The instant action was commenced with Hogans' filing of a form complaint for employment discrimination on August 3, 2007, [2] arguing that Hogans' complaint was untimely filed because of her failure to raise her charges with the EEOC within 300 days of the alleged discriminatory conduct. [3] On February 20, Hogans filed a form affirmation in opposition to defendant's motion. Her affirmation states only that she "had seniority and . . . was the only person downsized from the company," and that her "health problems were becoming bothersome to" defendant. It makes no reference to the timeliness of this action, nor does it dispute any of the arguments made by defendant in its motion.

> 2   There was substantial delay in service of the summons and complaint on Dell. Service was effectuated on November 29, 2007, and Dell executed and returned the [*5] acknowledgement of service on December 27.
>
> 3   In connection with its motion to dismiss, Dell apprised Hogans of her rights as a *pro se* litigant opposing a *Rule 12* motion supported by matters outside the pleadings. It is not immediately clear to what matters outside the pleadings Dell is referring. In any event, this Opinion relies solely on Hogans' complaint and the documents she filed along with it.

## DISCUSSION

When considering a motion to dismiss under *Rule 12(b)(6)*, a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)* (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006)* (citation

omitted). A court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).* [*6] "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).* In deciding the motion, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004)* (citation omitted).

Before a plaintiff brings a Title VII, ADEA, or ADA suit in federal court, "the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. New York City Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006)* (citing *42 U.S.C. § 2000e-5*); *see also 29 U.S.C. §§ 626(d), 633(b)* (setting out the procedural requirements for ADEA claims); *42 U.S.C. § 12117(a)* (applying the procedural requirements of *§ 2000e-5* to ADA claims). This timeliness requirement "is analogous to a statute of limitations." *McPherson v. New York City Dep't of Educ., 457 F.3d 211, 214 (2d Cir. 2006)* [*7] (citation omitted). "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct." *Flaherty v. Metromail Corp., 235 F.3d 133, 137 (2d Cir. 2000).*

Hogans' complaint makes clear that each act of discrimination she alleges occurred on or before August 4, 2004, the day her employment was terminated. Indeed, the injury she complains of is her termination, and so any discriminatory act must predate that event. She does not dispute that her complaint was filed with the EEOC well past the 300-day deadline, nor does she claim that the limitations period should be equitably tolled. Accordingly, the complaint is untimely and must be dismissed.

The only act Hogans identifies that postdates her firing is her discovery on July 13, 2006, that Dell "never stopped profit sharing, bonuses or Christmas parties." Hogans appears to offer this as evidence that Dell did not need to cut its workforce. In any event, this date does not affect the timeliness of Hogans' discrimination claim because by August 4, 2004, she "knew or had reason to know of the injury serving as the basis for [her] [*8] claim," *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999),* thus triggering the running of the 300-day period. Anything she might have learned about her former employer's current practices on July 13, 2006 was

2008 U.S. Dist. LEXIS 20898, *

irrelevant to the allegedly discriminatory acts leading up to the termination of her employment.

CONCLUSION

Defendant's January 16, 2008 motion to dismiss is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York

March 18, 2008

/s/ Denise **Cote**

DENISE **COTE**

United States District Judge

LEXSEE 457 F. 3D 211

**LOUISE MCPHERSON, Plaintiff-Appellant, - v. - NEW YORK CITY DEPART-MENT OF EDUCATION, THERESA EUROPE, individually, SUSAN W. HOLTZMAN, individually and SHERRY BOKSER, individually and as Senior Associate Counsel of New York State United Teachers, Defendants-Appellees.**

**Docket No. 05-4387-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*457 F.3d 211; 2006 U.S. App. LEXIS 17739; 98 Fair Empl. Prac. Cas. (BNA) 769; 88 Empl. Prac. Dec. (CCH) P42,573*

**April 17, 2006, Argued**
**July 13, 2006, Decided**

**PRIOR HISTORY:** [**1] Appeal from a judgment of the United States District Court for the Southern District of New York (Hellerstein, J.) dismissing employment discrimination claims and claims under the *Fifth* and *Fourteenth Amendments* for deprivation of liberty and property without due process of law. The district court dismissed the discrimination claims for lack of merit and for failure to comply with the statutory timeliness requirements; the due process claims were dismissed for plaintiff's failure to demonstrate deprivation of a property or liberty interest, and for failure to utilize post-deprivation remedies. We affirm.

**COUNSEL:** ROCHELLE M. SIROTA, Rego Park, NY, for Plaintiff-Appellant (on submission).

DEBORAH A. BRENNER, Assistant Corporation Counsel of the City of New York, (Michael A. Cardozo, Corporation Counsel of the City of New York on the brief, Barry P. Schwartz, Assistant Corporation Counsel, of counsel) New York, NY, for Defendants-Appellees.

**JUDGES:** Before: McLAUGHLIN, JACOBS, and B.D. PARKER, Circuit Judges.

**OPINION BY:** DENNIS JACOBS

**OPINION**

[*212] DENNIS JACOBS, Circuit Judge:

Following an adverse employment action, plaintiff brings claims under Title VII of the Civil Rights Act of 1964 ("Title [**2] VII"), *42 U.S.C. §§ 2000e et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), *29 U.S.C. §§ 621 et seq*, and the *Due Process*

*clauses of the Fifth* and *Fourteenth Amendments*. Under Title VII, the filing of a federal discrimination suit is conditioned on (1) the previous timely filing of a charge with the Equal Employment Opportunity Commission ("EEOC") and (2) a decision by the EEOC to dismiss the charge against the employer (or the EEOC's failure to act within 180 days). Plaintiff here filed a timely charge with the EEOC, but withdrew it; filed another, which was untimely; and sued following the dismissal for untimeliness of the second filing. The United States District Court for the Southern District of New York (Hellerstein, J.), ruled that the federal civil complaint is time-barred, and we agree. The district court ruled that the ADEA and Due Process claims should be dismissed for lack of merit, and we agree.

**BACKGROUND**

Louise McPherson, who worked as a provisional teacher for the New York City Department of Education ("DOE"), alleges that the termination of her employment (1) resulted from discrimination on [**3] account of race, national origin, and age, and (2) deprived [*213] her of liberty and property interests without due process of law.

In September 2000, DOE launched an investigation into an allegation that McPherson was using corporal punishment in the classroom. Investigator Michael Kondos--after interviewing McPherson, four students, and one parent--concluded that "the allegation of corporal punishment against Louise McPherson is substantiated" and that "Louise McPherson contacted a student witness in an attempt to coerce the student to lie." DOE discharged McPherson on December 11, 2000, and put her name on the "Ineligible/Inquiry" list, barring her from employment at any DOE school.

In July 2001, McPherson filed a charge against DOE with the EEOC and with the New York State Department of Human Rights, alleging termination on account of race, national origin, and age. While the charge was pending, McPherson's union-provided lawyer (defendant Sherry Bokser) broached settlement with DOE, which expressed willingness to negotiate on the understanding that, as part of any settlement, McPherson would agree to drop pending legal claims and release future claims. Allegedly on advice of her lawyer, [**4] McPherson unilaterally withdrew her state and federal discrimination allegations. [1] However, no settlement materialized. So, on October 24, 2002, McPherson filed a second set of charges with the EEOC and the New York State Department of Human Rights. Both agencies dismissed her charges as time-barred.

> 1    EEOC regulations allow for the withdrawal of charges with the consent of the Commission. *29 C.F.R. § 1601.10*
>
> The record does not pinpoint the date McPherson withdrew administrative charges; but it was no earlier than July 30, 2002, the date DOE informed McPherson that she would need to withdraw pending grievances as part of any settlement stipulation.

## DISCUSSION

The district court granted summary judgment, dismissing McPherson's discrimination claims as (variously) untimely and meritless. The due process claim was dismissed for failure to demonstrate a protected property interest, for failure to show stigma, and for failure to take advantage of post-deprivation remedies. We [**5] review the district court's grant of summary judgment de novo. *Mackey v. Bd. of Educ., 386 F.3d 158, 163 (2d Cir. 2004).*

Under Title VII and the ADEA, a plaintiff can sue in federal court only after filing timely charges with the EEOC. See *29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5(f)(1); Holowecki v. Fed. Express Corp., 440 F.3d 558, 562-63 (2d Cir. 2006).* A private Title VII plaintiff must also first receive a "right-to-sue" letter from the EEOC. *42 U.S.C. § 2000e-5(f)(1); Holowecki, 440 F.3d at 563.*

## Title VII

A private plaintiff under Title VII must satisfy two conditions before commencing suit in federal court. First, the complainant must file timely administrative charges with the EEOC. If the complainant has instituted state or local proceedings with an agency that is empowered "to grant or seek relief from [a discriminatory employment] practice or to institute criminal proceedings with respect

thereto," the complainant has 300 days from the occurrence of an adverse employment action to file charges with the EEOC. *42 U.S.C. § 2000e-5(e)(1)* [**6] . This timetable governs McPherson's claim, which was originally filed with a duly empowered New York state agency.

Second, the complainant must await dismissal of the administrative charge (or a failure to act):

> [*214]  If a charge filed with the Commission . . . is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action under this section . . . , the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought . . . by the person claiming to be aggrieved . . . .

*42 U.S.C. § 2000e-5(f)(1).* Such notification is called a "right-to-sue" letter because the notification is a prerequisite to suit (even though the notification does not indicate that *all* of the statutory prerequisites for suit have been met, and therefore does not bespeak a "right"). *NAACP v. Town of E. Haven, 259 F.3d 113, 115 n.4 (2d Cir. 2001).*

McPherson demonstrates that she filed a timely charge and received a right-to-sue letter, and thereby claims that she has satisfied the two requisites [**7] for filing a Title VII action in federal court, notwithstanding that there were two charges--one timely, one not--and that the right to sue letter was not issued in connection with the charge that was timely. We disagree, of course.

The timeliness requirement of Title VII "is analogous to a statute of limitations." *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996).* As such, it is meant to "put the adversary on notice to defend within a specified period" and to promote "the right to be free of stale claims." *United States v. Kubrick, 444 U.S. 111, 117, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979)* (internal quotations omitted). Both those ends would be frustrated if McPherson's argument prevailed: By withdrawing a timely administrative charge before it is decided (and before 180 days elapsed), the complainant could delay indefinitely the filing of a second charge that would produce a "right-to-sue" letter when dismissed as untimely. Nothing could more reliably defeat "the particular purpose of the filing requirement, to give prompt notice to the employer." *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 398, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982).* [**8]  We therefore hold that a right-to-sue

457 F.3d 211, *; 2006 U.S. App. LEXIS 17739, **;
98 Fair Empl. Prac. Cas. (BNA) 769; 88 Empl. Prac. Dec. (CCH) P42,573

letter enables a private suit only if it is issued in connection with an administrative charge that is timely filed. [2]

> 2   The district court believed this issue was addressed in *Criales v. American Airlines, Inc., 105 F.3d 93 (2d Cir. 1997).* See Joint Appx. at 33. However, *Criales* stands for a different proposition: that a plaintiff may sue as the result of the dismissal of a timely-filed administrative charge, even if a plaintiff has also filed an untimely administrative charge. *Id. at 95* ("[A] superfluous untimely administrative charge [is] irrelevant to [plaintiff's] right to proceed on his timely charge."). *Criales* satisfied both statutory requirements—a timely filing and an agency dismissal—in the context of a single administrative charge. That case therefore does not control this appeal, in which McPherson attempts to satisfy the two statutory requirements with two different administrative charges.

Since McPherson [**9] sued on the basis of her dismissed untimely charge, we affirm the district court's dismissal. [3]

> 3   McPherson also raises equitable estoppel, claiming that she "was actively misled by defendants into withdrawing her July 2001 charge based on their promise to effect the restoration of her license." Appellant Br. at 30. This argument is unsupported by record evidence: During depositions, McPherson acknowledged that her lawyer convinced her to withdraw the administrative charge; it is also undisputed that DOE solicited withdrawal only as part of a draft settlement agreement that was never executed. See Joint Appx. at 97-98, 206-07.

## ADEA

No "right-to-sue" letter is needed in ADEA cases, see *Holowecki, 440 F.3d at 563;* [*215] so a complainant may exhaust the administrative process by withdrawing agency charges so long as the charge was pending with the EEOC for at least 60 days. See *Hodge v. N.Y. Coll. of Podiatric Med., 157 F.3d 164, 168 (2d Cir. 1998).* McPherson meets this [**10] exhaustion requirement: She timely filed her ADEA claim in July 2001, and withdrew it sometime after July 2002—that is, more than 60 days later. Compliance with the agency exhaustion requirement does not insulate a federal suit from dismissal as untimely, but "there is no clear statutory answer as to what time period governs [plaintiff's] bringing of suit or when that time period starts." Id. We do not undertake to clear up this statutory ambiguity,

because McPherson's claim was properly dismissed on the merits.

To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting laid out by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973);* see also *Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005)* (applying McDonnell Douglas to age discrimination claim). In a nutshell, a plaintiff first bears the "minimal" burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a "legitimate, nondiscriminatory reason" for the adverse employment action, in which event, the presumption evaporates [**11] and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination. Id. (internal quotation omitted).

Assuming arguendo that McPherson made out a prima facie case, the DOE articulated facially "legitimate, non-discriminatory" reasons for firing her: the investigatory conclusions that she used corporal punishment and that she had tried to silence one of her child accusers. McPherson adduces no sufficient evidence to show that these proffered reasons are pretextual; [4] her main attack is on the *legitimacy* of the reasons, specifically, DOE's reliance on hearsay evidence contained in the Kondos investigatory report (the summaries of interviews conducted by Kondos). [5]

> 4   Plaintiff speculates that she was dismissed to evade pension costs, but speculation alone is insufficient to defeat a motion for summary judgment. See, e.g., *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993)* (party "may not rely simply on conclusory statements" to defeat summary judgment).
>
> 5   Plaintiff also claims that the proffered rationale is illegitimate in that reliance on it unlawfully deprived Plaintiff of due process. However, because we find Plaintiff's due process claim to be without merit, see infra, only the "hearsay" challenge remains.

[**12]  This Court has applied arguably inconsistent standards in evaluating the legitimacy of a reason given to justify a challenged employment action. Sometimes we treat "legitimate" and "non-discriminatory" as equivalent terms; other times, we treat the "legitimacy" requirement as demanding that a proffered reason reflect a legitimate business concern. [6] [*216] There is some space between these two readings of the term "legitimate"; but neither formulation demands that any particular process be used in reaching employment decisions. More generally, McPherson is attacking the *reliability* of the evidence supporting DOE's conclusions. In a dis-

457 F.3d 211, *; 2006 U.S. App. LEXIS 17739, **;
98 Fair Empl. Prac. Cas. (BNA) 769; 88 Empl. Prac. Dec. (CCH) P42,573

crimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what "motivated the employer," *United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)* (emphasis added) (internal quotations omitted); the factual validity of the underlying imputation against the employee is not at issue. [7]

> 6  Compare *Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001)* (interchangeably using terms "legitimate" and "non-discriminatory" in describing defendant's burden), *De la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 23 (2d Cir. 1996)* ("[Plaintiff] also asserts [] 'mixed motives'-- one legitimate, one discriminatory . . . ." (emphasis added)), *Fields v. N.Y. State Office of Mental Retardation and Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997)*, with *Windham v. Time Warner, Inc., 275 F.3d 179, 188 (2d Cir. 2001)* ("We agree . . . that [defendant] met its burden of producing evidence of a legitimate business reason for the terminations by demonstrating that the Department had less work." (emphasis added)); *Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93 (2d Cir. 2001)* ("Certainly [plaintiff's] late reports, failure to lead, and incapacity to bring in new business-- especially in the face of an express requirement that he do so--were legitimate business reasons for his probation and termination." (emphasis added)).

[**13]

> 7  We are aware of the risk that false negative performance reports or arbitrary procedures may be employed to cover illegal discrimination. While such practices would arguably result in a defensibly "legitimate" reason for the adverse employment action, bizarre or duplicitous processes might strengthen a plaintiff's showing of pretext. Here, plaintiff has made no such showing: In the business context, reliance on evidence (such as hearsay) that would be excluded by the Federal Rules of Evidence is insufficiently arbitrary and aberrant to support an inference of pretext.

DOE's proffered reasons for firing McPherson are both non-discriminatory and responsive to legitimate institutional concerns. McPherson has failed to show either that these reasons are illegitimate or that they were pretexts. Therefore, the district court correctly dismissed McPherson's ADEA suit.

## Due Process

McPherson also claims that DOE deprived her of liberty and property rights without due process of law. These claims were both properly dismissed.

To state a deprivation of property claim under the *Fifth* and *Fourteenth* [**14] *Amendments*, a plaintiff "must have more than a unilateral expectation . . . . He must, instead, have a legitimate claim of entitlement . . . ." *Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)* (emphasis added). An interest that can be terminated "at the whim of another person" is not protected by the Due Process clause. *White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1062 (2d Cir. 1993)* (treating at-will employment).

Because the Constitution does not create property interests, this Court must look to independent sources of rules and understandings to see if a property interest exists. See *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)*. McPherson's complaint does not allege that provisional teachers are guaranteed protection against dismissal without cause, and no evidence to that effect was offered in opposition to summary judgment. Having shown nothing more than a unilateral expectation of continued employment, McPherson failed to demonstrate that she enjoyed a property interest protected by the Constitution.

Likewise, Plaintiff's liberty interest claim was properly [**15] dismissed. "Stigmatizing statements by the government about an employee upon her discharge only implicate a liberty interest when there is also public disclosure." *Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 631 (2d Cir. 1996)*. The City has maintained that the reasons for placement on the "Ineligible/Inquiry List" remain [*217] confidential, and Plaintiff has provided no evidence suggesting otherwise. See generally *McDonald v. Bd. of Educ., 01 civ 1911, 2001 U.S. Dist. LEXIS 10325, *22-23 (S.D.N.Y. July 25, 2001)* ("[Plaintiff] simply alleges that her name was placed on the Board's Ineligible/Inquiry List as having been fired 'for cause.' Nowhere does she assert that the List disclosed the stigmatizing grounds for her dismissal or that inclusion on the List gives rise to a per se inference that plaintiff was terminated for a reason sufficiently 'stigmatizing' to state a due process claim." (internal citations omitted)). In the absence of a demonstrated liberty or property interest, summary judgment was properly granted dismissing the due process claims.

* * *

For the foregoing reasons, the judgment of the district court is affirmed. [**16]

LEXSEE 432 U.S. 355

## OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA v. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

No. 76-99

### SUPREME COURT OF THE UNITED STATES

*432 U.S. 355; 97 S. Ct. 2447; 53 L. Ed. 2d 402; 1977 U.S. LEXIS 124; 14 Fair Empl. Prac. Cas. (BNA) 1718; 14 Empl. Prac. Dec. (CCH) P7619*

**Argued April 20, 1977**
**June 20, 1977; as amended**

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**SUMMARY:**

Approximately three years after receiving a certain employment discrimination complaint under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), and five months after the failure of conciliation efforts regarding that complaint, the Equal Employment Opportunity Commission commenced an enforcement action in the United States District Court for the Central District of California against the private employer. The District Court granted the employer's motion for summary judgment on the ground that 706(f)(1) of Title VII (*42 USCS 2000e-5(f)(1)*)--which sets forth the conditions under which an aggrieved party, after filing a charge with the Equal Employment Opportunity Commission, may personally bring a civil action against the employer, and which provides, in effect, that in the event of extended Commission proceedings, such action may be brought 180 days after the charge was filed--required the Commission to bring an enforcement action within 180 days of the filing of a charge. Alternatively, the District Court held that application of the most appropriate state statute of limitations barred the action. The United States Court of Appeals for the Ninth Circuit reversed (*535 F2d 533*).

On certiorari, the United States Supreme Court affirmed. In an opinion by Stewart, J., joined by Brennan, White, Marshall, Blackmun, Powell, and Stevens, JJ., it was held that (1) 706(f)(1) imposed no time limitation upon the power of the Equal Employment Opportunity Commission to bring an enforcement action in a federal court against a private employer alleged to have violated the Act, and (2) an enforcement action brought by the

Commission in a federal court was not subject to state statutes of limitations.

Rehnquist, J., joined by Burger, Ch. J., dissented, expressing the view that, while 706(f)(1) did not impose a limitation on the power of the Commission to file suit in a federal court, the appropriate state limitations period should be held to be applicable and to bar the action since the suit was not brought on behalf of the United States in its sovereign capacity.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

  RIGHTS §12.5

  Title VII actions -- EEOC -- time limitation --

  Headnote:[1A][1B]

Section 706(f)(1) of the Civil Rights Act of 1964 (*42 USCS 2000e-5(f)(1)*)--which sets forth the conditions under which an aggrieved party, after filing a charge with the Equal Employment Opportunity Commission, may personally bring a civil action against the employer, and which provides, in effect, that in the event of extended Commission proceedings, such action may be brought 180 days after the charge was filed--imposes no time limitation upon the power of the Commission to bring an enforcement action in a federal court against a private employer alleged to have violated the Act.

[***LEdHN2]

  COURTS §901

  Title VII action -- EEOC -- state statute of limitations --

  Headnote:[2A][2B]

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

An enforcement action brought by the Equal Employment Opportunity Commission in a federal court against an employer alleged to have violated Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) is not subject to state statutes of limitations. (Rehnquist, J., and Burger, Ch. J., dissented from this holding.)

[***LEdHN3]

COURTS §901

state statute of limitations -- applicability to federal statutes --

Headnote:[3]

Since state legislatures do not devise their limitations periods with national interests in mind, it is the duty of the federal courts to assure that the importation of state law, through application of analogous state limitations periods to actions brought under federal statutes containing no limitations periods, will not frustrate or interfere with the implementation of national policies; state law regarding the limitations of actions is the primary guide utilized in determining the limitations period applicable to actions under a federal statute lacking such a period, but it is not the exclusive guide, and state limitations periods need not be borrowed if their application would be inconsistent with the underlying policies of the federal statute.

[***LEdHN4]

RIGHTS §12.5

EEOC -- functions --

Headnote:[4]

Under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*), the Equal Employment Opportunity Commission does not function simply as a vehicle for conducting litigation on behalf of private parties, but is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination and settling disputes, if possible, in an informal, noncoercive fashion.

[***LEdHN5]

RIGHTS §12.5

Title VII actions -- time limitations --

Headnote:[5]

The absence of inflexible time limitations on the bringing of lawsuits by the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) does not deprive defendants in such actions of fundamental fairness or subject them to the surprise and prejudice that can result from the prosecution of stale claims; federal courts do not lack the power to provide relief to a defendant in an enforcement action under Title VII should his defense be handicapped by an inordinate delay by the Commission in filing the action after exhausting its conciliation efforts, and the same discretionary power of a federal court to locate a just result in light of the circumstances peculiar to a case which is exercisable against a private plaintiff in a Title VII action may be utilized when the Commission is the plaintiff.

## SYLLABUS

About three years after an employee of petitioner company had first complained to the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964 that petitioner had discriminated against her because of her sex, and five months after conciliation efforts by the EEOC had failed, the EEOC brought this enforcement action in the District Court for the Central District of California. The court granted petitioner's motion for summary judgment on the ground that the enforcement action was time barred by § 706 (f)(1) of the Act, since the action had not been brought within 180 days of either the formal filing of the charge with the EEOC or the effective date of the Equal Employment Opportunity Act of 1972. Alternatively, the court held that the action was subject to and barred by the California one-year statute of limitations. The Court of Appeals reversed. Section 706 (f)(1) provides in relevant part: "If a charge filed with the Commission? is dismissed by the Commission, or within one hundred and eighty days from the filing of such charge or the expiration of any period of reference [from a state agency], whichever is later, the Commission has not filed a civil action under this section?, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission? shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice." *Held:*

1. Section 706 (f)(1) imposes no limitation upon the EEOC's power to file suit in federal court. The provision's language and legislative history show that it was intended to enable an aggrieved person unwilling to await the conclusion of extended EEOC proceedings to institute a private lawsuit 180 days after a charge has been filed. Pp. 358-366.

2. EEOC enforcement actions are not subject to state statutes of limitations. Pp. 366-372.

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

(a) Though a congressional intent to apply a local limitations period has been inferred in instances where a federal statute creating a cause of action fails to specify such a period, state limitations periods will not be borrowed if their application would not comport with the federal statute's underlying policies. P. 367.

(b) Under the procedural structure created by amendments to the Act in 1972, when EEOC was created and given enforcement powers in lieu of the previous voluntary-compliance scheme, EEOC does not function as a vehicle for conducting litigation on behalf of private parties but is charged with investigating employment discrimination claims and settling them by informal conciliation if possible, and it is required to refrain from suing until it has discharged its administrative responsibilities. Application of a State's limitation period would not thus further the federal policy, and the one-year California bar applied by the District Court could under some circumstances conflict with that policy. Pp. 367-369.

(c) Congress was well aware of the enormous backlog of EEOC cases but the concern expressed for the fair operation of the Act focused on the filing of the initial charge with the EEOC rather than on later limitations on EEOC's power to sue. Pp. 369-372.

3. The courts do not lack discretionary remedial power if, despite procedural protections accorded a Title VII defendant under the Act, EEOC delay in bringing suit, after conciliation efforts have failed, significantly handicaps the defense. See *Albemarle Paper Co.  v. Moody, 422 U.S. 405, 424-425*. Pp. 372-373.

*535 F.2d 533*, affirmed.

STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed an opinion dissenting in part, in which BURGER, C.J., joined, *post*, p. 373. NINTH CIRCUIT

**COUNSEL:** *Dennis H. Vaughn*  argued the cause for petitioner. With him on the briefs were *Leonard S. Janofsky*  and *Howard C. Hay*.

*Thomas S. Martin*  argued the cause for respondent. With him on the brief were *Acting Solicitor General Friedman, Deputy Solicitor General Jones, Abner W. Sibal, Joseph T. Eddins*, and *Beatrice Rosenberg*. *

* *Wayne S. Bishop*  and *John J. Gallagher*  filed a brief for the Texas Association of Business as *amicus curiae*  urging reversal.

*Robert T. Thompson, Lawrence Kraus*, and *Richard P. O'Brecht*  filed a brief for the Chamber of Commerce of the United States as *amicus curiae.*

**JUDGES:** Burger, Brennan, Stewart, White, Marshall, Blackmun, Powell, Rehnquist, Stevens

**OPINION BY:** STEWART

**OPINION**

[*357]    [***405]    [**2450]   MR. JUSTICE STEWART delivered the opinion of the Court.

[***LEdHR1A]   [1A]In 1972 Congress amended Title VII of the Civil Rights Act of [***406] 1964 so as to empower the Equal Employment Opportunity Commission to bring suit in a federal district court against a private employer alleged to have violated the Act. The sole question presented by this case is what time limitation, if any, is imposed on the EEOC's power to bring such a suit.

I

On December 27, 1970, an employee of the petitioner Occidental Life Insurance Co. filed a charge with the EEOC claiming that the company had discriminated against her because of her sex. [1] After a fruitless referral to the appropriate state agency, the charge was formally filed with the EEOC on March 9, 1971, [2] and subsequently served on the company. After investigation, the EEOC served proposed findings of fact on the company on February 25, 1972, to which the company in due course filed exceptions. Conciliation discussions between the EEOC and the company began in the summer of 1972. These discussions continued sporadically into 1973, but on September 13 of that year the EEOC determined that conciliation efforts had failed and so [*358] notified the company and the original complaint. The latter requested that the case be referred to the General Counsel of the EEOC to bring an enforcement action. On February 22, 1974, approximately three years and two months after the complainant first communicated with the EEOC and five months after conciliation efforts had failed, the EEOC brought this enforcement action in a Federal District Court.

1    The charge specified that the most recent act of discrimination was on October 1, 1970.
2    Civil Rights Act of 1964, §§ 706 (b), (d), 78 Stat. 259, *42 U.S.C.  §§ 2000e-5 (b), (d)*; *Love v. Pullman Co., 404 U.S. 522.*

The District Court granted the company's motion for summary judgment on the ground that the law requires that an enforcement action be brought within 180 days of

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

the filing of a charge with the EEOC. ³ Alternatively, the court held that the action was subject to the most appropriate state limitations statute and was therefore barred by the one-year limitation provision of Cal. Code Civ. Proc. Ann. § 340 (3) (West Supp. 1977). ⁴ The Court of Appeals for the Ninth Circuit reversed, holding that the federal law does not impose a 180-day limitation on the EEOC's authority to sue and that the action is not governed by any state statute of limitations. 535 F.2d 533.

　　3　The 1972 amendments to Title VII were made applicable "with respect to charges pending with the Commission on the date of enactment." § 14, 86 Stat. 113. The District Court also held that EEOC enforcement suits, such as this one, based on charges within the coverage of § 14 must be brought within 180 days of March 24, 1972, the effective date of the amendments.
　　4　The District Court's decision is reported in 12 FEP Cases 1298.

0">We granted certiorari, 429 U.S. 1022, to consider an important and recurring question regarding Title VII.

II

　　As enacted in 1964, Title VII limited the EEOC's function to investigation of employment discrimination charges and informal methods of [***407] conciliation and persuasion. ⁵ The failure [*359] of conciliation efforts terminated the involvement of the EEOC. Enforcement [**2451] could then be achieved, if at all, only if the charging party, or other person aggrieved by the allegedly unlawful practice, initiated a private suit within 30 days after EEOC notification that conciliation had not been successful. ⁶

　　5　Civil Rights Act of 1964, § 706 (a), 78 Stat. 259, 42 U.S.C. § 2000e-5 (a).
　　6　§ 706 (e), 42 U.S.C. § 2000e-5 (e).

In the Equal Employment Opportunity Act of 1972 ⁷ Congress established an integrated, multistep enforcement procedure culminating in the EEOC's authority to bring a civil action in a federal court. That procedure begins when a charge is filed with the EEOC alleging that an employer has engaged in an unlawful employment practice. A charge must be filed within 180 days after the occurrence of the allegedly unlawful practice, and the EEOC is directed to serve notice of the charge on the employer within 10 days of filing. ⁸ The EEOC is then required to investigate the charge and determine whether there is reasonable cause to believe that it is true. This determination is to be made "as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge." ⁹ If the EEOC finds that there is reasonable cause it "shall

endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." ¹⁰ When "the Commission [is] unable to secure... a [*360] conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge." ¹¹

　　7　86 Stat. 103, 42 U.S.C.§ 2000e et seq. (1970 ed., Supp. V), amending Civil Rights Act of 1964, 78 Stat. 253. All subsequent citations to Title VII in this opinion are to the 1964 Act as amended.
　　8　§ 706 (e), 42 U.S.C. § 2000e-5 (e) (1970 ed., Supp. V). If a charge has been initially filed with or referred to a state or local agency, it must be filed with the EEOC within 300 days after the practice occurred or within 30 days after notice that the state or local agency has terminated its proceeding, whichever is earlier. Ibid.
　　9　§ 706 (b), 42 U.S.C. § 2000e-5 (b) (1970 ed., Supp. V).
　　10　Ibid.
　　11　§ 706 (f)(1), 42 U.S.C. § 2000e-5 (f)(1) (1970 ed., Supp. V). In the case of a government, governmental agency, or political subdivision, the EEOC is required, upon failure of conciliation, to refer the case to the Attorney General who may then bring a civil action. Ibid.

　　The 1972 Act expressly imposes only one temporal restriction on the EEOC's authority to embark upon the final stage of enforcement - the bringing of a civil suit in a federal district court: Under § 706 (f)(1), the EEOC may not invoke the judicial power to compel compliance with Title VII until at least 30 days after a charge has been filed. But neither § 706 (f) nor any other section of the Act explicitly requires the EEOC to conclude its conciliation efforts and bring an enforcement suit within any maximum period of time.

　　The language of the Act upon which the District Court relied in finding a limitation that bars the bringing of a lawsuit by the EEOC more than 180 days after a timely charge has been filed with it is found [***408] in § 706 (f)(1), 42 U.S.C. § 2000e-5 (f)(1) (1970 ed., Supp. V), which provides in relevant part: S

　　"If a charge filed with the Commission... is dismissed by the Commission, or within one hundred and eighty days from the filing of such charge or the expiration of any period of reference [from a state agency], whichever is later, the Commission has not filed a civil action under this section..., or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission... shall so notify the person aggrieved and within ninety days after the giving

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was [*361] filed by a member of the Commission, by any person whom the charge alleges was aggrieved [**2452] by the alleged unlawful employment practice."I

On its face, § 706 (f)(1) provides little support for the argument that the 180-day provision is such a statute of limitations. Rather than limiting action by the EEOC, the provision seems clearly addressed to an alternative enforcement procedure: If a complaint is dissatisfied with the progress the EEOC is making on his or her charge of employment discrimination, he or she may elect to circumvent the EEOC procedures and seek relief through a private enforcement action in a district court. The 180-day limitation provides only that this private right of action does not arise until 180 days after a charge has been filed. Nothing in § 706 (f)(1) indicates that EEOC enforcement powers cease if the complaint decides to leave the case in the hands of the EEOC rather than to pursue a private action.

In short, the literal language of § 706 (f)(1) simply cannot support a determination that it imposes a 180-day time limitation on EEOC enforcement suits. On the contrary, a natural reading of § 706 (f)(1) can lead only to the conclusion that it simply provides that a complainant whose charge is not dismissed or promptly settled or litigated by the EEOC may himself bring a lawsuit, but that he must wait 180 days before doing so. After waiting for that period, the complainant may either file a private action within 90 days after EEOC notification or continue to leave the ultimate resolution of his charge to the efforts of the EEOC.

Only if the legislative history of § 706 (f)(1) provided firm evidence that the subsection cannot mean what it so clearly seems to say would there be any justification for construing it in any other way. But no such evidence is to be found.

The dominant Title VII battle in the 92d Congress was over what kind of additional enforcement powers should be granted to the EEOC. Proponents of increased EEOC power [*362] constituted a substantial majority in both Houses of Congress, but they were divided between those Members who favored giving the EEOC power to issue cease-and-desist orders and those who advocated authorizing it to bring suits in the federal district courts.

The supporters of cease-and-desist authority won the first victory when Committees in both Houses favorably [***409] reported bills providing for that enforcement technique. The bill reported by the House Committee contained a section entitled "Civil Actions by Persons Aggrieved," embodying the provisions that eventually

became that part of § 706 (f)(1) at issue in the present case. [12]

12    The section in the House Committee bill provided, in relevant part:

"If (1) the Commission determines that there is no reasonable cause to believe the charge is true and dismisses the charge..., (2) finds no probable jurisdiction and dismisses the charge, or (3) within one hundred and eighty days after a charge is filed with the Commission..., the Commission has not either (i) issued a complaint..., (ii) determined that there is not reasonable cause to believe that the charge is true and dismissed the charge,... or (iii) entered into a conciliation agreement..., the Commission shall so notify the person aggrieved and within sixty days after the giving of such notice a civil action may be brought... by the person claiming to be aggrieved.... Upon timely application, the court may, in its discretion, permit the Commission to intervene in such civil action if it certifies that the case is of general public importance. Upon the commencement of such civil action, the Commission shall be divested of jurisdiction over the proceeding and shall take no further action with respect thereto[sic]...." H.R. 1746, 92d Cong., 1st Sess., § 8 (j) (1971), reprinted in H.R. Rep. No. 92-238, pp. 54-55 (1971).

The Committee Report clearly explained that the purpose of this provision was to afford an aggrieved person the option of withdrawing his case from the EEOC if he was dissatisfied with the rate at which his charge was being processed: S

"In the case of the Commission, the burgeoning workload, accompanied by insufficient funds and a shortage of staff, has, in many instances, forced a party to wait 2 to 3 years [*363] before final conciliation procedures can be instituted. This situation [**2453] leads the committee to believe that the private right of action, both under the present Act and in the bill, provides the aggrieved party a means by which he may be able to escape from the administrative quagmire which occasionally surrounds a case caught in an overloaded administrative process."I [13]

13    Id., at 12.

Opponents of cease-and-desist authority carried their cause to the floor of the House, where Congressmen Erlenborn and Mazzoli introduced a substitute bill, which authorized the EEOC when conciliation failed to file federal-court actions rather than conduct its own hearings and issue cease-and-desist orders. The Erlenborn-

Mazzoli substitute contained a private action provision substantially the same as that of the Committee bill. [14] There was no suggestion in the House debates that that section in the substitute bill was intended to be a statute of limitations on EEOC enforcement action, or that the purpose of the provision differed in any way from that expressed in the Committee Report. The Erlenborn-Mazzoli substitute was adopted by the House.

14    H.R. 9247, 92d Cong., 1st Sess., § 3 (c) (1971).

Senate action on amendments to Title VII was essentially parallel to that of the House, beginning with the introduction of a bill giving the EEOC cease-and-desist power, and ending with the substitution of a bill authorizing it instead to file suits in the federal courts. As in the House, both the original and substitute Senate bills authorized complainants dissatisfied with the pace of EEOC proceedings to bring individual lawsuits [***410] after 180 days. [15] And, as in the House, the Senate Committee explained that such a provision was necessary [*364] because the heavy caseload of the EEOC could result in delays unacceptable to aggrieved persons: S

15    S. 2515, 92nd Cong., 1st Sess., § 4 (a) (1971); S. 2617, 92d Cong., 1st Sess., § 3 (c) (1971).

"As it indicated in testimony, [the EEOC's] caseload has increased at a rate which surpasses its own projections. The result has been increasing backlogs in making determinations, and the possibility of occasional hasty decisions, made under the press of time, which have unfairly prejudiced complaints. Accordingly, where the Commission is not able to pursue a complaint with satisfactory speed, or enters into an agreement which is not acceptable to the aggrieved party, the bill provides that the individual shall have an opportunity to seek his own remedy, even though he may have originally submitted his charge to the Commission."I [16]

16    S.Rep. No. 92-415, p. 23 (1971).

The Senate Committee further noted that the "primary concern should be to protect the aggrieved person's option to seek a prompt remedy," and that the purpose of the 180-day provision was to preserve "the private right of action by an aggrieved person." [17]

17    Id., at 24, 40.

Senator Dominick led the opposition to the Committee bill on the floor of the Senate. His substitute bill did not give the EEOC power to issue cease-and-desist or-ders but authorized it instead to bring enforcement suits in federal courts. The substitute bill also contained a provision authorizing private lawsuits almost identical to that contained in the Committee bill. There ensued a month-long Senate debate, at the conclusion of which the substitute bill was adopted by the Senate. During the course of that debate there were only a few isolated and ambiguous references to the provision in the substitute bill authorizing federal suits by complainants dissatisfied with EEOC delay. [18] But a section-by-section [*365] [**2454] analysis of the substitute bill made available before the final vote in the Senate clearly explained the purpose of the 180-day provision: S

18    At one point in the debates Senator Javits, a sponsor of the Committee bill, sought to amend the substitute bill to clarify the relationship between EEOC and private lawsuits, by providing that "if within thirty days after a charge is filed with the Commission... the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission *shall* bring a civil action...." Senator Dominick objected to the substitution of the word "shall" for "may" and suggested that "in the interest of flexibility in the Commission's schedule, and in the interest of flexibility in working something out through voluntary compliance, it would be far better to put in the word 'may.'" In the exchange that followed, both Senators manifested their understanding that the 180-day provision in the Dominick amendment served the same purpose as the analogous provision in the Committee bill. 118 Cong. Rec. 1068-1069 (1972). Senator Javits later agreed to the use of the word "may," and Senator Dominick responded as follows:

"I think this change is very meritorious, as I pointed out in my first statement. I do not think the Commission should be mandated on what date an agency should bring suit when we are trying to work out matters the best we can by conciliation." *Id., at 1069.*

"In providing this provision, it is [***411] intended that... the person aggrieved should [not] have to endure lengthy delays if the agency does not act with due diligence and speed. Accordingly, the provisions... would allow the person aggrieved to elect to pursue his or her own remedy in the courts where agency action does not prove satisfactory."I [19]

19    *Id.,* at 4942.

After the final Senate vote the House and Senate bills were sent to a Conference Committee. An analysis presented to the Senate with the Conference Report pro-

vides the final and conclusive confirmation of the meaning of § 706(f)(1): S

"The retention of the private right of action, as amended,... is designed to make sure that the person aggrieved does not have to endure lengthy delays if the Commission... does not act with due diligence and speed. Accordingly, the provisions... allow the person [*366] aggrieved to elect to pursue his or her own remedy under this title in the courts where there is agency inaction, dalliance or dismissal of the charge, or unsatisfactory resolution.

"It is hoped that recourse to the private lawsuit will be this exception and not the rule, and that the vast majority of complaints will be handled through the offices of the EEOC.... However, as the individual's rights to redress are paramount under the provisions of Title VII it is necessary that all avenues be left open for quick and effective relief." [20]I

20  Id., at 7168; see id., at 7565.

[***LEdHR1B]  [1B]The legislative history of § 706(f)(1) thus demonstrates that the provision was intended to mean exactly what it seems to say: An aggrieved person unwilling to await the conclusion of extended EEOC proceedings may institute a private lawsuit 180 days after a charge has been filed. The subsection imposes no limitation upon the power of the EEOC to file suit in a federal court. [21]

21  In addition to the Court of Appeals for the Ninth Circuit in the present case, six other Courts of Appeals have reached this conclusion. EEOC v. E.I. du Pont de Nemours & Co., 516 F.2d 1297 (CA3); EEOC v. Cleveland Mills Co., 502 F.2d 153 (CA4); EEOC v. Louisville & Nashville R. Co., 505 F.2d 610 (CA5); EEOC v. Kimberly-Clark Corp., 511 F.2d 1352 (CA6); EEOC v. Meyer Bros. Drug Co., 521 F.2d 1364 (CA8); EEOC v. Duval Corp., 528 F.2d 945 (CA10).

III

[***LEdHR2A]  [2A]The company argues that if the Act contains no limitation on the time during which an EEOC enforcement suit may be brought, then the most analogous state statute of limitations should be applied. [22] Relying on a long line of cases in this [*367] Court holding state limitations periods applicable to actions brought under federal statutes, the company contends that California law barred the EEOC from bringing this lawsuit.

22  The two Courts of Appeals that have considered this question have reached differing conclusions. EEOC v. Kimberly-Clark Corp., supra, at 1359-1360 (state limitations not applicable); EEOC v. Griffin Wheel Co., 511 F.2d 456 (CA5) (state limitations applicable to backpay suits only).

[**2455] When Congress has created a cause of action and has not specified the period of time within which it may be asserted, the Court has frequently inferred that Congress intended [***412] that a local time limitation should apply. E.g., Runyon v. McCrary, 427 U.S. 160, 179-182 (Civil Rights Act of 1866); Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696 (§ 301 of the Labor Management Relations Act); O'Sullivan v. Felix, 233 U.S. 318 (Civil Rights Act of 1871); Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390 (Sherman Antitrust Act); Campbell v. Haverhill, 155 U.S. 610 (Patent Act). This "implied absorption of State statutes of limitation within the interstices of... federal enactments is a phase of fashioning remedial details where Congress has not spoken but left matters for judicial determination." Holmberg v. Armbrecht, 327 U.S. 392, 395.

[***LEdHR3]  [3]But the Court has not mechanically applied a state statute of limitations simply because a limitations period is absent from the federal statute. State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies. "Although state law is our primary guide in this area, it is not, to be sure, our exclusive guide." Johnson v. Railway Express Agency, 421 U.S. 454, 465. State limitations periods will not be borrowed if their application would be inconsistent with the underlying policies of the federal statute. Ibid.; Auto d"> Workers v. Hoosier Cardinal Corp., supra, at 701; Board of County Comm'rs v. United States, 308 U.S. 343, 352. With these considerations in mind, we turn to the company's argument in this case.

[***LEdHR4]  [4]When Congress first enacted Title VII in 1964 it selected "[c]ooperation and voluntary compliance... as the preferred [*368] means for achieving" the goal of equality of employment opportunities. d">Alexander v. Gardner Denver Co., 415 U.S. 36, 44. To this end, Congress created the EEOC and established an administrative procedure whereby the EEOC "would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit." Ibid. Although the 1972 amendments provided the EEOC with the additional enforcement power of instituting civil actions in

federal courts, Congress preserved the EEOC's administrative functions in § 706 of the amended Act. Thus, under the procedural structure created by the 1972 amendments, the EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties; it is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination and settling disputes, if possible, in an informal, noncoercive fashion. Unlike the typical litigant against whom a statute of limitations might appropriately run, the EEOC is required by law to refrain from commencing a civil action until it has discharged its administrative duties.

[***LEdHR2B]  [2B]In view of the federal policy requiring employment discrimination claims to be investigated by the [***413] EEOC and, whenever possible, administratively resolved before suit is brought in a federal court, it is hardly appropriate to rely on the "State's wisdom in setting a limit... on the prosecution...." *Johnson v. Railway Express Agency, supra, at 464*.For the "State's wisdom" in establishing a general limitation period could not have taken into account the decision of Congress to delay judicial action while the EEOC performs its administrative responsibilities. See *Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 348*; *Cope v. Anderson, 331 U.S. 461, 464*; [**2456] *Rawlings v. Ray, 312 U.S. 96, 98*. Indeed, the one-year statute of limitations applied by the District Court in this case could  [*369] under some circumstances directly conflict with the timetable for administrative action expressly established in the 1972 Act. [23]

> 23  Since California has created a state agency with authority to provide a remedy for employment discrimination, *Cal. Labor Code Ann. §§ 1410-1433 (West 1971)*, an aggrieved party in that State may file a charge with the EEOC as long as 300 days after the allegedly unlawful act. See n. 8, *supra*. Under § 706(b) the EEOC may then take at least 120 days to investigate the charge and make its determination of reasonable cause. Thus, even if the aggrieved party and the EEOC act within the 420-day period expressly authorized by the Act, the California limitations period applied by the District Court would expire before the EEOC had an opportunity to begin any conciliation efforts, let alone bring a lawsuit.

But even in cases involving no inevitable and direct conflict with the express time periods provided in the Act, absorption of state limitations would be inconsistent with the congressional intent underlying the enactment of the 1972 amendments. Throughout the congressional debates many Members of both Houses demonstrated an acute awareness of the enormous backlog of cases before

the EEOC [24] and the consequent delays of 18 to 24 months encountered by aggrieved persons awaiting administrative action on their complaints. [25] [*370] Nevertheless, Congress substantially [***414] increased the workload of the EEOC by extending the coverage of Title VII to state employers, private employers with as few as 15 employees, and nonreligious educational institutions; [26] by transferring the authority to bring pattern-or-practice suits from the Attorney General to the Commission; [27] and by authorizing the Commission to bring civil actions in the federal courts. [28] It would hardly be reasonable to suppose that a Congress aware of the severe time problems already facing the EEOC would [**2457] grant that agency substantial additional enforcement responsibilities and at the same time consign its federal lawsuits to the  [*371]  vagaries of diverse state limitations statutes, some as short as one year.

> 24  In his testimony before the House Committee, William Brown III, Chairman of the EEOC, stated that as of February 20, 1971, there was a backlog of 25,195 pending charges. Equal Employment Opportunities Enforcement Procedures, Hearings on H.R. 1746 before the General Subcommittee on Labor of the House Committee on Education and Labor, 92d Cong., 1st Sess., 81 (1971). By the time Chairman Brown testified before the Senate Committee, the backlog had increased to nearly 32,000 cases and further increases were expected. Equal Employment Opportunity Enforcement Act of 1971, Hearings on S. 2515, S. 2617, H.R. 1746, before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., 71 (1971).
>
> 25  See, *e.g.*, 117 Cong. Rec. 31959 (1971) (remarks of Rep. Martin); *id.*, at 31972 (remarks of Rep. Erlenborn); 118 Cong. Rec. 594-595 (1972) (remarks of Sen. Dominick); *id.*, at 699-700 (remarks of Sen. Fannin); *id.*, at 944 (remarks of Sens. Talmadge and Chiles); *id.*, at 2386 (remarks of Sen. Allen); *id.*, at 3136-3137 (remarks of Sens. Gurney and Allen); *id.*, at 3969-3973 (remarks of Sens. Javits, Cooper, Dominick, Williams, and Allen).

The company contends that the numerous references in the debates to the EEOC's backlog and delays demonstrate that by adopting the court enforcement plan Congress intended to restrict the time allowed for investigation and conciliation of a charge. Nearly all of the references, however, were in the context of discussions of whether enforcement after conciliation efforts had failed could be accomplished more expeditiously through an administrative process or

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

through lawsuits in the federal courts. The concern, therefore, was with the additional delays that complainants would suffer if the EEOC were given the task of conducting its own hearings and issuing cease-and-desist orders. Congressional concern over delays during the investigation and conciliation process was resolved by providing complainants with the continuing opportunity to withdraw their cases from the EEOC and bring private suits. See Part II, *supra.*

26 §§ 701 (a), (b), 702, *42 U.S.C. §§ 2000e (a), (b), 2000e-1 (1970 ed., Supp. V).* The number of state and local governmental employees who would be brought under the jurisdiction of the EEOC was estimated to be more than 10 million.117 Cong. Rec. 31961 (1971) (remarks of Rep. Perkins); 118 Cong. Rec. 699 (1972) (remarks of Sen. Fannin). The elimination of the exemption for nonreligious educational institutions added an estimated 4.3 million employees. *Id.,* at 4931 (remarks of Sen. Cranston).

27 § 707 (c), *42 U.S.C. § 2000e-6 (c) (1970 ed., Supp. V).*

28 § 706 (f)(1), *42 U.S.C. § 2000e-5 (f)(1) (1970 ed., Supp. V).*

Congress did express concern for the need of time limitations in the fair operation of the Act, but that concern was directed entirely to the initial filing of a charge with the EEOC and prompt notification thereafter to the alleged violator. The bills passed in both the House and the Senate contained short time periods within which charges were to be filed with the EEOC and notice given to the employer. [29] And the debates and reports in both Houses made evident that the statute of limitations problem was perceived in terms of these provisions, rather than in terms of a later limitation on the EEOC's power to sue. [30] That perception was reflected in the final version of the 1972 Act, which requires that a charge must be filed with the EEOC within 180 days of the alleged [*372] violation of Title VII, and that the alleged violator must be notified "of the charge (including [***415] the date, place and circumstances of the alleged unlawful employment practice)... within ten days" thereafter. [31]

29 The House bill provided that the EEOC serve notice of the charge on the alleged violator within five days; the Senate bill required notice within 10 days. Both bills included a 180-day limitation on an aggrieved party's filing of a charge. S. Rep. No. 92-681, pp. 16-17 (1972).

30 Because the bill reported by the House Committee did not require notice of a charge within any specific time, the dissenters from the Committee Report urged that the 180-day filing limitation be amended to require the EEOC to give notice within five days, or some other reasonable time, after a charge had been filed. H.R. Rep. No. 92-238, p. 66 (1971). On the floor of the House, Congressman Erlenborn explained that the amendment was for the purpose of

"giving notice to the party charged [so] that he would have the opportunity to gather and preserve the evidence with which to sustain himself when formal charges are filed and subsequent enforcement proceedings are instituted." 117 Cong. Rec. 31972 (1971).

The requirement of reasonable notice quickly received the support of proponents of the Committee bill. *Id.,* at 31783-31784 (remarks of Rep. Dent); *id.,* at 31961 (remarks of Rep. Perkins). In the Senate a 10-day-notice provision was included in the bill reported out of Committee in order "to protect fully the rights of the person or persons against whom the charge is filed." S. Rep. No. 92-415, p. 25 (1971).

31 §§ 706 (b), (e), *42 U.S.C. §§ 2000e-5 (b), (e) (1970 ed., Supp. V).*

The fact that the only statute of limitations discussions in Congress were directed to the period preceding the filing of an initial charge is wholly consistent with the Act's overall enforcement structure -- a sequential series of steps beginning with the filing of a charge with the EEOC. Within this procedural framework, the benchmark, for purposes of a statute of limitations, is not the last phase of the multistage scheme, but the commencement of the proceeding before the administrative body.

IV

[***LEdHR5] [5]The absence of inflexible time limitations on the bringing of lawsuits will not, as the company asserts, deprive defendants in Title VII civil actions of fundamental fairness or subject them to the surprise and prejudice that can result from the prosecution of stale claims. Unlike the litigant in a private action who may first learn of the cause against him upon service of the complaint, the Title VII defendant is alerted to the possibility of an enforcement suit within 10 days after a charge has been filed. This prompt notice serves, as Congress intended, to give him an opportunity to gather and preserve evidence in anticipation of a court action.

Moreover, during the pendency of EEOC administrative proceedings, a potential defendant is kept informed of the progress of the action. Regulations promulgated by the EEOC require that the charged party be promptly notified when a determination of reasonable cause has been made, [32] [*373] 29 [**2458] CFR §

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

1601.19b (b) (1976), and when the EEOC has terminated its efforts to conciliate a dispute, §§ 1601.23, 1601.25.

     32  Prompt notice of a reasonable-cause determination also serves to cure any deficiencies in the 10-day notice that may result from EEOC amendment of the claimed violation after investigation. See d">*EEOC v. General Electric Co., 532 F.2d 359, 366* (CA4); *EEOC v. Huttig Sash & Door Co., 511 F.2d 453, 455*"/>"/> (CA5); *EEOC v. Kimberly-Clark Corp., 511 F.2d, at 1363.* See also *NLRB v. Fant Milling Co., 360 U.S. 301; National Licorice Co. v. NLRB, 309 U.S. 350, 367-369.*

It is, of course, possible that despite these procedural protections a defendant in a Title VII enforcement action might still be significantly handicapped in making his defense because of an inordinate EEOC delay in filing the action after exhausting its conciliation efforts. If such cases arise the federal courts do not lack the power to provide relief. This Court has said that when a Title VII defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny backpay relief. *Albemarle Paper Co. v. Moody, 422 U.S. 405, 424-425.* The same discretionary power "to locate 'a just result' in light of the circumstances peculiar to the case," *ibid,* can also be exercised when the EEOC is the plaintiff.

    The judgment of the Court of Appeals is affirmed.

    *It is so ordered.*

**DISSENT BY:** REHNQUIST (In Part)

**DISSENT**

    [***416]  MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting in part.

    While I agree with Part II of the Court's opinion, holding that § 706(f)(1), 42 U.S.C. § 2000e-5(f)(1) (1970 ed., Supp. V), does not impose a limitation on the power of the EEOC to file suit in a federal court, I do not agree with the Court's conclusion in Part III that the EEOC is not bound by any limitations period at all. The Court's actions, and the reasons which it assigns for them, suggest that it is more concerned with limitlessly expanding the important underlying statutory policy than it is with considerations traditionally dealt with by judges. Since I believe that a consistent line of opinions from this Court holding that, in the absence of a [*374] federal limitations period, the applicable state limitations period will apply, is being ignored by a process of unwarranted judicial legislation, I would reverse the judgment of the Court of Appeals in this case.

I

    Since I agree with the Court that the Act contains no limitation on the time during which an enforcement suit may be brought by the EEOC, I also agree with it that the relevant inquiry is whether the most analogous state statute of limitations applies. Unless the United States is suing in its sovereign capacity, a matter which I treat below, the answer one would have derived before today from the opinions of this Court over a period of 140 years would surely have been "yes." See, e.g., d">*McCluny v. Silliman,* 3 Pet. 270, 277 (1830); *Campbell v. Haverhill, 155 U.S. 610* (1895); *McClaine v. Rankin, 197 U.S. 154* (1905); *Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390* (1906); d">*O'Sullivan v. Felix, 233 U.S. 318* (1914); *Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696* (1966); *Johnson v. Railway Express Agency, 421 U.S. 454* (1975); d">*Runyon v. McCrary, 427 U.S. 160* (1976)."/>

    The Court, however, today relies on basically two interrelated reasons for refusing to apply California's applicable statute of limitations to suits brought by the EEOC. First, the Court postulates that "the Court has not mechanically applied a state statute of limitations simply because a limitations period is absent from the federal statute." *Ante,* at 367. Second, "State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate [**2459] or interfere with the implementation of national policies." *Ibid.* Both of these assertions are created out of whole cloth; contrary to their tenor, neither statement, as applied to statutes of limitations, draws sustenance from [*375] any cases whatsoever. Rather, anything more than a superficial examination of precedent reveals that they are contrary to the established line of decisions of this Court.

    This Court has long followed the rule that, unless the United States was suing in its sovereign capacity, "in the absence of any provision of the act of Congress creating the liability, [***417] fixing a limitation of time for commencing actions to enforce it, the statute of limitations of the particular State is applicable." *McClaine v. Rankin, supra,* at 158. See also *Cope v. Anderson, 331 U.S. 461, 463 (1947).* The consistent nature of this history was described in *Auto Workers v. Hoosier Cardinal Corp., supra,* at 703-704: S

    "As early as 1830, this Court held that state statutes of limitations govern the timeliness of federal causes of action unless Congress has specifically provided otherwise. *M'Cluny v. Silliman,* 3 Pet. 270, 277. In 1895, the question was re-examined in another context, but the conclusion remained firm. *Campbell v. Haverhill, 155 U.S. 610.* Since that time, state statutes have repeatedly

supplied the periods of limitations for federal causes of action when federal legislation has been silent on the question. Yet when Congress has disagreed with such an interpretation of its silence, it has spoken to overturn it by enacting a uniform period of limitations. Against this background, we cannot take the omission in the present statute as a license to judicially devise a uniform time limitation for § 301 suits." (Citations omitted.)I

This general policy has been recently reaffirmed with respect to lawsuits brought under *42 U.S.C. § 1981,* see *Johnson v. Railway Express Agency, supra,* at *462; Runyon v. McCrary, supra,* at *180.* Indeed, *Johnson* noted that "the express terms of *42 U.S.C. § 1988* suggest" that there is not "anything peculiar to a federal civil rights action that would justify special reluctance in applying state law." *421 U.S.,* at *464.* The Court fails to point to any case not involving the [*376] United States in its sovereign capacity, in which the federal statute being silent, the applicable state limitations period was disregarded in favor of either a judge-made limitations period or, as here, no limitations period at all. There is simply no support for the proposition that a federally created right of action should impliedly be without temporal limitations. Indeed, Mr. Chief Justice Marshall, writing for the Court in 1805, observed that a case without a limitations period "would be utterly repugnant to the genius of our laws." *Adams v. Woods, 2 Cranch 336, 342 (1805).* Yet, the Court today, without acknowledging the radical nature of its act, creates precisely such a situation. [1]

> 1  In *Campbell v. Haverhill, 155 U.S. 610, 615-616 (1895),* this Court stated that it might not be necessary to follow a state statute of limitations which discriminated against or was "passed in manifest hostility to Federal rights or jurisdiction" or which gave such an unreasonably limited time to sue so as to "be within the competency of the courts to declare the same unconstitutional and void." These narrowly delimited exceptions are wholly different from the approach the Court takes today in looking to whether the state statute "will not frustrate or *interfere with* the implementation of national policies." *Ante,* at 367. (Emphasis added.) This open-ended standard would seem to render wholly superfluous the narrow exceptions discussed in *Campbell.*

As for the second point, I can readily concede that the California [***418] Legislature did not specifically consider the federal interests underlying the enactment of Title VII. But this argument begs the question. This Court, in 1830, rejected the argument that a state statute of limitations should not apply because the State had not

considered the federal policies. It stated, in *McCluny* v. [**2460] *Silliman, supra,* at 277-278: S

"It is contended that this statute cannot be so construed as to interpose a bar to any remedy sought against an officer of the United States, for a failure in the performance of his duty; that such a case could not have been contemplated by the legislature....

[*377] "It is not probable that the legislature of Ohio, in the passage of this statute, had any reference to the misconduct of an officer of the United States. Nor does it seem to have been their intention to restrict the provision of the statute to any particular causes for which the action on the case will lie....

"Where the statute is not restricted to particular causes of action, but provides that the action, by its technical denomination, shall be barred, if not brought within a limited time, every cause for which the action may be prosecuted is within the statute."

Similar arguments were also rejected in construing § 301 of the Labor Management Relations Act, *Auto Workers v. Hoosier Cardinal Corp., 383 U.S.,* at *701-704.* And in both *Johnson v. Railway Express Agency,* and *Runyon v. McCrary,* we followed, without hesitation, state limitations periods even though one would suppose that the federal policies underlying *42 U.S.C. § 1981* were of a magnitude comparable to those of Title VII and even though the general state statute of limitations would hardly have taken these policies into account.

The Court apparently rests its case on the authority of three opinions: Johnson v. Railway Express Agency, Auto Workers v. *Hoosier Cardinal Corp., and Board of County Comm'rs v. United States, 308 U.S. 343 (1939).* None are applicable. Johnson did not state, or hint, that "[s]tate limitations periods will not be borrowed if their application would be inconsistent with the underlying policies of the federal statute." *Ante,* at 367. Rather, *after* concluding that the state limitations period applied, it turned, in a separate section of the opinion, to a question of tolling, *421 U.S.,* at *465,* where the statement that "[a]lthough state law is our primary guide in this area, it is not, to be sure, our exclusive guide," so heavily relied on by the Court today, is found. Nor does *Auto Workers* provide support for the Court: pointing [*378] to the longstanding history of constant interpretation that when the federal statute does not speak, the state limitations period applies, it *rejected* the argument that federal uniformity required a federal limitations period by stating that "there is no justification for the drastic sort of judicial legislation that is urged upon us," *383 U.S.,* at *703.* The last of the three cases, *Board of County Comm'rs,* is [***419] also irrelevant. It involved a suit brought by the United States in its sovereign capacity, to which it is

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

clear state limitations period do not apply, *308 U.S., at 351.* In any case, the language the Court points to, *id., at 351-352*, is in the context of a discussion of the absorption of substantive rights and liabilities, not in the context of a statute of limitations at all. The two are decisively different. See *Auto Workers, 383 U.S., at 703 n. 4*; see also *id., at 701.*

The premises of the majority, then, are supported, not by a slender reed, but by no reed at all. Perhaps the Court's decision can be explained by its apparent fear that the application of the State's limitations period will result in the anomaly of the statute is running before the EEOC is entitled to bring its suit at all. *Ante,* at 369 n. 23. The Court notes, *ante*, at 368: "Unlike the typical litigant against whom a statute of limitations might appropriately run, the EEOC is required by law to refrain from commencing a civil action until it has discharged its administrative duties." If this fear is the motivating reason behind the Court's unusual action today, it rests on [**2461] a misunderstanding of the nature of the application of a State's limitations period to a federal action brought by the EEOC.

The EEOC may not bring a suit on behalf of a complainant for a violation of Title VII until 30 days after a charge is filed with the EEOC, *42 U.S.C. § 2000e-5(f)(1) (1970 ed., Supp. V)*; see *ante*, at 360. It would appear that, as a matter of federal law, the EEOC's cause of action accrues on that date, which is the date on which it first becomes entitled to [*379] sue. See, *e.g., Cope v. Anderson, 331 U.S., at 464; McAllister v. Magnolia Petroleum Co., 357 U.S. 221 (1958)*. In this case, then, the EEOC would have one year, measured from that time, in which to bring suit under Cal. Code Civ. Proc. Ann. § 340(3) (West Supp. 1977). [2] Thus, the fears expressed by the Court are not well grounded. And while it is true that Congress, in enacting Title VII, chose "[cooperation] and voluntary compliance... as the preferred means of achieving" its goals, *Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974)*, this is not, in the context of this case, a reason to ignore the state limitations period. We noted, in *Johnson v. Railway Express Agency, 421 U.S., at 465*, in response to similar arguments, that the "plaintiff... may ask the court to stay proceedings until the administrative efforts at conciliation and voluntary compliance have been completed." The EEOC in this case is given 30 days plus the one-year limitations period; the fact, then, that there is a federal policy for the EEOC to attempt to achieve its goals by voluntary compliance does not seem to me to be a sound basis for ignoring state limitations periods. That policy is not without constraints, as the statute [***420] itself acknowledges.§ 706(f)(1). [3] [*380] Given that, I am wholly unable to agree that the utilization of state statutes of limitations, which may be "as short as one year,"

*ante*, at 371, trenches so severely on the structure or policies of Title VII to warrant this departure from precedent. [4]

2    The District Court determined that this is the applicable statute of limitations.
3    The Act gives the complaining party the right to disrupt the ostensible federal policy of voluntary settlement by filing suit during the "window" period from 180 to 270 days after "the filing of the charge or the expiration of any period of reference [from a state agency]." *42 U.S.C. § 2000e-5(f)(1) (1970 ed., Supp. V)*. The reason given for this option was that "the person aggrieved should [not] have to endure lengthy delays if the agency does not act with due diligence and speed." 118 Cong. Rec. 4942 (1972); see *id*, at 7168. In light of this, it is odd to rely on the policy of "[c]ooperation and voluntary compliance" as invested with such overpowering importance as to sustain a result different from that reached in a long line of precedents prior to today. As we noted in *Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974)*, the original intent in enacting Title VII was to establish an administrative procedure whereby the EEOC "would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was *permitted* to file a lawsuit." (Emphasis added.) Whatever validity the administrative-procedure argument may have, then, is greatly weakened after the expiration of that 180-day period.
4    In both *Johnson v. Railway Express Agency, 421 U.S. 454 (1975)*, and *Electrical Workers v. Robbins & Myers, Inc., 429 U.S. 229 (1976)*, this Court rejected arguments based, in part, on contentions that Title VII plaintiffs should be treated with special deference because Title VII served to vindicate important public interests. I fear that the Court today adopts, *sub silentio,* these previously rejected "Title VII-is-different" arguments as a way of approaching a statute notable for its expanses of congressional silence.

II

In this case, Tamar Edelson filed her charge with the EEOC on December 27, 1970, when it was referred to the California Fair Employment Practices Commission in accordance with the provisions of *42 U.S.C. § 2000e-5(c)*. When that agency took no action, the charge was formally filed with the EEOC on March 9, 1971. The EEOC, [**2462] then, had one year and 30 days from that point in which to investigate and attempt to secure voluntary compliance. Since the EEOC is directed to

"make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the [formal] filing of the charge," *42 U.S.C.§ 2000e-5(b) (1970 ed., Supp. V)*, this time period of more than one year would appear ample to ensure that what the Court perceives to be federal policy, including voluntary settlement negotiations, is [*381] not unduly denigrated. [5] Yet, here, the EEOC did not file its action in the [***421] District Court until February 22, 1974, almost three years after the formal filing of the charge. Since this is clearly outside the state limitations period, I would hold the action barred, unless the EEOC is to be considered to be suing on behalf of the United States in its sovereign capacity, a matter to which I now turn.

[5]  While I agree that it is impossible to read *42 U.S.C.  § 2000e-5(f)(1) (1970 ed., Supp. V)* as a time limitation on the EEOC's right to bring suit, the existence of that limitations period on the *individual's* right to bring suit is not without significance. I can perceive of no reason, and the legislative debates suggest none, why the private party's right to sue is cut off 90 days after it is given, unless it is intended as a form of a limitations period. Yet, if Congress was concerned with a limitations period when the suit could be brought by the complaining party, it suggests that the Court is wrong in asserting that "the benchmark, for purposes of a statute of limitations" is simply the "commencement of the proceeding before the administrative body." *Ante*, at 372. It also leads me to conclude that there is no reason not to allow the normal presumption to operate in this case, by limiting the EEOC's right of action by the most analogous state limitations period. Cf. *Auto Workers v. Hoosier Cardinal Corp., 383 U.S.  696, 704 (1966)*. I see nothing which affirmatively rebuts the longstanding doctrine that "the silence of Congress has been interpreted to mean that it is federal policy to adopt the local law of limitation." *Holmberg v. Armbrecht, 327 U.S. 392, 395 (1946)*.

Insofar as the EEOC seeks to recover backpay for individuals, it stands in the shoes of the individuals, and represents them in a suit the individuals would otherwise be entitled to bring, *42 U.S.C.  § 2000e-5(f)(1) (1970 ed., Supp. V)*. Not only is the United States itself not a party to the suit, but the EEOC is vindicating a right which a private party was entitled to vindicate in his own right. Cf. *Alexander v. Gardner-Denver Co., supra, at 45*. Since the United States is not suing in its sovereign capacity, there is no reason to exempt these suits from the general application of state limitations statutes. The scope of the relevant inquiry [*382] was formed by this

Court in *United States v. Beebe, 127 U.S. 338, 344 (1888)*: S

  "The principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign Government to enforce a public right, or to assert a public interest, is established past all controversy or doubt. *United States v. Nashville &c. Railway Company, 118 U.S. 120, 125*, and cases there cited. But this case stands upon a different  footing, and presents a different question. The question is, Are these defences available to the defendant in a case where the Government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person?"I

As this has been interpreted, the decisive fact which excepts the general applicability of these statutes is that the United States is suing to enforce "*its* rights." *United States v. Summerlin, 310 U.S. 414, 416 (1940)*"/> (emphasis added); see also *United States v. Nashville, C. & St. L.R. Co., 118 U.S. 120, 125 (1886); United States v. Des Moines Navigation & R. Co., 142 U.S. 510, 538-539 (1892); United States v. Bell Telephone Co., 167 U.S. 224, 264-265 (1897)*; [**2463] *French Republic v. Saratoga Vichy Co., 191 U.S. 427, 438 (1903)*. In *Beebe* itself, the Court acknowledged that "[t]he Government is charged with the duty... to protect [the public domain] from trespass and unlawful appropriation...." *127 U.S., at 342*. See also *Moran v. Horsky, 178 U.S. 205, 213 (1900)*. Yet this "interest" was not sufficient to make it a suit by the sovereign, unbounded by a limitations period. While the Government [***422] may be interested in the vindication of the policies enunciated in Title VII, cf. *Franks v. Bowman Transportation Co., 424 U.S. 747, 778 n. 40 (1976)* -- as, [*383] presumably, it would be interested in vindicating the policies expressed in all congressional enactments - that is not the decisive fact. It is not "interest," but whether the sovereign is suing to recover in its own right. Since here the suit is to recover backpay for an individual that could have brought her own suit, it is impossible to think that the EEOC was suing in the sovereign capacity of the United States. Cf. *United States v. Beebe, supra, at 346*. Rather, it is suing as a conduit for the recovery of sums due an individual citizen rather than the public treasury. The Court does not suggest otherwise.

  The conclusion should be no different when we turn to the issue of injunctive relief. The decisive fact remains the same: The sovereign is not suing to redress "its" injury, rather it is seeking relief that the complaining individual otherwise would have been entitled to seek. While injunctive relief may appear more "broad based," it nonetheless is redress for individuals. The United

432 U.S. 355, *; 97 S. Ct. 2447, **;
53 L. Ed. 2d 402, ***; 1977 U.S. LEXIS 124

States gains nothing tangible as a result of the suit. It does, to be sure, vindicate a congressional policy by seeking to enjoin practices proscribed by Title VII, but, it bears repeating, presumably the Government vindicates some congressional policy *whenever* it sues. That, then, cannot be the test, for it would exalt form (who brings the suit) over substance (whom the suit directly benefits). For these reasons, I am unable to agree with the Ninth Circuit that because the EEOC promotes public policy by its prayer for injunctive relief, it therefore "seeks to vindicate rights belonging to the United States as sovereign," *535 F.2d 533, 537.* This reason does not adequately distinguish a prayer for injunctive relief from a prayer by the EEOC for backpay for individuals. [6]

> 6 The EEOC is only entitled to bring suit after a complaint has been filed with it. Normally, therefore, it brings suit only after a complaining individual has filed a charge with it. "Individual grievants usually initiate the Commission's investigatory and conciliatory procedures." *Alexander v. Gardner-Denver Co., 415 U.S., at 45.* While the 1972 amendments allow members of the EEOC to file charges, *42 U.S.C. § 2000e-5(b) (1970 ed., Supp. V),* this is not the normal method of initiating suit. *Alexander, supra, at 45.* Since this case does not involve the situation where the complaining individual is not the allegedly aggrieved party, I do not need to deal with the question of whether a different result would follow when the EEOC brings suit upon a complaint initiated by one of its members.

[*384] Since I believe that the EEOC's suit is barred by the running of the statute of limitations in Cal. Code Civ. Proc. Ann. § 340 (3) (West Supp. 1977), I respectfully dissent.

**REFERENCES**
*15 Am Jur 2d, Civil Rights 366, 367*

5 Am Jur Pl & Pr Forms (Rev Ed), Civil Rights, Form 65; 16 Am Jur Pl & Pr Forms (Rev Ed), Labor and Labor Relations, Forms 321 et seq.

2 Am Jur Proof of Facts 2d 187, Racial Discrimination in Employment (In General; Use of Statistics)

21 Am Jur Trials 1, Employment Discrimination Action Under Federal Civil Rights Acts

*42 USCS 2000e-5(f)(1)*

FRES, Job Discrimination 3:3, 3:11, 3:117, 3:246

US L Ed Digest, Civil Rights 12.5; Courts 901

ALR Digests, Civil Rights 1.3; Courts 380(1)

L Ed Index to Annos, Labor and Employment; Limitation of Actions

ALR Quick Index, Discrimination; Limitation of Actions

Federal Quick Index, Fair Employment Practices ;Limitation of Actions

Annotation References:

Construction and application of provisions of Title VII of Civil Rights Act of 1964 (*42 USCS 2000e et seq.*) making sex discrimination in employment unlawful. 12 ALR Fed 15.

Time requirement for civil action for violation of equal employment opportunities provisions under 706 of Civil Rights Act of 1964 (*42 USCS 2000e-5*). 4 ALR Fed 833.

What statute of limitations is applicable to a damage action under Federal Civil Rights Acts. 98 ALR2d 1160.

LEXSEE 444 US 111

**UNITED STATES v. KUBRICK**

No. 78-1014

**SUPREME COURT OF THE UNITED STATES**

*444 U.S. 111; 100 S. Ct. 352; 62 L. Ed. 2d 259; 1979 U.S. LEXIS 152*

**October 3, 1979, Argued**
**November 28, 1979, Decided**

**PRIOR HISTORY:**     CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

**DISPOSITION:**   *581 F.2d 1092*, reversed.

**DECISION:**

Claim against government, for purposes of Tort Claims Act's statute of limitations (*28 USCS 2401(b)*), held to accrue when plaintiff learns of injury's existence and cause, rather than its legal implications as well.

**SUMMARY:**

After a veteran underwent treatment at a Veterans Administration hospital for a leg infection in 1968, he experienced some loss of hearing, and, in January of 1969, was informed by a physician that it was highly possible that the hearing loss was the result of an antibiotic which had been used during his treatment. The veteran, who was already receiving disability benefits for a service-connected back injury, then filed an application with the Veterans Administration for an increase in benefits, alleging that the antibiotic treatment had caused his deafness, but in September of 1969 the Veterans Administration denied the claim on the ground that there was no causal relationship between the antibiotic treatment and the hearing loss, and that there was no evidence of negligence or any other fault on the part of the government. Upon learning from the Veterans Administration, during the course of his administrative appeal from the denial of increased benefits, that a certain doctor had suggested a connection between his hearing loss and his prior occupation as a machinist, the veteran questioned the doctor, who not only denied making the statement attributed to him, but also told the veteran that the antibiotic had caused his injury and should not have been administered. Subsequently, in August of 1972, the Veterans Administration Board of Appeals recognized that the

veteran's hearing loss might have been caused by the antibiotic, but rejected the appeal on the ground that the treatment was in accord with acceptable medical practice and procedures. Thereafter, the veteran brought suit against the government under the Federal Tort Claims Act (*28 USCS 2674*) in the United States District Court for the Eastern District of Pennsylvania. The District Court rendered judgment for the veteran (*435 F Supp 166*), rejecting, among other defenses, the assertion by the United States that the veteran's claim was barred by the two-year statute of limitations applicable to claims under the Tort Claims Act (*28 USCS 2401(b)*), which bars any tort claim against the government unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues," the government's argument having been that the veteran's claim had accrued in January of 1969, when he learned that his hearing loss had probably resulted from the antibiotic. The United States Court of Appeals for the Third Circuit affirmed on appeal, but remanded for resolution of a set-off claimed by the United States (*581 F2d 1092*).

On certiorari, the United States Supreme Court reversed. In an opinion by White, J., joined by Burger, Ch. J., and Stewart, Blackmun, Powell, and Rehnquist, JJ., it was held that for purposes of the Tort Claims Act's statute of limitations, a claim "accrues" within the meaning of the Act when a plaintiff knows both the existence and the cause of his injury, rather than at the time he learns that acts inflicting the injury might constitute medical malpractice, and that although the veteran had exercised reasonable diligence in ascertaining the cause of his injury, his claim was barred under such statute of limitations since he had waited until more than two years after learning of his injury's cause to ascertain that he had been legally wronged and to bring his action.

Stevens, J., joined by Brennan and Marshall, JJ., dissented on the ground that the appropriate rule for judging the veteran's claim in terms of the statute of limitations was that the statute of limitations does not begin to run

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

until after fair notice of the invasion of the plaintiff's legal rights, that under such rule it was not necessary to distinguish between a plaintiff's knowledge of the cause of his injury on the one hand, and his knowledge of a doctor's failure to meet acceptable medical standards on the other, and that under the circumstances of the case at bar, the veteran, having been reasonably diligent in presenting his claim against the government, was not barred from asserting his claim because of the statute of limitations.

## LAWYERS' EDITION HEADNOTES:

[***LEdHN1]

ACTIONS §153

Federal Tort Claims Act -- accrual of claim -- injury -- knowledge of existence and cause -- knowledge of malpractice --

Headnote:[1A][1B][1C]

Under 2401(b) of the Federal Tort Claims Act (28 USCS 2401(b)), barring any tort claim against the United States unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues," a claim "accrues" when a plaintiff knows both the existence and the cause of his injury, and not at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice; thus, a plaintiff who is reasonably diligent in ascertaining the cause of his injury is barred by the two-year statute of limitations of the Act when he waits until more than two years thereafter to ascertain that he has been legally wronged and to bring his action. (Stevens, Brennan, and Marshall, JJ., dissented from this holding.)

[***LEdHN2]

ACTIONS §2

general nature --

Headnote:[2]

Statutes of limitation, which are found and approved in all systems of enlightened jurisprudence, represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time, and that the right to be free from stale claims in time comes to prevail over the right to prosecute them.

[***LEdHN3]

ACTIONS §3

statutes of repose --

Headnote:[3]

Statutes of limitation are statutes of repose, and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

[***LEdHN4]

ACTIONS §6

Federal Tort Claims Act -- construction by Supreme Court --

Headnote:[4]

In construing the limitations provision of the Federal Tort Claims Act (28 USCS 2401(b)), barring any tort claim against the United States unless it is presented in writing to the appropriate federal agency within two years after such claim accrues, the United States Supreme Court is not free to construe the provision so as to defeat its obvious purpose of encouraging the prompt presentation of tort claims against the government, but the court will regard the plea of limitations as a meritorious defense, in itself serving a public interest, and will neither extend nor narrow the waiver of immunity of the United States which Congress intended in the Act.

[***LEdHN5]

ERROR §1473

claim against government -- malpractice of physician -- trial court's findings -- standard of care --

Headnote:[5]

On certiorari to review the decision of the Federal Court of Appeals affirming the decision of a Federal District Court awarding damages to a plaintiff in an action under the Federal Tort Claims Act (28 USCS 2674) arising from the plaintiff's treatment in a Veterans Administration hospital, the United States Supreme Court must credit the finding of the trial court, which the United States did not appeal, that the physician treating the plaintiff at the hospital had failed to observe the standard of care governing doctors of his specialty in the geographic area of the hospital, and that reasonably competent doctors in such branch of medicine would have known that the plaintiff should not have been treated with the drug which allegedly had caused his injury.

[***LEdHN6]

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

ACTIONS §6

construction -- approach by courts --

Headnote:[6]

Courts should give effect to statutes of limitation in accordance with what courts can ascertain the legislative intent to have been.

[***LEdHN7]

COURTS §153

statute of limitations -- Federal Tort Claims Act -- Supreme Court interpretation -- prerogative of Congress --

Headnote:[7]

If the United States Supreme Court misconceives the intent of Congress in determining when a claim "accrues" within the meaning of the statute of limitations of the Federal Tort Claims Act (28 USCS 2401(b)), barring any tort claim against the United States unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues," or even if the Supreme Court has not misconceived Congress' intent but Congress desires a different result, Congress may exercise its prerogative to amend the statute so as to effect its legislative will.

**SYLLABUS**

A provision of the Federal Tort Claims Act (FTCA), 28 U. S. C. § 2401 (b), bars any tort claim against the United States unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues." In 1968, several weeks after having an infected leg treated with neomycin (an antibiotic) at a Veterans' Administration (VA) hospital, respondent suffered a hearing loss, and in January 1969 was informed by a private physician that it was highly possible that the hearing loss was the result of the neomycin treatment. Subsequently, in the course of respondent's unsuccessful administrative appeal from the VA's denial of his claim for certain veterans' benefits based on the allegation that the neomycin treatment had caused his deafness, another private physician in June 1971 told respondent that the neomycin had caused his injury and should not have been administered. In 1972, respondent filed suit under the FTCA, alleging that he had been injured by negligent treatment at the VA hospital. The District Court rendered judgment for respondent, rejecting the Government's defense that respondent's claim was barred by the 2-year statute of limitations because it had accrued in January 1969, when respondent first learned that his hearing loss had probably resulted from the neomycin, and holding that respondent had no reason to suspect

negligence until his conversation with the second physician in June 1971, less than two years before the action was commenced. The Court of Appeals affirmed, holding that if a medical malpractice claim does not accrue until a plaintiff is aware of his injury and its cause, neither should it accrue until he knows or should suspect that the doctor who caused the injury was legally blameworthy, and that here the limitations period was not triggered until the second physician indicated in June 1971 that the neomycin treatment had been improper.

*Held:* A claim accrues within the meaning of § 2401 (b) when the plaintiff knows both the existence and the cause of his injury, and not at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice. Hence, respondent's claim accrued in January 1969 when he was aware of his injury and its probable cause, and thus was barred by the 2-year statute of limitations. Pp. 117-125.

(a) Section 2401 (b) is the balance struck by Congress in the context of tort claims against the Government, and should not be construed so as to defeat its purpose of encouraging the prompt presentation of claims. Moreover, § 2401 (b), being a condition of the FTCA's waiver of the United States' immunity from suit, should not be construed to extend such waiver beyond that which Congress intended. Pp. 117-118.

(b) There is nothing in the FTCA's language or legislative history that provides a substantial basis for the Court of Appeals' construction of § 2401 (b). Nor did the prevailing case law at the time the FTCA was passed lend support to the notion that tort claims in general or malpractice claims in particular do not accrue until a plaintiff learns that his injury was negligently inflicted. Pp. 119-120.

(c) For statute of limitations purposes, a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should not receive equal treatment. P. 122.

(d) A plaintiff such as respondent, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community, and to excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute. Whether or not he is competently advised, or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort plaintiffs must make. Pp. 123-124.

**COUNSEL:** Elinor Hadley Stillman argued the cause for the United States. With her on the brief were Solicitor General McCree, Assistant Attorney General Babcock,

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

Deputy Solicitor General Easterbrook, and William Kanter.

Benjamin Kuby argued the cause for respondent. With him on the brief were Paul N. Minkoff and Joan Saltzman.

**JUDGES:** WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, post, p. 125.

**OPINION BY:** WHITE

**OPINION**

[*113] [***263] [**354] Mr. JUSTICE WHITE delivered the opinion of the Court.

[***LEdHR1A]    [1A]Under the Federal Tort [***264] Claims Act (Act), [1] *28 U. S. C. § 2401 (b)*, a tort claim [**355] against the United States is barred unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues." The issue in this case is whether the claim "accrues" within the meaning of the Act when the plaintiff knows both the existence and the cause of his injury or at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice.

1 Title *28 U. S. C. § 2674* provides in part:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

Title *28 U. S. C. § 1346 (b)* provides that the district courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Title *28 U. S. C. § 2401 (b)*, the limitations provision applicable to tort claims against the United States, provides:

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."

I

Respondent Kubrick, a veteran, was admitted to the Veterans' Administration (VA) hospital in Wilkes-Barre, Pa., in April 1968, for treatment of an infection of the right femur. Following surgery, the infected area was irrigated with neomycin, an antibiotic, until the infection cleared. Approximately six weeks after discharge, Kubrick noticed [*114] a ringing sensation in his ears and some loss of hearing. An ear specialist in Scranton, Pa., Dr. Soma, diagnosed the condition as bilateral nerve deafness. His diagnosis was confirmed by other specialists. One of them, Dr. Sataloff, secured Kubrick's VA hospital records and in January 1969, informed Kubrick that it was highly possible that the hearing loss was the result of the neomycin treatment administered at the hospital. Kubrick, who was already receiving disability benefits for a service-connected back injury, filed an application for an increase in benefits pursuant to *38 U. S. C. § 351*, [2] alleging that the neomycin treatment had caused his deafness. The VA denied the claim in September 1969, and on resubmission again denied the claim, on the grounds that no causal relationship existed between the neomycin treatment and the hearing loss and that there was no evidence of "carelessness, accident, negligence, lack of proper skill, error in judgment or other fault on the part of the Government."

2 Title *38 U. S. C. § 351* provides that a veteran who suffers "an injury, or an aggravation of an injury, as the result of hospitalization, medical or surgical treatment" administered by the VA shall be awarded disability benefits "in the same manner as if such disability . . . were service-connected." The regulations require the applicant for benefits to show that "the disability proximately resulted through carelessness, accident, negligence, lack of proper skill, error in judgment, or similar instances of indicated fault on the part of the Veterans Administration." *38 CFR § 3.358 (c)(3) (1978)*.

In [***265] the course of pursuing his administrative appeal, Kubrick was informed by the VA that Dr. Soma had suggested a connection between Kubrick's loss of hearing and his prior occupation as a machinist. When questioned by Kubrick on June 2, 1971, Dr. Soma not only denied making the statement attributed to him

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

but also told respondent that the neomycin had caused his injury and should not have been administered. On Dr. Sataloff's advice, respondent then consulted an attorney and employed him to help with his appeal. In rendering its decision in August 1972, the VA Board of [*115] Appeals recognized that Kubrick's hearing loss "may have been caused by the neomycin irrigation" but rejected the appeal on the ground that the treatment was in accordance with acceptable medical practices and procedures and that the Government was therefore faultless. [3]

3  In 1975, upon reconsideration of its decision, the VA Board of Appeals not only found, as it had before, that Kubrick's hearing loss may have been caused by neomycin irrigation but also concluded that there was fault on the part of the VA in administering that drug by irrigation. In the present litigation, the Government contested the allegation of malpractice despite the administrative finding of fault.

[**356] Kubrick then filed suit under the Act, alleging that he had been injured by negligent treatment in the VA hospital. [4] After trial, the District Court rendered judgment for Kubrick, rejecting, among other defenses, the assertion by the United States that Kubrick's claim was barred by the 2-year statute of limitations because the claim had accrued in January 1969, when he learned from Dr. Sataloff that his hearing loss had probably resulted from the neomycin. The District Court conceded that the lower federal courts had held with considerable uniformity that a claim accrues within the meaning of the Act when "the claimant has discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." *435 F.Supp. 166, 180 (ED Pa. 1977)*, and that notice of the injury and its cause normally were sufficient to trigger the limitations period. [*116] *Id., at 184*. As the District Court read the authorities, however, a plaintiff could avoid the usual rule by showing that he had exercised reasonable diligence and had no "reasonable suspicion" that there was negligence in his treatment. *Id., at 185*. "[We] do not believe it reasonable to start the statute running until the plaintiff had reason at least to suspect that a legal duty to him had been breached." *Ibid*. Here, the District Court found, Kubrick had no reason to suspect negligence until his conversation with Dr. Soma in June 1971, less than two years prior to presentation of his tort claim.

4  Title *28 U. S. C. § 2675 (a)* in pertinent part provides:

"An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful

act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal Agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."

Kubrick did not file an administrative claim until after he filed his action in the District Court. This possible objection to his suit the District Court found moot when the VA denied the administrative claim on April 13, 1973. The United States did not pursue the issue on appeal.

[***266]  The District Court went on to hold, based on the expert testimony before it, that a reasonably competent orthopedic surgeon in the Wilkes-Barre community, which the VA doctor held himself out to be, should have known that irrigating Kubrick's wound with neomycin would cause deafness. It was therefore negligent to use that drug in that manner. Damages were determined and awarded.

Except for remanding to resolve a setoff claimed by the United States, [5] the Court of Appeals for the Third Circuit affirmed. *581 F.2d 1092 (1978)*. It ruled that even though a plaintiff is aware of his injury and of the defendant's responsibility for it, the statute of limitations does not run where the plaintiff shows that "in the exercise of due diligence he did not know, nor should he have known, facts which would have alerted a reasonable person to the possibility that the treatment was improper." *Id., at 1097*. We granted certiorari to resolve this important question of the administration [*117] of the statute, *440 U.S. 906 (1979)*, and we now reverse.

5  The VA Board of Appeals' reconsideration of Kubrick's case in 1975 entitled him to an increase in his disability rating as a result of the use of neomycin. By the time of the Court of Appeals' decision, respondent had received over $ 50,000 in augmented disability benefits. Under 38 U. S. C. § 351, the benefits payments must be set off against the damages awarded in tort; and the increment in future monthly benefits is not paid until the future amount of the benefits withheld equals the damages awarded.

II

[***LEdHR2]  [2] [***LEdHR3] [3]Statutes of limitations, which "are found and approved in all systems of enlightened jurisprudence," *Wood v. Carpenter, 101 U.S. 135, 139 (1879)*, represent a pervasive legislative judgment that it is unjust to fail to put the adversary [**357] on notice to defend within a specified period of time and

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Railroad Telegraphers* v. *Railway Express Agency, 321 U.S. 342, 349 (1944).* These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise. *United States v. Marion, 404 U.S. 307, 322, n. 14 (1971); Burnett v. New York Central R. Co., 380 U.S. 424, 428 (1965); Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314 (1945); Missouri, K. & T. R. Co. v. Harriman, 227 U.S. 657, 672 (1913); Bell v. Morrison,* 1 Pet. 351, 360 (1828).

[***LEdHR4] [4]*Section 2401 (b),* the limitations provision involved here, is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe it so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims. *Campbell v. Haverhill, 155 U.S. 610, 617 (1895);* [***267] *Bell* v. *Morrison, supra,* at 360. We should regard the plea of limitations as a "meritorious defense, in itself serving a public interest." *Guaranty Trust Co. v. United States, 304 U.S. 126, 136 (1938).*

We should also have in mind that the Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we [*118] should not take it upon ourselves to extend the waiver beyond that which Congress intended. See *Soriano v. United States, 352 U.S. 270, 276 (1957);* cf. *Indian Towing Co. v. United States, 350 U.S. 61, 68-69 (1955).* Neither, however, should we assume the authority to narrow the waiver that Congress intended. *Indian Towing Co. v. United States, supra.*

It is in the light of these considerations that we review the judgment of the Court of Appeals.

III

It is undisputed in this case that in January 1969 Kubrick was aware of his injury and its probable cause. Despite this factual predicate for a claim against the VA at that time, the Court of Appeals held that Kubrick's claim had not yet accrued and did not accrue until he knew or could reasonably be expected to know that in the eyes of the law, the neomycin treatment constituted medical malpractice. The Court of Appeals thought that in "most" cases knowledge of the causal connection between treatment and injury, without more, will or should alert a reasonable person that there has been an actionable wrong. *581 F.2d, at 1096.* But it is apparent, particularly in light of the facts in this record, that the Court

of Appeals' rule would reach any case where an untutored plaintiff, without benefit of medical or legal advice and because of the "technical complexity" of the case, *id., at 1097,* would not himself suspect that his doctors had negligently treated him. As we understand the Court of Appeals, the plaintiff in such cases need not initiate a prompt inquiry and would be free to sue at any time within two years from the time he receives or perhaps forms for himself a reasonable opinion that he has been wronged. In this case, for example, Kubrick would have been free to sue if Dr. Soma had not told him until 1975, or even 1980, instead of 1971, that the neomycin treatment had been a negligent act.

[*119] There is nothing in the language or the legislative history of the Act that provides a substantial basis for the Court of Appeals' construction of the accrual language of [**358] *§ 2401 (b).* [6] [***268] Nor did the prevailing case law at the time the Act was passed lend support for the notion that tort claims in general or malpractice [*120] claims in particular do not accrue until a plaintiff learns that his injury was negligently inflicted. Indeed, the Court of Appeals recognized that the general rule under the Act has been that a tort claim accrues at the time of the plaintiff's injury, although it thought that in medical malpractice cases the rule had come to be that the 2-year period did not begin to run until the plaintiff has discovered both his injury and its cause. [7] But even so -- and the [**359] United States was prepared [*121] to [***269] concede as much for present purposes -- the latter rule would not save Kubrick's action since he was aware of these essential facts in January 1969. Reasoning, however, that if a claim does not accrue until a plaintiff is aware of his injury and its cause, neither should it accrue until he knows or should suspect that the doctor who caused his injury was legally blameworthy, the Court of Appeals went on to hold that the limitations period was not triggered until Dr. Soma indicated in June 1971 that the neomycin irrigation treatment had been improper. [8]

6 Respondent concedes as much with respect to the legislative history. The Act was enacted as part of the Legislative Reorganization Act of 1946. 60 Stat. 842. The Senate Report on the bill, S. Rep. No. 1400, 79th Cong., 2d Sess., 33 (1946), merely states that the limitations period is one year but does not mention when a claim accrues. In 1949, the limitations period was extended to two years, Ch. 92, 63 Stat. 62, but the issue of accrual was not further addressed. H. R. Rep. No. 276, 81st Cong., 1st Sess., 1 (1949), notes that the limitations period would enlarge the period for filing to two years from "the date of accrual" but does not explain how to determine the date of accrual. Indeed, to the extent that the

Report touches the issue at all, the Report seems almost to indicate that the time of accrual is the time of injury. Thus, the Report states as the reason for the amendment, in addition to bringing the Act more in line with limitations periods for state tort actions and other federal statutes:

"The 1-year existing period is unfair to some claimants who suffered injuries which did not fully develop until after the expiration of the period for making claim. Moreover, the wide area of operations of the Federal agencies, particularly the armed-service agencies, would increase the possibility that notice of the wrongful death of a deceased to his next of kin would be so long delayed in going through channels of communication that the notice would arrive at a time when the running of the statute had already barred the institution of a claim or suit." *Id.,* at 3-4.

The Act was further amended in 1966, 80 Stat. 307, to require that every claim under the Act be presented in writing to the appropriate agency as a prerequisite to suit. The Act originally required presentation to the agency only if the claim was for $ 1,000 or less, 60 Stat. 845. An amendment in 1959 raised the amount to $ 2,500, Pub. L. 86-238, 73 Stat. 472. Prior to 1966, the limitations period was keyed to the filing of suit; the 1966 amendment made the time of filing the administrative claim the critical date for limitations purposes. But although the Reports indicate these changes with precision, they do not further explicate when a tort claim "accrues" within the meaning of *28 U. S. C. § 2401 (b).* S. Rep. No. 1327, 89th Cong., 2d Sess., 1, 5 (1966); H. R. Rep. No. 1532, 89th Cong., 2d Sess., 3, 8 (1966).

7   In *Urie v. Thompson, 337 U.S. 163 (1949),* the Court held that a claim under the Federal Employers' Liability Act did not accrue until the plaintiff's injury manifested itself. In that case, plaintiff Urie contracted silicosis from his work as a fireman on a steam locomotive. His condition was diagnosed only in the weeks after he became too ill to work. The Court was reluctant to charge Urie with the "unknown and inherently unknowable" and held that because of his "blameless ignorance" of the fact of his injury, his claim did not accrue under the Federal Employers' Liability Act until his disease manifested itself. *337 U.S.,* at 169-170. *Quinton v. United States, 304 F.2d 234 (CA5 1962),* applied the *Urie* approach to medical malpractice claims under the Federal Torts Claims Act. Other Circuits have followed suit. *Hungerford v. United States,*

*307 F.2d 99 (CA9 1962); Toal v. United States, 438 F.2d 222 (CA2 1971); Tyminski v. United States, 481 F.2d 257 (CA3 1973); Portis v. United States, 483 F.2d 670 (CA4 1973); Reilly v. United States, 513 F.2d 147 (CA8 1975); Casias v. United States, 532 F.2d 1339 (CA10 1976).*

*Restatement (Second) of Torts § 899, Comment e,* pp. 444-445 (1979), reflects these developments:

"One group of cases in which there has been extensive departure from the earlier rule that the statute of limitations runs although the plaintiff has no knowledge of the injury has involved actions for medical malpractice. Two reasons can be suggested as to why there has been a change in the rule in many jurisdictions in this area. One is the fact that in most instances the statutory period within which the action must be initiated is short -- one year, or at most two, being the common time limit. This is for the purpose of protecting physicians against unjustified claims; but since many of the consequences of medical malpractice often do not become known or apparent for a period longer than that of the statute, the injured plaintiff is left without a remedy. The second reason is that the nature of the tort itself and the character of the injury will frequently prevent knowledge of what is wrong, so that the plaintiff is forced to rely upon what he is told by the physician or surgeon.

"There are still courts that proceed to apply the rule that the action is barred by the statute even though there has been no knowledge that it could be brought. . . .

"In a wave of recent decisions these various devices have been replaced by decisions meeting the issue directly and holding that the statute must be construed as not intended to start to run until the plaintiff has in fact discovered the fact that he has suffered injury or by the exercise of reasonable diligence should have discovered it. There have also been a number of instances in which a similar rule has been applied to other professional malpractice, such as that of attorneys or accountants and the rule may thus become a general one."

8   The Court of Appeals relied on three federal cases, all decided within the past five years, that held or indicated in dictum that a malpractice plaintiff under the federal Act must know the legal implications of the facts, as well as the facts themselves, before the limitations period will begin to run. *Exnicious v. United States, 563 F.2d*

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

*418, 420, 424 (CA10 1977); Bridgford v. United States, 550 F.2d 978, 981-982 (CA4 1977); Jordan v. United States, 503 F.2d 620 (CA6 1974).* Since the holding below, another Circuit has endorsed these views. *De Witt v. United States, 593 F.2d 276 (CA7 1979).*

The dissent, like the respondent, relies on *Urie* and *Quinton*, but neither case controls this one. Both dealt with the discovery of the factual predicate for a malpractice claim, but neither addressed the question of plaintiff's awareness of negligence on defendant's part. Contrary to the implications of the dissent, the prevailing rule under the Act has not been to postpone the running of the limitations period in malpractice cases until the plaintiff is aware that he has been legally wronged. Holdings such as the one before us now are departures from the general rule and, as indicated above, are of quite recent vintage.

[*122] We disagree. We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

[***LEdHR5] [5] In this case, the trial court found, and the United States did not appeal its finding, that the treating physician at the VA hospital had failed to observe the standard of care governing doctors of his specialty in Wilkes-Barre, Pa., and that reasonably competent doctors in this branch of medicine would have known that Kubrick should not have been treated with neomycin. [9] Crediting [***270] [**360] this finding, as we must, Kubrick [*123] need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action. The difficulty is that it does not appear that Kubrick ever made any inquiry, although meanwhile he had consulted several specialists about his loss of hearing and had been in possession of all the facts about the cause of his injury since January 1969. Furthermore, there is no reason to doubt that Dr. Soma, who in 1971 volunteered his opinion that Kubrick's treatment

had been improper, would have had the same opinion had the plaintiff sought his judgment in 1969.

9 The trial court found:

"We credit the testimony of plaintiff's experts that the medical literature as of April 1968 contained sufficient and sufficiently widespread information as to the ototoxicity and absorption properties of neomycin to have warned [the treating physician] of the dangerousness and hence the impropriety of his treatment." *435 F.Supp. 166, 177 (ED Pa. 1977)* (footnote omitted).

It further concluded:

"Those findings tell us that [the physician's] lack of knowledge, and his concomitant treatment, violated the national standard for specialists because of the generalized knowledge in the national community of orthopedic specialists of the hazards of neomycin and of its potentiality for absorption in circumstances such as those created by [the physician's] use of neomycin in 1% irrigating solution through a closed hemovac system (at least in such high and lengthy dosage). However, even if a similar locality standard were to be applied, our findings of fact support the conclusion that the information in question was available to or known by the average specialist in Wilkes-Barre to the same or similar extent as the average specialist in Philadelphia. . . .

"Finally, we conclude that what was involved was not mere error in judgment but a lack of skill or knowledge as measured, of course, by the level of medical knowledge in April, 1968." *Id., at 188-189.*

[***LEdHR1B] [1B] We thus cannot hold that Congress intended that "accrual" of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government. [10] If there exists in the community a generally applicable standard of care with respect to the treatment of his ailment, we see no [*124] reason to suppose that competent advice would not be available to the plaintiff as to whether his treatment conformed to that standard. If advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim. Of course, he may be incompetently advised

or the medical community may be divided on the crucial issue of negligence, as the experts proved to be on the trial of this case. But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make. If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the [***271] plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury.

[***LEdHR1C] [1C]

10  As the dissent suggests, *post*, at 128, we are thus in partial disagreement with the conclusion of the lower courts that Kubrick exercised all reasonable diligence. Although he diligently ascertained the cause of his injury, he sought no advice within two years thereafter as to whether he had been legally wronged. The dissent would excuse the omission. For statute of limitations purposes, we would not.

The District Court, *435 F.Supp., at 185*, and apparently the Court of Appeals, thought its ruling justified because of the "technical complexity," *581 F.2d. at 1097*, of the negligence question in this case. But determining negligence or not is often complicated and hotly disputed, so much so that judge or jury must decide the issue after listening to a barrage of conflicting expert testimony. And if in this complicated malpractice case, the statute is not to run until the plaintiff is led to suspect negligence, it would be difficult indeed not to apply the same accrual rule to medical and health claims arising under other statutes and to a whole range of other negligence cases arising under the Act and other federal statutes, where the legal implications or complicated facts make it unreasonable to expect the injured plaintiff, who does not seek legal or other appropriate advice, to realize that his legal rights may have been invaded.

[*125]  We also have difficulty ascertaining the precise standard proposed by the District Court and the Court of Appeals. On the one hand, the Court of Appeals seemed to hold that a Torts Claims Act malpractice claim would not accrue until the plaintiff knew or could reasonably be expected to [**361] know of the Government's breach of duty. *Ibid*. On the other hand, it seemed to hold that the claim would accrue only when the plaintiff had reason to suspect or was aware of facts that would have alerted a reasonable person to the possibility that a legal duty to him had been breached. *Ibid*. In any event, either of these standards would go far to

eliminate the statute of limitations as a defense separate from the denial of breach of duty.

IV

[***LEdHR6] [6] [***LEdHR7] [7]It goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable. We should give them effect in accordance with what we can ascertain the legislative intent to have been. We doubt that here we have misconceived the intent of Congress when *§ 2401 (b)* was first adopted or when it was amended to extend the limitations period to two years. But if we have, or even if we have not but Congress desires a different result, it may exercise its prerogative to amend the statute so as to effect its legislative will.

The judgment of the Court of Appeals is

*Reversed*.

**DISSENT BY:** STEVENS

**DISSENT**

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Normally a tort claim accrues at the time of the plaintiff's injury. In most cases that event provides adequate notice to the plaintiff of the possibility that his legal rights have been invaded. It is well settled, however, [***272] that the normal rule does [*126] not apply to medical malpractice claims under the Federal Tort Claims Act. The reason for this exception is essentially the same as the reason for the general rule itself. The victim of medical malpractice frequently has no reason to believe that his legal rights have been invaded simply because some misfortune has followed medical treatment. Sometimes he may not even be aware of the actual injury until years have passed; at other times, he may recognize the harm but not know its cause; or, as in this case, he may have knowledge of the injury and its cause, but have no reason to suspect that a physician has been guilty of any malpractice. In such cases -- until today -- the rule that has been applied in the federal courts is that the statute of limitations does not begin to run until after fair notice of the invasion of the plaintiff's legal rights.

Essentially, there are two possible approaches to construction of the word "accrues" in statutes of limitations: (1) a claim might be deemed to "accrue" at the moment of injury without regard to the potentially harsh consequence of barring a meritorious claim before the plaintiff has a reasonable chance to assert his legal rights,

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

or (2) it might "accrue" when a diligent plaintiff has knowledge of facts sufficient to put him on notice of an invasion of his legal rights. The benefits that flow from certainty in the administration of our affairs favor the former approach in most commercial situations. [1] But in medical malpractice cases the harsh consequences of that approach have generally been considered unacceptable. [2] In all events, this Court adopted the latter approach over 30 years ago when it endorsed the principle that "blameless ignorance" should not cause the loss of a valid claim for [*127] medical injuries. Writing for the Court, Mr. Justice Rutledge expressed the point simply:

"We do not think the humane legislative plan [Federal Employers' Liability Act] intended such consequences to attach to blameless ignorance. Nor do we [**362] think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights." *Urie v. Thompson, 337 U.S. 163, 170.*

This rule has been consistently applied by the Courts of Appeals in the intervening decades without any suggestion of complaint from Congress.

    1    See *Gates Rubber Co.* v. *USM Corp.,* 508 F.2d 603, 611 (CA7 1975).
    2    One should note not only the cases cited by the Court in its footnote 7, *ante,* at 120, but also the reference to "a wave of recent decisions" in the quotation from the Restatement (Second) of Torts in that footnote.

In my judgment, a fair application of this rule forecloses the Court's attempt to distinguish between a plaintiff's knowledge of the cause of his injury on the one hand and his knowledge of the doctor's failure to meet acceptable medical standards on the other. For in both situations the typical plaintiff will, and normally should, rely on his doctor's [***273] explanation of the situation. [3]

    3    In its discussion of the reasons why most jurisdictions have adopted a special rule for medical malpractice cases, the Restatement (Second) of Torts notes "that the nature of the tort itself and the character of the injury will frequently prevent knowledge of what is wrong, so that the plaintiff is forced to rely upon what he is told by the physician or surgeon." *Restatement (Second) of Torts § 899, Comment e,* p. 444 (1979).

The *Urie* rule would not, of course, prevent the statute from commencing to run if the plaintiff's knowledge of an injury, or its cause, would place a reasonably dili-

gent person on notice that a doctor had been guilty of misconduct. But if he neither suspects, nor has any reason to suspect, malpractice, I see no reason to treat his claim differently than if he were not aware of the cause of the harm or, indeed, of the harm itself. In this case the District Court expressly found that "plaintiff's belief that there was no malpractice was reasonable in view of the technical complexity of the question [*128] whether his neomycin treatment involved excessive risks, the failure of any of his doctors to suggest prior to June 1971 the possibility of negligence, and the repeated unequivocal assertions by the Veterans Administration that there was no negligence on the part of the government." *435 F.Supp. 166, 174.*

The Court is certainly correct in stating that one purpose of the statute of limitations is to require the "reasonably diligent presentation of tort claims against the Government." *Ante,* at 123. A plaintiff who remains ignorant through lack of diligence cannot be characterized as "blameless." But unless the Court is prepared to reverse the Court of Appeals' judgment that the District Court's findings were adequately supported by the evidence, the principle of requiring diligence does not justify the result the Court reaches today. The District Court found that "plaintiff exercised all kinds of reasonable diligence in attempting to establish a medical basis for increased disability benefits." *435 F.Supp., at 185.* That diligence produced not only the Government's denials, but, worse, what may have been a fabrication. It was only after the Government told plaintiff that Dr. Soma had suggested that plaintiff's occupation as a machinist had caused his deafness that plaintiff, by confronting Dr. Soma, first became aware that neomycin irrigation may not have been an acceptable medical practice. Plaintiff was unquestionably diligent; moreover, his diligence ultimately bore fruit. There is no basis for assuming, as this Court holds, that plaintiff could have been more diligent and discovered his cause of action sooner.

The issue of diligence in a negligence case should be resolved by the factfinder -- not by the Supreme Court of the United States -- and its resolution should depend on the evidence in the record, rather than on speculation about what might constitute diligence in various other circumstances. [1] [*129] [**363] Since a large number [***274] of circuit judges have reached the same conclusion, and since I find nothing in the Court's opinion that lessens my respect for their collective wisdom, I would simply affirm the unanimous holding of the Court of Appeals for the Third Circuit affirming the judgment of the District Court which merely applied well-settled law to the somewhat unusual facts of this case. [5]

    4    The factual predicate for the Court's speculation is its assumption that if a patient who has

444 U.S. 111, *; 100 S. Ct. 352, **;
62 L. Ed. 2d 259, ***; 1979 U.S. LEXIS 152

been mistreated by one doctor should ask another if the first "failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff." *Ante*, at 122. I am not at all sure about those odds. See W. Prosser, Law of Torts 164 (4th ed. 1971); Markus, Conspiracy of Silence, 14 Clev.-Mar. L. Rev. 520 (1965); Seidelson, Medical Malpractice Cases and the Reluctant Expert, 16 Cath. U. L. Rev. 158 (1966). But whatever the odds are generally, I would prefer to have the issue of the diligence in exploring the reason for the unfortunate condition of this deaf plaintiff decided on the basis of evidence relevant to his particular injury.

5  Not only do I dissent from the Court's result, but I also believe the decision to grant certiorari was ill-advised. The Court notes, *ante*, at 125, that Congress may change the rule announced today. I would add that Congress possesses certain options we do not have, such as creating a bifurcated statute, to temper the interest in repose when it threatens to cause an unfair result. See *Gates Rubber Co.* v. *USM Corp., 508 F.2d, at 611-612.* But Congress possessed the same options before this decision as well as after it. There was nothing to prevent the Executive from notifying Congress that the omission of any statutory definition of the word "accrues" has created problems that need legislative attention. Reversal of a just judgment is an unnecessarily high price to pay in order to provide Congress with that notice.

**REFERENCES**

*35 Am Jur 2d, Federal Tort Claims Act 126*

15 Federal Procedural Forms L Ed, Statutes of Limitation, and Other Time Limits 61:75

11 Am Jur Pl & Pr Forms (Rev), Federal Tort Claims Act, Form 17, 18

8 Am Jur Legal Forms 2d, Federal Tort Claims Act 113.16

8 Am Jur Trials 635, Federal Tort Claims Act Proceedings

*28 USCS 2401*

US L Ed Digest, Limitation of Actions 153

L Ed Index to Annos, Claims Against Government; Limitation of Actions

ALR Quick Index, Federal Tort Claims Act

Federal Quick Index, Limitation of Actions

Annotation References:

Statute of limitations under **Federal Tort Claims Act** (*28 USCS 2401(b)*). 29 ALR Fed 482.

124VM2

********** Print Completed **********

Time of Request: Thursday, May 08, 2008  17:27:14 EST

Print Number:    1861:91702110
Number of Lines: 585
Number of Pages:

Send To:  STERN, SHARON
          TROUTMAN SANDERS LLP
          405 LEXINGTON AVE
          NEW YORK, NY 10174-0002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

NOLITA CARIDAD LORQUET,                  :        08 CIV 2787 (DLC)

                        Plaintiff,       :        **AFFIDAVIT OF SERVICE**

LOEHMANN'S DEPARTMENT STORE              :

                        Defendant.       :
-----------------------------------------------------------X

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

I, LAURIE RODRIGUEZ, a legal secretary employed by Troutman Sanders LLP, being duly sworn, state:

I am not a party to the within action; I am over eighteen (18) years of age; and I reside in Hazlet Township, New Jersey.

On May 8, 2008, I served a copy of an **Appendix of Cases Cited in Defendant Loehmann's Inc. Memorandum of Law in In Support of Motion to Dismiss Complaint**, by depositing a true copy of the same, enclosed in a postage paid wrapper, via regular mail, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, and by depositing a true copy of same enclosed in a wrapper, via overnight mail under the exclusive care and custody of the FedEx, addressed to the following person at the last known address set forth below:

To:   Ms. Nolita Caridad Lorquet
      1281 Eastern Parkway, #5C
      Brooklyn, New York  11213

Laurie Rodriguez

Sworn to before me this
8th day of May, 2008

CHRISTINA M. WEST -ROSSO
Notary Public, State of New York
No. 01WE6133842
Qualified in Suffolk County
Commission Expires Sept. 19, 2007